Lauren M. Rule (OSB #015174)
Elizabeth H. Zultoski (OSB #105482)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Ste. 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org
ezultoski@advocateswest.org

Attorneys for Plaintiffs


# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# EUGENE DIVISION


| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, | **Case No.** 15-2358 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **U.S. BUREAU OF RECLAMATION** | |
| Defendant, | |

## INTRODUCTION

1.        Plaintiff Center for Biological Diversity challenges the U.S. Bureau of

Reclamation's continuing operation and maintenance of Crane Prairie Dam and Reservoir and

Wickiup Dam and Reservoir for violating the Endangered Species Act ("ESA") due to impacts

on Oregon spotted frog populations in the Upper Deschutes Basin of central Oregon.  Oregon

spotted frog is a threatened species under the ESA, and changes to normal water flows caused by

operation of Crane Prairie and Wickiup dams impairs Oregon spotted frogs and their habitat

around the reservoirs and downstream along the Upper Deschutes River.

2.         Crane Prairie reservoir is upstream of Wickiup reservoir, and water flows from

Crane Prairie into Wickiup before being released into the Deschutes River.  These reservoirs

have significantly altered the normal hydrology of the Upper Deschutes River by storing water in

winter and then releasing it in summer for irrigation purposes.

3.        The changes to the normal river flows caused by these dams and reservoirs create

fluctuations in water levels that adversely impact spotted frogs and their habitat.  These unnatural

water flows reduce spotted frog breeding and rearing habitat around the reservoirs and

downstream along the Deschutes River, and often leave egg masses and tadpoles stranded and

desiccated.  Low river flows in winter also reduce overwintering habitat for spotted frogs

downstream of the reservoirs.  Additionally, the water manipulation makes it difficult for frogs to

disburse between sites, creating isolated sub-populations that have little genetic exchange.

4.        The impacts from Crane Prairie and Wickiup dams and reservoirs have reduced

the abundance, distribution, and genetic diversity of Oregon spotted frog populations in the

Upper Deschutes River Basin, and have injured or killed individual frogs, egg masses and

tadpoles.  BOR has not completed consultation with U.S. Fish and Wildlife Service over impacts

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 1

to Oregon spotted frog from operation and maintenance of the Crane Prairie and Wickiup facilities, yet continues to operate those facilities in ways that significantly harm Oregon spotted frogs and their habitat.

5.      BOR's continued operation and maintenance of Crane Prairie and Wickiup dams and reservoirs in ways that harm Oregon spotted frog and degrade its habitat without completing consultation with U.S. Fish and Wildlife Service violates the ESA.  Plaintiff thus seeks declaratory and injunctive relief under the ESA's citizen suit provision to remedy these violations of law and provide protections to Oregon spotted frogs in the Upper Deschutes River Basin until the necessary consultation is completed.

6.      Additionally, in the course of investigating this case, Plaintiff sent BOR a request for information under the Freedom of Information Act ("FOIA").  Because BOR unlawfully withheld a significant amount of public information from its response to Plaintiff's request, Plaintiff also seeks declaratory and injunctive relief under FOIA and asks the Court to order the release of the unlawfully withheld information.

## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 *et seq.,* FOIA, 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 16 U.S.C. § 1540(g), 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. §§ 2201-02.

8.      Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) because the violations occurred in this judicial district.  Venue is proper under 5 U.S.C. § 552(a)(4)(B) because Plaintiff Center for Biological Diversity resides in this district.

9.    The federal government waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g)(1) and 5 U.S.C. § 552(a)(4)(B).

10.    As required by the ESA, Plaintiff provided sixty days' notice of its intent to bring this action.

11.    As required by FOIA, Plaintiff exhausted its administrative remedies prior to bringing this action.

**PARTIES**

12.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit organization with more than 48,000 active members and with offices in Oregon and elsewhere across the country.  The Center and its members are concerned with the conservation of imperiled species, including the Oregon spotted frog, and the effective implementation of laws to protect those species and their habitat.  The Center's staff and members use the area around Wickiup and Crane Prairie reservoirs and the Deschutes River downstream of those reservoirs for wildlife observation, educational, recreational, and aesthetic purposes, and plan to continue to use those areas in the future for those same purposes.  Operations of the Crane Prairie and Wickiup dams and reservoirs that harm Oregon spotted frog and degrade its habitat impair the use and enjoyment of these areas by the Center's staff and members.

13.    The Center uses FOIA to gather information about listed species, including Oregon spotted frog, and impacts to those species from federal activities.  The Center uses this information to inform its staff and members, as well as the public, about such impacts.  Improper withholding of public information from FOIA responses such as occurred here injures The Center's staff and members by withholding records that would otherwise help inform The Center about impacts from the operation of Crane Prairie and Wickiup dams to Oregon spotted frog in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 3

order to better protect that species.

14.     Plaintiff's interests have been and will continue to be directly harmed by Defendant's actions as challenged herein.  Unless the relief prayed for herein is granted, Plaintiff and the public will continue to suffer irreparable harm and injury to their interests.

15.     Defendant U.S. BUREAU OF RECLAMATION is an agency or instrumentality of the United States, under the U.S. Department of Interior, and owns, operates, and maintains the federal dams and reservoirs at issue here.

## STATEMENT OF LAW

Endangered Species Act

16.     The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such [] species."  16 U.S.C. § 1532(b).

17.     U.S. Fish and Wildlife Service or National Marine Fisheries Service ("Services") must list a species as endangered under the ESA if it is in danger of going extinct throughout all or a significant portion of its range, and must list it as threatened if it is likely to become endangered in the foreseeable future.  16 U.S.C. §§ 1532(6), (20); 1533(a)(1). [1]  Once species are listed as threatened or endangered, the Services must designate their critical habitat, which is occupied or unoccupied habitat that contains physical or biological features essential to the conservation of the species and which may require special management considerations or protection.  16 U.S.C. §§ 1532(5), 1533(a)(3).

18.      A federal agency that authorizes, funds, or carries out an activity that may affect

---

[1] U.S. Fish and Wildlife Service is responsible for consultations involving terrestrial species, such as the Oregon spotted frog, while National Marine Fisheries Service is responsible for consultations involving marine species, such as salmon and steelhead.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 4

a listed species must consult with the Services over the impacts of that activity to ensure that it does not jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(a)(2).  Jeopardize means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of the species in the wild by reducing the reproduction, numbers, or distribution of the species.  50 C.F.R. § 402.02.

19.    During the ESA consultation process, if the action agency concludes in a "biological assessment" that the activity is "not likely to adversely affect" the listed species or adversely modify its critical habitat, and the Service concurs with that conclusion, then the consultation is complete.  50 C.F.R. §§ 402.12, 402.14(b).  If, however, the action agency or the Service determines that the activity is "likely to adversely affect" the listed species or its critical habitat, then the Service completes a "biological opinion" to determine whether the activity will jeopardize the species or result in destruction or adverse modification of critical habitat.  *Id.* § 402.14.  If the Service determines that the action will jeopardize the species or adversely modify critical habitat, it may propose one or more reasonable and prudent alternative actions that would avoid such results.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

20.    In addition to the substantive duty under ESA Section 7 to avoid jeopardizing a species or adversely modifying critical habitat, action agencies also have a duty, while the consultation process is occurring, to avoid making any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures that would avoid jeopardizing the species or adversely modifying critical habitat.  16 U.S.C. § 1536(d).

21.    In addition, the ESA and its regulations prohibit "take" of listed species, including

Oregon spotted frog, where take includes harassing, harming, wounding, or killing the species. 16 U.S.C. §§ 1538, 1532(19) (prohibiting take of endangered species); 50 C.F.R. § 17.31(a) (extending take prohibition to threatened species). Harm is further defined to include significant habitat modification or degradation that kills or injures a listed species by significantly impairing essential behavioral patterns, including breeding, rearing, migrating, feeding, or sheltering. 50 C.F.R. § 17.3.

22.     The Service can authorize take of a listed species through an "Incidental Take Statement" that accompanies a biological opinion if the taking is incidental to an otherwise lawful activity and does not cause jeopardy to the species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). Any taking that conforms to the terms and conditions within an Incidental Take Statement is not prohibited under Section 9 of the ESA. 16 U.S.C. § 1536 (o)(2); 50 C.F.R. § 402.14(i)(5).

23.     Once the consultation is complete, the agencies have a duty to insure that it remains valid. Reinitiation of consultation is required and shall be requested by the action agency or the Service if: (a) the amount or extent of taking specified in the incidental take statement is exceeded; (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16.

Freedom of Information Act

24.     FOIA allows the public to request public information from federal agencies, and requires agencies to make those records promptly available. 5 U.S.C. § 552(a)(3)(A). An

agency must respond to a FOIA request within twenty working days, or within thirty working days if there are unusual circumstances. *Id.* § 552(a)(6)(A)-(B).

25. An agency may withhold information from its FOIA response under nine specific exemptions. *Id.* § 552(b)(1)-(9). Under exemption 5, an agency may withhold information if it constitutes "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *Id.* § 552(b)(5). If exempted material is reasonably segregable from a record, the agency must redact the exempted portion and release the remainder of the record. *Id.* § 552(b).

26. FOIA requires that an agency notify a requestor of the right to appeal any adverse determination by the agency with regard to the denial of requested information. *Id.* § 552(a)(6)(A)(i). Department of Interior regulations allow for such appeals when the agency denies or partially denies a request. 43 C.F.R. § 2.58. The Department must make a determination with respect to any such appeal within twenty working days after receipt of the appeal. 5 U.S.C. § 552(a)(6)(A)(ii); 43 C.F.R. § 2.62. A ten-day extension of that deadline is allowed in unusual circumstances only if the agency provides the requestor written notice of the need for the ten-day extension, the reasons explaining the unusual circumstances, and the date on which a determination is expected to be dispatched. 5 U.S.C. § 552(a)(6)(B)(i); 43 C.F.R. § 2.62.

27. A requestor is deemed to have exhausted his administrative remedies if the agency fails to comply with the applicable time limits under FOIA. *Id.* § 552(a)(6)(C)(i).

## STATEMENT OF FACTS

### I.    Oregon Spotted Frog in the Upper Deschutes Basin.

28. The Oregon spotted frog was listed under the ESA as a threatened species on

August 29, 2014.  79 Fed. Reg. 51,658.[2]  This species is the most aquatic native frog in the Pacific Northwest, and occupies wetlands at the margins of streams, lakes, ponds, and reservoirs.

29.     Historically, this species ranged from British Columbia to northeastern California. Its distribution has shrunk, however, and now it occurs only in disjunct populations near Puget Sound and along the Cascade Mountains from southern Washington to the Klamath Basin of Oregon.  The final listing rule noted that the current range of the Oregon spotted frog is significantly smaller than the historical range, with an estimated 76-90% of its historical range no longer occupied.

30.     U.S. Fish and Wildlife Service listed the Oregon spotted frog as threatened due to the following factors: (1) habitat necessary to support all life stages continues to be impacted or destroyed by human activities that cause loss of wetlands, including hydrologic changes resulting from operation of existing water diversions/manipulation structures; (2) predation by non-native species; (3) inadequate regulatory mechanisms that result in significant negative impacts such as habitat loss and modifications; and (4) small and isolated breeding locations, low connectivity, low genetic diversity within occupied sub-basins, and high genetic differentiation between sub-basins.

31.     In Oregon, very few populations are left west of the Cascade crest (found in just two of twelve historically occupied sub-basins), and the species is considered extirpated from the Willamette Valley.  East of the Cascades, Oregon spotted frogs are found in eight sub-basins, including the Upper Deschutes River sub-basin.

32.     Spotted frogs in the Upper Deschutes River sub-basin occur in high-elevation

---

[2] U.S. Fish and Wildlife Service also issued a proposed rule for designation of Oregon spotted frog critical habitat, but has not yet issued a final rule.  The proposed rule included critical habitat in the Upper Deschutes basin both above and below Wickiup reservoir.  78 Fed. Reg. 53,538 (Aug. 29, 2013).

lakes, wetland ponds, and riverine wetlands and oxbows along the Deschutes River.  At least four areas around Crane Prairie Reservoir are used by Oregon spotted frogs for breeding, rearing, and overwintering, with two sites currently containing more than 100 breeding females.  There is less suitable habitat around Wickiup Reservoir, and thus fewer spotted frogs have been detected in that area.  Six egg masses were observed at one site on the edge of Wickiup and a slightly larger number found along the arm of the Deschutes River between Crane Prairie and Wickiup.

33.    Five known Oregon spotted frog breeding sites occur along the 61 miles of Upper Deschutes River between Wickiup Dam and Bend, Oregon:  Dead Slough, La Pine State Park SW, Sunriver, Slough Camp (two wetlands on opposite sides of the river), and the Old Mill pond.  Juvenile spotted frogs have also been found at Bull Bend, about three miles below Wickiup Dam, indicating a likely sixth breeding site.

34.    With the exception of the Sunriver site, 50 or fewer breeding females occur at each site along the river.  U.S. Fish and Wildlife Service has stated that existing spotted frog populations on the Deschutes River below Wickiup Dam are small and extremely disjunct (separated by more than ten miles), and therefore at risk of extirpation.

35.    The Sunriver site, which has more than 700 breeding females, has weirs to control water levels that allow for sufficient water at breeding locations during the entire breeding period.  U.S. Fish and Wildlife Service has noted that the maintenance of water levels during this time period is a key factor in the persistence of a robust population of Oregon spotted frogs.

36.    This species has a life history that requires four types of habitat:  spring breeding and rearing habitat, summer foraging habitat, winter habitat, and dispersal habitat.  Because Oregon spotted frogs are highly aquatic during each life stage, each of these habitat types requires some amount of water.

37.      Females often lay eggs at the same breeding sites year after year due to the specific requirements of breeding habitat.  They deposit eggs amongst herbaceous vegetation in shallow water (2-12 inches deep) over gently sloping ground with ample exposure to the sun, often in areas that are seasonally flooded and become dry by late summer.  Breeding in the Upper Deschutes Basin can occur anytime between mid-March and early May, with "breeding" consisting of the time period between females entering the breeding habitat, laying eggs, and the eggs hatching.  Hatching usually occurs within about 17 days of egg laying, depending on the water temperature.

38.      Rearing occurs from early April through early September, and consists of the time between hatching of tadpoles and metamorphosis into juvenile frogs, which usually takes about four months.  Tadpoles move into deeper, permanently flooded areas as summer progresses and water recedes. Because breeding occurs in shallow water, eggs and tadpoles are vulnerable to desiccation if water levels drop before tadpoles are ready to move to deeper water.  Falling water levels can strand the entire cohort of egg masses for that year.

39.      After breeding and rearing, post-metamorphic juveniles and adult frogs inhabit wetlands with moderate to dense emergent vegetation for feeding and basking, and use deeper pools for escape cover.  Predators of Oregon spotted frogs include bullfrogs, trout, snakes, herons, cranes, kingfishers, and raccoons.

40.      Juvenile and adult spotted frogs overwinter in well-oxygenated water that persists throughout the winter, such as springs, side channels, and beaver ponds.  This habitat must provide sheltering locations that protect frogs from predators and freezing.  Movement into overwinter habitat can begin as early as mid-September and use of this habitat can last until mid-March.  Fluctuations of water levels in winter can be particularly hard on spotted frogs because

they have low energy at this time of year, making movement to other suitable areas difficult.

41.    Due to the aquatic nature of Oregon spotted frogs, these various seasonal habitats must have surface water connections for frogs to move between them.  Surface water connections must also exist for frogs to disperse to other breeding sites or other populations.

**II.    Impacts of Crane Prairie and Wickiup Dams and Reservoirs.**

42.    Changes in water levels at critical periods in the Oregon spotted frog's life cycle can negatively affect the species.  High water levels can overly inundate wetlands, which reduces the amount of shallow wetlands that are necessary for breeding.  In contrast, low water levels can leave breeding and rearing habitat dry and unusable or cause eggs and tadpoles to become stranded and desiccated.  Changes in water level can also reduce overwintering habitat, when spotted frogs need deep, well-oxygenated water to survive the winter.

43.    Wickiup Dam was constructed in 1949, significantly altering the hydrology of the Deschutes River.  The reservoir behind the dam can hold up to 200,000 acre-feet of water, and the upstream Crane Prairie Reservoir can hold an additional 55,000 acre-feet.  These facilities are managed together to store up to 255,000 acre-feet of water in winter and then release flows in spring and summer for irrigation purposes.

44.    The final listing rule for Oregon spotted frog stated that threats to the species include "changes in hydrology due to construction of dams and human-related alterations to seasonal flooding," and that "damming and diverting water for irrigation needs has resulted in the loss of wetlands within the Upper Deschutes."  79 Fed. Reg. at 51,688.  The listing rule identified changing water levels at critical periods in the Oregon spotted frog's life cycle as a negative effect on breeding and reproduction.  *Id.* at 51,669.  Specifically, "regulated water releases from Crane Prairie and Wickiup Reservoirs result in extreme seasonal fluctuations in

stream flows that have affected the amount of overwintering and breeding habitat available for Oregon spotted frogs." *Id.* at 51,670.

45.    Prior to construction of Wickiup Dam, the Deschutes River had stable flows of about 730 cubic feet per second (cfs) in summer and 660 cfs in winter.  Water storage in the reservoirs during winter and water releases in spring and summer result in extremely low winter flows of about only 20-30 cfs and high summer flows of about 1400 cfs.  Low flows generally occur October to April each year.

46.    These dams adversely affect Oregon spotted frog in numerous ways, both around the reservoirs and downstream in the Deschutes River.

47.    Changes in water levels within the reservoirs affects breeding habitat at the edge of the reservoirs.  Rising water levels during the breeding season can flood perimeter wetland breeding habitat, creating water depths that are greater than what frogs prefer at egg laying sites and/or flushing egg masses out of emergent vegetation into open water where they are vulnerable to predators.  Over the past several years, water levels in Crane Prairie Reservoir have risen during the breeding season, which flushed egg masses out of breeding habitat and into open water of the reservoir.

48.    When the irrigation season begins, water releases into the river drop reservoir levels, which dewaters shallow wetland breeding habitat at the edge of the reservoirs.  Where frogs have already deposited eggs, the drop in water level strands and desiccates egg masses or tadpoles.  Egg mass stranding was observed in 2014 and 2015 in wetlands along the Deschutes arm above Wickiup Reservoir.  If breeding has not occurred yet, low water levels can prevent or significantly reduce breeding at that site for that year.

49.    The continued drop in reservoir water level over the course of the spring dewaters

rearing habitat, either stranding tadpoles and juvenile frogs or forcing tadpoles to migrate to other areas before metamorphosis is complete, both of which increase mortality. In most years, water levels in the reservoirs drop below what is needed for rearing habitat before the end of the metamorphosis period.

50.     Dropping reservoir levels during irrigation season also dries out summer foraging habitat, forcing frogs out of prime feeding and basking habitat and into other refugia, which increases energy expenditure and exposes frogs to predators.  Likewise, the reservoirs often do not fill early enough in fall to inundate overwintering habitat before frogs start moving to that habitat, forcing them into small areas with less cover, increasing predation and mortality rates.

51.     For frog populations along the Deschutes River below Wickiup Dam, storage of water in the reservoirs from mid-October to mid-April creates flows in the Deschutes River that are 1/10 their historic base flows.  During the rapid drop in fall water levels at the start of the storage season, juvenile and adult frogs have been observed stranded on dry land or in isolated pockets of water that are not suitable for overwinter habitat.  Juveniles in particular are not likely to move overland to the main river channel and thus have a high mortality risk if they are stranded.

52.     For example, juvenile frogs were observed this fall stranded in off-channel pools after Deschutes River flows were lowered, with no aquatic connection to overwinter habitat. These pools dried up or froze while juvenile frogs were still there, almost certainly leading to mortality of those frogs.

53.     Other observations of spotted frog habitat along the Upper Deschutes during water storage conditions this fall showed that low river flows in winter dewater most of the off-channel and stream edge wetland habitat as well as beaver ponds and runs, thereby eliminating

most overwinter habitat along the river.  Instead, frogs must use small areas within the main river channel that have slower water velocity for overwinter habitat, where predators are also present and there is minimal cover.

54.    Although water levels in the river are generally very low in winter, fluctuations have occurred several times per winter in the past several years.  These sporadic changes to flow rates forces frogs to move around to find suitable locations within the main channel at a time when they have low energy and movement is difficult.  Then when irrigation water is suddenly released in spring, flows rise too quickly to allow frogs to safely transition from overwinter habitat in the main channel to off-channel breeding habitat.

55.    Additionally, releases of irrigation water that do not begin until mid-April or later usually do not occur in time to inundate breeding areas along the river.  This makes available breeding habitat unusable or strands egg masses that were deposited earlier in the spring, which can result in reproductive failure at a site for an entire season.

56.    Surveys during the past three years at breeding sites along the Deschutes River below Wickiup Dam found desiccated egg masses at some sites while other sites were completely dry and unusable for breeding because water had not yet been released from the reservoir.   For instance, in 2015 water levels were too low for breeding at much of the East Slough Camp site during most of the breeding season, significantly reducing breeding potential at that site.  In 2014, egg mass stranding was observed for a period of two weeks at that same site, and the Bull Bend site had too little water for breeding.  The timing of irrigation releases in spring causes unsuitable breeding conditions below Wickiup Dam for all or most of every breeding season.

57.    Extreme fluctuations in river flows has also altered the channel morphology of the

Upper Deschutes River, causing loss of sinuosity, increased bank erosion, and deposition of

sediment that has filled in and cut off channels between the river and emergent wetlands along

the river's edge.  Accordingly, these off-channel wetlands are no longer inundated during low

flows, causing a loss of frog habitat.  Removing this sediment to restore these channels would

create additional frog breeding and overwintering habitat.

58.    Finally, Wickiup dam and altered water flows in the river below the dam also

impair movement of frogs between populations above and below Wickiup Reservoir.  This

reduces genetic exchange and creates isolated sub-populations at risk of genetic in-breeding.

**III.    BOR's Prior Consultation Over Crane Prairie and Wickiup Dams and Reservoirs.**

59.    Due to its ownership and discretionary control over operations and maintenance

of Crane Prairie and Wickiup dams and reservoirs, BOR previously consulted with U.S. Fish and

Wildlife Service and NOAA Fisheries over the impacts of these facilities, among others, on

ESA-listed species.

60.    BOR's biological assessment was titled, "Biological Assessment on Continued

Operation and Maintenance of the Deschutes River Basin Projects and Effects on Essential Fish

Habitat under the Magnuson-Stevens Act," and it was dated September 2003.  The "Proposed

Action" in the assessment stated:

> Reclamation's proposed action is the continued operation and maintenance of
> Reclamation's project facilities throughout the Deschutes River basin as described in
> Chapter 2.  Subsequent consultations will be initiated if significant changes are
> anticipated in future project O&M [operations and maintenance] procedures, *additional
> listings of species occur within the Deschutes River basin potentially affected by O&M
> activities*, or other criteria described in 50 CFR 402.16 apply."

BOR Biological Assessment at 1-1 (emphasis added).

61.    Chapter two of BOR's biological assessment stated that the consultation "involves

O&M activities associated with those facilities for which Reclamation has authority to operate,

largely defined by Reclamation ownership.  Storage, diversion, and delivery facilities comprising

the proposed action include . . . Crane Prairie Dam and Reservoir [and] Wickiup Dam and

Reservoir" among other facilities.  BOR Biological Assessment at 2-1.

62.    With regard to Crane Prairie and Wickiup, the assessment noted that "the

following project operations are included in the proposed action . . .

- Storage in and release of water from Crane Prairie Dam and Reservoir for diversion (an interrelated and interdependent action is diversion of storage water by private facilities)
- Storage in and release of water from Wickiup Dam and Reservoir for diversion
- Diversion of Wickiup Reservoir storage water by North Unit Headworks and Main Canal (an interrelated and interdependent action is the diversion of natural flow water)

BOR Biological Assessment at 2-8.

63.    The assessment analyzed the hydrologic effects of BOR's project operations on a

variety of ESA-listed species by comparing water flows from the current operations with water

flows that would occur without BOR facilities operating--i.e. if the reservoirs were run-of-the-

river and just passed natural flows.  The analysis did not cover Oregon spotted frog because that

species had not yet been listed as threatened.

64.    As noted above, Oregon spotted frog was listed as a threatened species under the

ESA on August 29, 2014.  BOR has apparently initiated consultation with U.S. Fish and Wildlife

Service over its continuing operation of Crane Prairie and Wickiup reservoirs for water storage

and irrigation purposes but does not expect to complete this consultation until mid-2017 at the

earliest.  Despite not having completed consultation over this species through either reinitiation

of the prior consultation (as it noted it must if a new species was listed that may be affected by

the proposed action) or a new consultation over just Oregon spotted frog, it has continued its

operation and maintenance of Crane Prairie and Wickiup dams and reservoirs in ways that kill or

injure Oregon spotted frog.

65.     The continued operation of these facilities adversely affects or eliminates spotted frog breeding, rearing, summer foraging, and overwintering habitat around the reservoirs and downstream along the Deschutes River.  The timing, speed, and extent of water releases from the reservoirs and drawdowns of the river for water storage will continue to harm frogs through loss of breeding habitat and/or dessication of egg masses and tadpoles, forced movement of tadpoles and frogs to less suitable rearing or summer habitat, and loss of overwinter habitat that strands juveniles and forces adults into less suitable winter habitat. These impacts result in direct harm to individual frogs and egg masses, as well as degradation of habitat that significantly impairs spotted frog breeding, feeding, and sheltering behaviors.

66.     Due to the small number of breeding females found at many of the isolated sites along the Upper Deschutes River and around Crane Prairie and Wickiup reservoirs, continued harm to frogs and their habitat at these sites from operation of Crane Prairie and Wickiup facilities will likely cause extirpation of frogs from these sites.  Maintaining these breeding sites is important to maintaining the distribution, abundance and genetic diversity of spotted frogs in the Upper Deschutes River Basin, and their loss would jeopardize the survival and recovery of this species.

**IV.     Center for Biological Diversity's FOIA Request.**

67.     The Center sent a FOIA request to BOR on April 28, 2015, requesting information related to: (1) any ESA consultation over the effects of BOR's operations of Crane Prairie and Wickiup reservoirs and dams, (2) BOR's operations of those reservoirs and dams, and (3) Oregon spotted frog populations and/or habitat around or downstream of those reservoirs as well as downstream of Crescent Lake.

68.     BOR sent letters in response to The Center's request on May 13, 2015 and May 27, 2015 acknowledging the request and estimating a response date.  BOR finally responded to the request on September 30, 2015.

69.     BOR's response withheld a significant amount of information under FOIA exemption 5.  BOR claimed that the information fell within either the Deliberative Process Privilege for documents that were pre-decisional and deliberative, or within the Attorney-Client Privilege.  BOR withheld or redacted numerous draft documents, emails and other documents that contained allegedly deliberative or attorney-client privileged material, for a total of 484 pages withheld or redacted.

70.     BOR did not adequately establish in its response that all of the withheld material properly fell within exemption 5.  BOR did not provide a detailed justification to show that withheld information was pre-decisional to a specific BOR decision and deliberative, rather than factual, information to use the Deliberative Process Privilege.  Nor did it explain what information was withheld under the Attorney-Client Privilege and show that such information involved legal opinions or advice from an attorney.  BOR also did not explain why none of the redacted information was reasonably segregable.

71.     Many documents were withheld entirely or almost entirely even though, based on the nature of the documents, they certainly contained information that was factual and thus did not constitute deliberative material.  Other documents were withheld even though they concerned decisions being made by other agencies.  Therefore, they were not pre-decisional to any BOR decision and did not involve purely internal deliberations by BOR.  Finally, some withheld documents were created by or distributed to non-agency third-parties and therefore were not intra- or inter-agency documents.

72.     The Center submitted a timely administrative appeal to the FOIA Appeals Officer at the U.S. Department of Interior on October 16, 2015, which was received on October 26, 2015.  The Center's appeal alleged that BOR did not provide the required detailed justification to show that all of the withheld information properly fell within exemption 5; and that BOR unlawfully withheld information that was not pre-decisional and deliberative or attorney-client privileged and should have been released in full or reasonably segregated from factual information that was released.

73.     The Center has received no determination on its appeal nor any written explanation of unusual circumstances that would necessitate additional time for a determination. The twenty-day deadline for such determination and written explanation has now passed and The Center has therefore exhausted its administrative remedy.

### FIRST CLAIM FOR RELIEF

### VIOLATIONS OF ESA SECTION 7

74.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

75.     This first claim for relief challenges BOR's violations of ESA Section 7 regarding impacts to Oregon spotted frog from the continued operation and maintenance of Crane Prairie and Wickiup dams and reservoirs. Plaintiff brings this claim pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g).

76.     BOR previously consulted with the Services over its operation and maintenance of several facilities in central Oregon, including Crane Prairie Dam and Reservoir and Wickiup Dam and Reservoir.  BOR retains ownership and discretionary control over these two facilities and thus must consult over their impacts on the threatened Oregon spotted frog, either through reinitiation of the prior consultation or a new consultation.  BOR has not yet completed any such

consultation.

77.     By continuing to operate and maintain Crane Prairie and Wickiup dams and reservoirs in ways that adversely affect Oregon spotted frogs before completing ESA consultation, BOR has failed to ensure that its actions are not likely to jeopardize this species. Thus, it has violated ESA Section 7(a)(2).  16 U.S.C. § 1536(a)(2).

78.     BOR is also violating ESA Section 7 by continuing to operate and maintain Crane Prairie and Wickiup dams and reservoirs prior to completing any ESA consultation for the Oregon spotted frog because these operations constitute an irreversible and irretrievable commitment of resources.  The storage and release of water from these facilities causes irreversible harm to the species because water levels are raised or lowered at unnatural levels and at unnatural times, resulting in death or injury to frogs and egg masses at sites around the reservoirs as well as along the Deschutes River.  Most of these sites have only a small number of breeding females and continued harm puts them at great risk of extirpation.  Thus, BOR's actions also violate Section 7(d) of the ESA.  16 U.S.C. § 1536(d).

79.     Accordingly, BOR's continued operation and maintenance of Crane Prairie and Wickiup dams and reservoirs in ways that harm Oregon spotted frog before completing ESA consultation violates ESA Sections 7(a)(2) and (d) and thus is actionable pursuant to the ESA's citizen suit provision.  16 U.S.C. § 1540(g).

## SECOND CLAIM FOR RELIEF

## VIOLATIONS OF ESA SECTION 9

80.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

81.     This second claim for relief challenges BOR's violations of ESA Section 9 regarding "take" of Oregon spotted frogs from the continued operation and maintenance of

Crane Prairie and Wickiup dams and reservoirs. Plaintiff brings this claim pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g).

82.     The storage and release of water from Crane Prairie and Wickiup reservoirs is killing and harming Oregon spotted frog eggs, tadpoles, juveniles, and adults.  Water fluctuations from operation of these facilities flood habitat at certain times of year and dewater habitat at other times, each of which directly harms and kills frogs and frog eggs around the reservoirs and along the Deschutes River, and also causes habitat degradation that significantly impairs Oregon spotted frog breeding, feeding, and sheltering behaviors.

83.     These effects fall within the definition of "take" prohibited by the ESA, and BOR does not have an Incidental Take Statement to authorize such take.  Thus, its continued operation and maintenance of Crane Prairie and Wickiup dams and reservoirs violates ESA Section 9, and is actionable under the ESA citizen suit provision.  16 U.S.C. §§ 1538, 1540(g).

### THIRD CLAIM FOR RELIEF

**VIOLATION OF FOIA**

84.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

85.     This third claim for relief challenges BOR's violation of FOIA for unlawfully invoking FOIA exemption 5 to justify withholding information from its response to The Center's FOIA request.  The Center brings this claim under FOIA, 5 U.S.C. § 552(a)(4)(B).

86.     BOR's partial denial of The Center's FOIA request violates FOIA, 5 U.S.C. § 552(a), and has deprived The Center of its right to public information in the possession of BOR.

## PRAYER FOR RELIEF

A.     Adjudge and declare that BOR is violating Section 7 of the ESA by continuing to operate and maintain Crane Prairie and Wickiup dams and reservoirs without completing ESA consultation over the impacts of that activity on Oregon spotted frog;

B.     Adjudge and declare that BOR is violating Section 9 of the ESA by continuing to operate and maintain Crane Prairie and Wickiup dams and reservoirs in a manner that causes "take" of Oregon spotted frog without any legal authorization for that take;

C.     Adjudge and declare that BOR violated FOIA by improperly invoking exemption 5 and failing to release all relevant information pursuant to The Center's April 28, 2015 FOIA request;

D.     Order that BOR immediately provide The Center with unredacted copies of the records it has requested, free of charge;

E.     Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiff;

F.     Award Plaintiff its reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and to FOIA, 5 U.S.C. § 552(a)(4)(E); and

G.     Grant such further relief as the Court deems just and proper in order to provide Plaintiff with relief and protect the public interest.

Dated: December 18, 2015      Respectfully submitted,


        s/Lauren M. Rule

        Lauren M. Rule (OSB #015174)
        s/Elizabeth H. Zultoski

        Elizabeth H. Zultoski (OSB #105482)
        ADVOCATES FOR THE WEST
        3115 NE Sandy Blvd., Ste. 223
        Portland, OR  97232
        Tel: (503) 914-6388
        lrule@advocateswest.org
        ezultoski@advocateswest.org


        Attorneys for Plaintiffs