BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
KEVIN DANIELSON, OSB # 065860
Assistant United States Attorney
kevin.c.danielson@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2902
Telephone: (503) 727-1000
Facsimile: (503) 727-1117

JOHN C. CRUDEN, Assistant Attorney General
SETH M. BARSKY, Section Chief
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1479 | Fax: (303) 844-1350
Email: Michael.Eitel@usdoj.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>**U.S. BUREAU OF RECLAMATION**, et al.,<br><br>         Defendants,<br><br>    and<br><br>**ARNOLD IRRIGATION DISTRICT**, et al.,<br><br>        Intervenor-Defendants. | Case No.: 6:15-cv-02358-TC<br>(consolidated with 6:16-cv-00035-TC)<br><br>**FEDERAL DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** |

# TABLE OF CONTENTS

PAGE

INTRODUCTION……………………………………………………………………  1

STATUTORY BACKGROUND……………………………………………………...  2

FACTUAL BACKGROUND…………………………………………………………...  4

I.     THE DESCHUTES PROJECT……………………………………………  4

II.    ENDANGERED SPECIES ACT COMPLIANCE FOR THE DESCHUTES
PROJECT………………………………………………………………...  6

     A.    Early Endangered Species Act Compliance………………………  6

     B.    ESA Listing Of The Oregon Spotted Frog…………………………  7

     C.    Current Endangered Species Act Compliance ……………………  9

STANDARD OF REVIEW……………………………………………………..  11

ARGUMENT……………………………………………………………………  12

I.     PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM…………………  12

     A.    The Status Of Oregon Spotted Frogs Is Not Likely To Degrade, But
Improve, During The Pendency Of This Case……………………………  14

     B.    Plaintiffs Have Not Met Their Burden To Show That Injunctive Relief Is
Necessary Or That Their Proffered Relief Will Benefit Frogs………….....  18

          1.    Plaintiffs' Proposed Injunctions Are Built On Scientifically Infirm
Ground…………………………………………………………...  20

          2.    Plaintiffs' Specific Requests For Relief Are Unsubstantiated……..  23

          3.    Plaintiffs' Requested Relief Is Not Implementable……………….  26

II.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THEIR ESA
CLAIMS AGAINST RECLAMATION………………………………………..  28

III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST TIP
STRONGLY AGAINST GRANTING PLAINTIFFS' PROPOSED
INJUNCTIONS……………………………………………………………  32

CONCLUSION………………………………………………………………………  35

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE

*Alabama v. U.S. Army Corps of Eng'rs*, 441 F.Supp.2d 1123 (N.D. Ala. 2006)…….. 13

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)…..……… 11

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)………………..…..32

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995)………3, 31

*Cal. Sportfishing Prot. Alliance v. FERC*, 472 F.3d 593, 599 (9th Cir. 2006)…..…... 29-30

*Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ……… 12

*Cascadia Wildlands v. Kitzhaber*, 911 F.Supp.2d 1075, 1083-84 (D. Or. 2012)……..31

*Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031, 1047 (9th Cir. 2015)………..…11, 29, 31

*Ctr. for Envtl. Science, Accuracy & Reliability v. Cowin*, No. 1:15-CV-00884 LJO, 2015 WL 3797693, at *9 (E.D. Cal. June 18, 2015) ……………….…..…..……… 13

*Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) …..…..…... 12

*Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954-55 & n.9 (9th Cir. 2011) (*en banc*) ………………………………………………………………..….. 12

*Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) ……..11

*Dahl v. HEM Pharms. Corp.* 7 F.3d 1399, 1403 (1993)………………………....12

*Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) …………...…….…....13

*Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009)...…..13, 14

*DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 777 (9th Cir. 2011) …………...…..…32

*El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) ……………………………………………………………....12

*Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180-81 (2000) ……………...…..... 12

*Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015)…………………….....12, 31

*General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997)……………………… 20

*Heckler v. Lopez*, 463 U.S. 1328, 1333-34 (1983) …………………….…..…..... 28

*Humane Society of U.S. v. Bryson*, No. 3:12-CV-00642-SI, 2012 WL 1952329, at *5 (D. Or. May 30, 2012) ………………………………………………..…. 14, 32-33

*Idaho Rivers United v. U.S. Army Corps of Eng'rs*, ---F.Supp.3d---, 2015 WL 9700887, at *6 (W.D. Wash. Jan. 7, 2015) …………………………..…………........ *passim*

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (*en banc*)........................................................................................................................29

*Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011)………………………....... 11, 12

*Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996)………………........ 13, 29

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)…………..…………. 1, 11

*Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 796 (7th Cir. 2011)…....…..... 35

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 654-55, 658-59 (2007) ………………………………………………………………...……..... 31

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994)…….. 13

*Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) ……...…...26

*N.C Fisheries Ass'n, Inc. v. Pritzker*, No. 4:14-CV-138-D, 2015 WL 4488509, at *6 (E.D.N.C. July 22, 2015) …………………………………………………………… 12

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011)………………………………………………………………………… 13

*Nken v. Holder*, 556 U.S. 418, 435 (2009)…………………………………….………32

*Pac. Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 (E.D. Cal. 2008)….………………………………………………………………..... 14

*People Who Care v. Rockford Bd. of Educ., School District No. 205*, 111 F.3d 528 (7th Cir. 1997) …………………………………………………………...........34

*Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987)…………………………..32

*S. Yuba Citizens League v. NMFS*, No. 2:13-cv-00059-MCE, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013)…………………………………………..……….*passim*

*Stanley v. Univ. of S. Cal.*, 13 F. 3d 1313, 1320 (9th Cir. 1994)………………..…… 11

*TVA v. Hill*, 437 U.S. 153, 173 (1978)…………..…………………………………… 29

*University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)…………………………11, 18

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)………………………..….32

*Western Watershed Project v. Matejko*, 468 F.3d 1099, 1107-08 (9th Cir. 2006)…..... 29-30

*Western Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012)...…………32

*WildEarth Guardians v. EPA*, 759 F.3d 1196, 1209 (10th Cir. 2014) ……………….…30

*Wild Equity Inst. v. City and Co. of San Francisco*, 2011 WL 5975029 (N.D. Cal. Nov. 29, 2011)………………………………..…………………………………… 13

*Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)………………...…….. *passim*

STATUTES                                                                                                    PAGE

16 U.S.C. § 1531(b)…………………………………...…………………………… 13

16 U.S.C. § 1532(5) …………………………………………………………….3

16 U.S.C. § 1532(6) …………………………………………………………….2

16 U.S.C. § 1532(15) ……………………………………………………………2

16 U.S.C. § 1532(19)…………………………………………………………… 3

16 U.S.C. § 1532(20) ……………………………………………………………3

16 U.S.C. § 1533(a)………………………………………………...……………… 2

16 U.S.C. § 1536(a)(2) …………………………………………………………3, 28-29

16 U.S.C. § 1536(b)(3)(A)…………………………………………………………3

16 U.S.C. § 1536(b)(4), (o)…………………………………………………………3

16 U.S.C. § 1536(d)……………………………………………...………………… 31

16 U.S.C. § 1538(a)(1)(B)…………………………………………………..……… 3

16 U.S.C. § 1538(a)(1)(G)………………………………………………………… 31

16 U.S.C. § 1539…………………………………………………………………3

16 U.S.C. § 1539(a)(1)(A), (c)…………………………………………...………… 33

16 U.S.C. § 1539(a)(2)(A)………………………………………………………… 4, 7

16 U.S.C. § 1539(a)(2)(B)…………………………………………...……………… 4

43 U.S.C. 371 *et seq*…………………………………………………………..…… 4

43 U.S.C. § 383……………………………………………………………………5

43 U.S.C. § 499……………………………………………………………………5

FEDERAL REGULATIONS                                        PAGE

50 C.F.R. § 17.3……………………………………………………………3

50 C.F.R. § 17.31…………………………………………………...……3

50 C.F.R. § 17.32(b)(2)(i)…………………………………………………..4

50 C.F.R. § 402.02……………………………………………………29

50 C.F.R. § 402.14(g)……………………………………………...……3

40 Fed. Reg. 44,412 (Sept. 26, 1975)……………………………...………3

46 Fed. Reg. 54,748 (Nov. 4, 1981)…………………………………...……3

64 Fed. Reg. 14,517 (Mar. 25, 1999) ……………………………………6

64 Fed. Reg. 58,910 (Nov. 1, 1999)……………………………..……………6

71 Fed. Reg. 834 (Jan. 5, 2006)……………………………….…………6

78 Fed. Reg. 53,538 (Aug. 29, 2013)………………………………....………17

79 Fed. Reg. 51,658 (Aug. 29, 2014)…………………………………………*passim*

## <u>INTRODUCTION</u>

Plaintiffs ask the Court to affirmatively alter every aspect of water management in the Upper Deschutes River sub-basin. The central issue is whether Plaintiffs have provided a "clear showing" and presented "substantial proof" that this mandatory relief is necessary to avoid immediate irreparable harm to Oregon spotted frogs. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*). Plaintiffs have not made this showing.

First and foremost, Plaintiffs cannot show irreparable harm to themselves or their derivative interests in viewing Oregon spotted frogs, a species the U.S. Fish and Wildlife Service (FWS) listed as threatened in 2014. While operation of dams in the Upper Deschutes sub-basin affects the spotted frogs, the spotted frogs have persisted and adapted to flow regimes in this area for well over 70 years. There is no evidence that the status or distribution of these frog populations are likely to suddenly deteriorate. To the contrary, spotted frogs and their habitat conditions are likely to *improve* during the pendency of this case. Without immediate, irreparable harm, extraordinary preliminary injunctive relief should not be granted.

Second, Plaintiffs' proposed relief is more likely to harm the Upper Deschutes sub-basin spotted frog populations than current project operations. Plaintiffs admit that drastic changes to frog habitats would pose a substantial threat to Oregon spotted frogs. In complete disregard of this admission, Plaintiffs ask the Court to immediately order a rapid, untested, and extreme change in the hydrology of the entire sub-basin. Plaintiffs never reconcile this contradiction. As the U.S. Fish and Wildlife Service—the expert wildlife agency charged with protecting and conserving the spotted frogs—confirms, Plaintiffs' proposals for aggressive and immediate changes are neither scientifically justified nor in the best interest of the spotted frogs. The Court should reject Plaintiffs' invitation to experiment with the fate of the frogs. The consequences of failing to do so—potential extirpation of frogs from key habitat sites—would be severe.

Plaintiffs' motion also is misguided because it unjustifiably sets aside the significant efforts being taken in the basin to protect and conserve spotted frogs. The experts and parties in the region are actively engaged in numerous multi-year, multi-million dollar efforts to study

Oregon spotted frogs and identify those actions that the *science* demonstrates will conserve the species. These processes include the ongoing Endangered Species Act consultation with FWS, which is expected to be complete in July 2017. This consultation is addressing how ongoing project operations, as altered by conservation actions being implemented now, are likely to affect spotted frogs. Further, the Deschutes River Basin Habitat Conservation Plan (HCP), expected to be complete in 2019, is comprehensively addressing the long-term protection and conservation of the Basin's listed and sensitive fish and wildlife resources. These processes and attendant commitments of federal, state, tribal, and other regional entities to responsibly protect and conserve the Basin's fish and wildlife resources, including the Oregon spotted frog, belie Plaintiffs' suggestion that emergency action is required now.

These points reinforce why Plaintiffs' motion should fail. Ultimately, Plaintiffs do not prove that irreparable harm is likely to occur during the pendency of this case or that their relief will *not* irreparably harm spotted frogs. Plaintiffs fail to demonstrate any likelihood of success on the merits of their claims against the Bureau of Reclamation. And the balancing of harms and the public interest strongly counsel against granting Plaintiffs' motion, as their proposals are likely to harm spotted frogs and a myriad of interests in the region. Thus, as further explained below, Plaintiffs' motion should be denied.

## STATUTORY BACKGROUND

In the Endangered Species Act (ESA), Congress directed the Secretary to list endangered and threatened species and designate their critical habitats. 16 U.S.C. § 1533(a).[1] An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range," *id*. § 1532(6), and a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a

---

[1]  The ESA divides responsibility for listing species between the Secretary of the Interior, who generally is responsible for terrestrial species and inland fishes, and the Secretary of Commerce, who generally is responsible for marine species. 16 U.S.C. § 1532(15). These responsibilities have been delegated to FWS in the case of Interior, and to the National Marine Fisheries Service (NMFS) in the case of Commerce.

significant portion of its range," *id*. § 1532(20). Once listed, a species is subject to the ESA's protections.

Under Section 7(a)(2) of the ESA, each federal agency must ensure, in consultation with FWS or NMFS, that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" designated critical habitat. 16 U.S.C. § 1536(a)(2); *id*. § 1532(5) (defining "critical habitat"). During consultation, FWS analyzes the agency's proposed action and the best available scientific and commercial data to identify the current status of the species or critical habitat, the likely effects of the proposed agency action, and cumulative effects. 50 C.F.R. § 402.14(g). At the conclusion of the consultation, FWS formulates "its biological opinion as to whether the [proposed agency] action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. § 402.14(g)(4); 16 U.S.C. § 1536(b)(3)(A).

Section 9 of the ESA makes it unlawful for any person to "take" an endangered species, 16 U.S.C. § 1538(a)(1)(B), where "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," 16 U.S.C. § 1532(19); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703-04 (1995). Federal regulations extend the take prohibition to threatened species under FWS's jurisdiction, 50 C.F.R. § 17.31, and further define "harm" and "harass" as used in the "take" definition. 50 C.F.R. § 17.3; 40 Fed. Reg. 44,412 (Sept. 26, 1975); 46 Fed. Reg. 54,748 (Nov. 4, 1981).

Section 9's take prohibition is not absolute. Where FWS concludes in a Section 7(a)(2) consultation that the action is not likely to jeopardize listed species or destroy or adversely modify their critical habitat, FWS prepares an incidental take statement (ITS). An ITS exempts the action agency from Section 9 liability for any incidental "take" resulting from the proposed agency action. 16 U.S.C. § 1536(b)(4), (o). Non-federal entities or individuals, by contrast, can avoid Section 9 liability by obtaining an incidental take permit (ITP) under Section 10 of the ESA. 16 U.S.C. § 1539. To apply for an ITP, applicants submit a Habitat Conservation Plan

(HCP) that specifies the impacts on species, minimization and mitigation measures, funding, alternatives considered, and other measures. 16 U.S.C. § 1539(a)(2)(A). FWS reviews the HCP and must make several findings to issue an ITP. 16 U.S.C. § 1539(a)(2)(B). If these and other requirements are met, FWS issues the ITP. 50 C.F.R. § 17.32(b)(2)(i).

## FACTUAL BACKGROUND

### I.    THE DESCHUTES PROJECT

Crane Prairie and Wickiup dams, located southwest of Bend, Oregon, were financed and constructed by the United States in 1940 and 1949, respectively. Deflitch Decl. ¶¶ 11, 15-16, 21-32.[2] Under the 1902 Reclamation Act, as amended, Pub.L. 57-161, ch. 1093, 32 Stat. 388 (codified, as amended, 43 U.S.C. 371 *et seq.*), these projects are authorized principally for irrigation. *See* Deflitch Decl. ¶ 11; US Ex. A (project authorizations). Crane Prairie Dam was completed in 1940 and has a reservoir capacity of 55,300 acre-feet.[3] Deflitch Decl. ¶¶ 21-23. Wickiup Dam, located two miles downstream from Crane Prairie Dam, was completed in 1949 and has a total reservoir capacity of 200,000 acre-feet. *Id.* ¶ 26. Other irrigation facilities, such as irrigation canals, exist in the Upper Deschutes Basin, many of which are privately owned and operated. *See generally id.* at 5 (Fig. 2); ECF 21-5 at 30-31, 36 (PI Ex. 18).[4]

The United States possesses title to Crane Prairie and Wickiup dams. Deflitch Decl. ¶ 9 & Table 1, Fig. 2. The United States, however, financed and constructed the dams to facilitate private irrigation activities that were occurring prior to Reclamation's involvement. *Id.* ¶¶ 5-6,

---

[2]  Federal Defendant has filed in support of this opposition the declarations of: Bridget Moran, FWS ("Moran Decl."); Jennifer Johnson, Reclamation ("Johnson Decl."); Wendall Scott Willey, Reclamation ("Willey Decl."); Douglas Deflitch, Reclamation ("Deflitch Decl."), and Michael R. Eitel. The exhibits to the Eitel Declaration are referred to herein as "US Ex."

[3]  "Cubic feet per second" ("cfs") is a rate of flow that supplies one cubic foot of water in one second (equivalent to 7.48 gallons per second). "Acre-feet" ("af") is the volume of water needed to cover one acre to a depth of one foot (equivalent to 325,851 gallons).

[4]  Plaintiffs' exhibits are referenced herein by the ECF-generated document number, followed by the ECF-generated page number, followed by a reference to the exhibit number. Plaintiffs' preliminary injunction motion (ECF 20) is referenced as "PI Br." and citations are to the brief's internal page numbers. Plaintiffs' declarations are reference by ECF number and internal paragraph number (*e.g.*, ECF 23 ¶ X).

11. Congress also provided that nothing in the Reclamation laws shall be construed as affecting or interfering with state laws "relating to the control, appropriation, use, or distribution of water used in irrigation." 43 U.S.C. § 383. The irrigation districts perfected the state water rights in their names to store water behind Crane Prairie and Wickiup dams, and this allows them to divert storage water for downstream irrigation. Deflitch Decl. ¶¶ 18-20 & Table 4; Johnson Decl. ¶ 13 & Table 2; ECF 21-5 at 40, 44 (PI Ex. 18). In the late 1930s, the United States entered into repayment contracts with the Central Oregon Irrigation District (COID) and the North Unit Irrigation District (NUID) to define the distinct roles and interests of Reclamation and the districts. Deflitch Decl. ¶¶ 13, 15-16 & Table 3.[5]

These contracts provide that, in exchange for the United States' financing and construction of Crane Prairie and Wickiup dams, COID and NUID would repay the construction costs and assume responsibility for operating and maintaining the projects. *See, e.g.*, US Ex. B (1938 COID Contract ¶¶ 25, 35, 42); US Ex. D (1954 NUID Contract ¶¶ 15(a), 16(c), 20(a), 23(a)). Crane Prairie and Wickiup dams are therefore classified as "transferred works" because, as authorized under the law, Reclamation contracts transferred to the districts the responsibility for operating and maintaining the projects. Willey Decl. ¶ 11; 43 U.S.C. § 499 (Secretary of the Interior is authorized "to transfer to such … irrigation district the care, operation, and maintenance of all or any part of the project works"). Following construction of the projects, the irrigation districts, in conjunction with the Oregon Water Resources Department (the State agency that administers state water rights), have operated and controlled the storage and release of water from Wickiup and Crane Prairie dams. Deflitch Decl. ¶¶ 18-20, 33-39.

The districts' water operations at Crane Prairie and Wickiup dams are governed by

---

[5] For Crane Prairie dam, the United States entered into a 1938 contract with COID, which remains in effect. US Ex. B. For Wickiup dam, the United States entered into a 1938 contract (US Ex. C) with the Jefferson Water Conservancy District (now NUID), which was superseded by a 1954 contract (US Ex. D). Congress later approved the 1954 contract (68 Stat. 679) and amended it in 2008 to, among other things, expand the potential uses of stored water for "instream purposes, including fish or wildlife purposes, to the extent that such use is required by Oregon State law." Pub. L. 110-229, 122 Stat. 754. The 1954 contract was supplemented in 1955 (US Ex. E) to transfer the operations and maintenance of Wickiup Dam and Reservoir to NUID.

Reclamation law, Reclamation contracts, state water rights held by the districts, and a 1938 contract between several irrigation districts that allocates storage behind Crane Prairie and Wickiup dams. Deflitch Decl. ¶ 10. Generally, in the spring, summer, and fall (April 1 to October 31), water stored in Wickiup and Crane Prairie reservoirs is released downstream and diverted into a series of canals near Bend. ECF 21-5 at 40-41, 44-45 (PI Ex. 18). Depending on the year, this storage water is used to irrigate about 85,000 acres of project lands to produce grain, hay, pasture, potatoes, mint, and seeds (grass, carrot, garlic). *Id*. at 34 (PI Ex. 18); S. REP. 110-25, 1, 2007 WL 521874 (Feb. 16, 2007) ("Approximately 900 farms and ranches receive irrigation water from [NUID] for farming and ranching"). In the winter months (November to March), Wickiup and Crane Prairie reservoirs are refilled, where the majority of natural flow is generally stored in, and certain minimum flows released from, the reservoirs. ECF 21-5 at 33 (PI Ex. 18); *see generally* Deflitch Decl. ¶¶ 33-39.

## II.    ENDANGERED SPECIES ACT COMPLIANCE FOR THE DESCHUTES PROJECT

### A.    Early Endangered Species Act Compliance

In the late 1990s, NMFS listed several species of anadromous salmon and steelhead under the ESA, including Middle Columbia River steelhead. 64 Fed. Reg. 14,517 (Mar. 25, 1999); 71 Fed. Reg. 834, 853 (Jan. 5, 2006). NMFS and FWS later listed several other species affected by river conditions in the Deschutes Basin, including bull trout. 64 Fed. Reg. 58,910 (Nov. 1, 1999). In light of these listings, Reclamation routinely consulted with NMFS and FWS on specific actions it authorized, funded, or carried out, including construction activities, habitat enhancement projects, adoption of resource management plans, and other similar actions. *See* ECF 21-5 at 23-24 (PI Ex. 18, Table 1-1).

In 2003, Reclamation consulted with NMFS and FWS more broadly on three projects— the Deschutes, Crooked River, and Wapinitia Projects. Willey Decl. ¶ 7. Reclamation identified the "action" as the "operation and maintenance of Reclamation project facilities throughout the Deschutes River basin." ECF 21-5 at 18 (Ex. 18). It clarified, however, that it was not operating

several projects, including Crane Prairie and Wickiup dams.[6] Instead, Reclamation consulted

over these actions based on its "authority to operate, largely defined by Reclamation ownership."

*Id*. at 28. This consultation was completed in 2004 and 2005. Willey Decl. ¶¶ 8-9.

      In the mid-2000s, regional efforts shifted to more comprehensively address the Deschutes

River Basin's fish and wildlife resources. Specifically, the Deschutes Basin Board of Control

(DBBC)[7] and the City of Prineville initiated the Deschutes Basin Multi-Species Habitat

Conservation (Deschutes HCP) process. Moran Decl. ¶¶ 11-13; Deflitch Decl. ¶¶ 44-47; Willey

Decl. ¶¶ 10-16. As explained above, an HCP is part of the ESA Section 10 incidental take

permitting process and represents a comprehensive plan that specifies the impact of covered

actions (e.g., irrigation activities) on listed species, minimization and mitigation measures,

funding, alternatives considered, and other measures. 16 U.S.C. § 1539(a)(2)(A). The Deschutes

HCP process represents a multi-year, multi-million dollar commitment by numerous state,

federal, tribal, and non-governmental entities to work collaboratively in ensuring that the Basin's

listed and sensitive fish and wildlife resources are protected and conserved. Moran Decl. ¶¶ 11-

13 (explaining substantial resources, including $2.6 million, dedicated to this effort).

### B.    ESA Listing Of The Oregon Spotted Frog

      In the midst of the Deschutes HCP process, FWS listed the Oregon spotted frog as a

threatened species. 79 Fed. Reg. 51,658 (Aug. 29, 2014). The spotted frog occupies 15 sub-

basins ranging from southwestern British Columbia southward to the Klamath Basin in southern

Oregon. *Id*. at 51,663, 51662. This current range has been reduced from historical times due to

continued habitat destruction, predation by non-native species, inadequate existing regulatory

mechanisms, and other natural and man-made factors. *Id*. at 51,658; Willey Decl. ¶ 34.

---

[6] *See* ECF 21-5 at 30 (PI Ex. 18, Table 2-1) (noting that COID and NUID are responsible for operating Crane Prairie and Wickiup dams); *id*. at 40 (Crane Prairie dam and reservoir operations transferred to COID, and "Reclamation owns no water rights for storing or diverting Crane Prairie stored water"); *id*. at 44 ("NUID operates Wickiup Dam and Reservoir" and "Reclamation does not hold the water right for storing or diverting Wickiup stored water").

[7]   The DBBC represents eight irrigation districts operating in the Upper Deschutes sub-basin— COID, NUID, and the Arnold, Ochoco, Swalley, Lone Pine, Three Sisters, and Tumalo.

In Oregon, the species occupies numerous sub-basins, including the Upper Deschutes and Little Deschutes sub-basins. Willey Decl. ¶¶ 35-36. In the Upper Deschutes, most spotted frog breeding sites and habitat are located above or surrounding Crane Prairie and Wickiup dams. 79 Fed. Reg. at 51,666. On the Deschutes River below Wickiup Dam, the spotted frog occupies five breeding areas—Dead Slough, La Pine State Park (SP), Sunriver, Slough Camp, and the Old Mill casting pond in Bend, Oregon. Moran Decl. ¶ 20 & Fig. 3; Willey Decl. ¶ 22 & Fig. 1.[8] These sites include Sunriver—"the largest population of Oregon spotted frogs within the Upper Deschutes River sub-basin." 79 Fed. Reg. at 51,666. This population is actively managed by using weirs to stabilize the water levels during portions of the year, and it is also positively influenced by late-spring and summer irrigation releases from Wickiup dam. Moran Decl. ¶¶ 32-33. The Little Deschutes sub-basin includes 23 known breeding locations spread across five watersheds. Much of the land in this area is private and unsurveyed, and "the frog population within the unsurveyed areas may be well above" the minimum estimate of female breeding frogs in this area. 79 Fed. Reg. 51,666. While the listing rule discussed population estimates as of 2014, updated adult breeding estimates are available. *See* ECF 21-1 at 81-82 (PI Ex. 5).[9]

Oregon spotted frogs begin their breeding season in February or March at lower elevations and between April and early June at higher elevations. 79 Fed. Reg. at 51,659, 51,663. Spotted frogs typically lay eggs in shallow, often temporary pools of water or wetlands, or on gradually receding shorelines. *Id*. at 51,660. Because of this, spotted frog eggs are naturally "extremely vulnerable to desiccation [drying out] and freezing as a result of the species' laying habitats," and spotted frogs have "highly variable mortality rates." *Id*. at 51,659-60. Moreover,

---

[8] Plaintiffs assert that Bull Bend, located five miles downstream of Wickiup Dam, is a known breeding site. PI Br. at 4, 9, 23. While post-metamorphic spotted frogs were observed in the area in 2013, breeding has not been observed and spotted frogs have not been located at this site in later years. Moran Decl. ¶ 21 & n.1. Further, Dilman Meadows is an off-channel spotted frog restoration site below Wickiup Dam that is not directly affected by Deschutes River flow but provides additional breeding, rearing, and overwintering habitat. Willey Decl. ¶ 45.

[9] Plaintiffs' discussion of female breeder estimates at each site ignores this available survey data. PI Br. at 4-5; ECF 23 ¶ 33; *compare* ECF 23 ¶ 33 (identifying 10 female breeders at East Slough Camp); *with* ECF 21-1 at 81 (identifying 39 female breeders at this site in 2015).

"Oregon spotted frogs exhibit relatively high fidelity to breeding locations, using the same seasonal pools every year and often using the same egg-laying sites." *Id*. at 51,687. Thus, stochastic events (*e.g*., uncertain or random events) "could significantly reduce the Oregon spotted frog population associated with that sub-basin." *Id*. After breeding, spotted frogs generally move to deeper, permanent pools or creeks (in June to August), and then back toward their overwintering sites located near breeding areas in the wet season (September to January). *Id*. at 51,661; *see generally* Willey Decl. ¶¶ 23-33.

### C.    Current Endangered Species Act Compliance

Even before FWS listed the Oregon spotted frog, the irrigation districts incorporated the spotted frog as a covered species in the Deschutes HCP. The spotted frog's ESA listing therefore added additional complexity to an already massive process addressing all of the Deschutes River Basin's listed and sensitive fish and wildlife resources. Despite the added complexities, the irrigation districts, FWS, and many others have made significant progress. FWS, for example, has already devoted over $2.6 million to the HCP effort, which is scientifically evaluating the effects of irrigation activities and identifying conservation actions that can be implemented to benefit spotted frogs. *See* Moran Decl. ¶ 11; Deflitch Decl. ¶¶ 44-47; Willey Decl. ¶¶ 10-16.

The HCP process has not occurred haphazardly, but has instead taken into account the current scientific understanding of spotted frogs and their habitat. Moran Decl. ¶¶ 11-13; Willey Decl. ¶¶ 13-16. These efforts are proving successful. For example, the irrigation districts are implementing the "Oregon spotted frog Proposal" (OSF Proposal), which dedicates 15,700 acre-feet of water for spotted frog conservation actions. *See* ECF 21-9 at 6-10 (PI Ex. 19). This action provides more stable and favorable habitat conditions at Crane Prairie reservoir, as well as increased instream flows below Crescent Lake (from about 6 cfs to 30 cfs of flow) and 700 acre-feet of water for an off-channel habitat restoration on the Deschutes River. *See generally* US Ex. F at 4-6 (discussing the proposal); Willey Decl. ¶¶ 46-58, 61.

The irrigation districts also will adjust operations to provide 600 cfs of flow below

Wickiup Dam by March 31. US Ex. G at 3.[10] The districts coordinated this action with FWS, the Warm Springs Tribes, and Reclamation, and the action is expected to provide more favorable conditions for spotted frogs. *Id.*; *see also* Moran Decl. ¶¶ 8, 28; Willey Decl. ¶¶ 53-55, 61. As part of this action, the irrigation districts also will adjust operations gradually in the spring (ramp up) and fall (ramp down), monitor the effects of operating the dams, and adapt operations "as per guidance from [FWS] to optimize conditions for [Oregon spotted frogs]." US Ex. G at 3.

Because some of these early conservation actions may require Reclamation approval or other affirmative action under the contracts, Reclamation initiated consultation with FWS in 2015. ECF 21-9 at 2 (PI Ex. 19). Reclamation determined that consulting on whether or how it approves changes to existing contracts was appropriate. *See* US Ex. H. Unlike the prior 2003 consultation, where Reclamation consulted generally on the "operation" of three large projects, Reclamation explained that the current ESA consultation better reflects its actual roles and responsibilities for Wickiup and Crane Prairie dams. *Id.* at 4-7. Specifically, Reclamation is not operating the projects, and its contracts with NUID and COID do not "commit[] Reclamation to act with respect to the operation." *Id.* at 7. "[N]or are the District's continued operation and maintenance responsibilities contingent on any ongoing or routine approval of the Secretary." *Id.* While Reclamation has rights under the contracts—for instance, to inspect the facilities and assume control over project operations in defined instances—it explained that it is not operating the projects or authorizing the districts to perform those actions. *Id.* at 4-7.

Thus, rather than consult on the irrigation districts' non-federal operations of Crane Prairie and Wickiup dams that are being analyzed in the Section 10 HCP process, Reclamation initiated consultation on its own proposed action of approving or authorizing changes under its contracts. *Id.*; ECF 21-9 at 2 (PI Ex. 19). This Section 7 consultation is expected to be complete

---

[10]  As this exhibit shows, the irrigation districts and Reclamation engaged in a good faith effort to resolve this dispute with Plaintiffs. The exhibit also refutes Plaintiffs' representations that the irrigation districts are not providing any spring breeding flows from Wickiup dam, such that emergency relief is needed by April 1. *See* PI Br. at 30 (incorrectly asserting there is "absolutely nothing to reduce harm to frogs on the mainstem Deschutes River" and therefore emergency relief needed "the first week of April").

in July 2017, and the consultation is evaluating how the operations of the projects, as modified by implementation of early conservation actions, is likely to affect Oregon spotted frogs. ECF 21-9 at 32 (PI Ex. 22);[11] Moran Decl. ¶ 14 & Fig. 2. The consultation will govern project operations pending completion of the Deschutes HCP, which is expected to be occur in 2019. Moran Decl. ¶ 13 & Fig. 1.

## STANDARD OF REVIEW

In an ESA case, the Ninth Circuit recently explained that a plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). Because a "preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong,* 520 U.S. at 972, whose "purpose … is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981), the party seeking such an injunction must make "a clear showing that the plaintiff is entitled to such relief," *Winter,* 555 U.S. at 22.[12]

The standards are altered where, as here, a plaintiff seeks a mandatory injunction that "goes well beyond simply maintaining the status quo pendent lite." *Stanley v. Univ. of S. Cal.*, 13

---

[11]  Plaintiffs argue that the ESA consultation is limited to evaluating only the effects of those conservation actions Reclamation proposes to approve or authorize under its contracts. PI Br. at 17-18. Plaintiffs misunderstand the scope of analysis in an ESA consultation. However characterized (*i.e.*, indirect, inter-related, inter-dependent, or cumulative effects), the effects of operating the dams, as modified by the conservation measures, must be evaluated in the ESA consultation. *See Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031, 1045 (9th Cir. 2015) (discussing effects considered in a biological opinion); *id*. at 1047 & n. 13 ("FWS is required in its biological opinion to determine 'whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species.'") (citation omitted).

[12] Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). "[S]erious questions going to the merits" requires more than a showing that "success is more likely than not[;]" it requires a plaintiff to demonstrate a "substantial case for relief on the merits." *Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).

Federal Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction
*Center for Biological Diversity v. U.S. Bureau of Reclamation*; 6:15-cv-02358-TC

F.3d 1313, 1320 (9th Cir. 1994); *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are those that "order [] a responsible party to take action") (citation omitted). Because mandatory injunctions are "particularly disfavored," requests for this relief are subject to "heightened scrutiny." *Dahl v. HEM Pharms. Corp.* 7 F.3d 1399, 1403 (9th Cir. 1993). As the Ninth Circuit recently explained, "[t]he 'district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Garcia*, 786 F.3d at 740 (citation omitted). "In plain terms, mandatory injunctions should not issue in 'doubtful cases.'" *Id.* (citation omitted).

## ARGUMENT

### I.   PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM.

To prevail, Plaintiffs must demonstrate that *they*—not the environment—are likely to suffer irreparable harm. *Winter*, 555 U.S. at 20 (plaintiff must establish "that *he* is likely to suffer irreparable harm") (emphasis added); *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 180-81 (2000) (relevant showing "is not injury to the environment, but injury to the plaintiff"). The harm must be immediate, individualized, and substantiated with evidence. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Leiva-Perez v. Holder*, 640 F.3d at 968-69. And Plaintiffs must do more than establish standing. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, … a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm.").

Plaintiffs submit standing declarations alleging that their members visit and recreate in the Upper Deschutes sub-basin to look for Oregon spotted frogs. PI Br. at 2 n.1; ECF 22 (Curry Decl.).[13] Any harm to Plaintiffs is therefore "based derivatively on the harm they allege to the

---

[13] WaterWatch cannot establish Article III standing because its complaint contains no standing allegations at all, necessitating dismissal of the complaint. *See* ECF 4; *Chapman v. Pier 1 Imports (U.S.)*, 631 F.3d 939, 954-55 & n.9 (9th Cir. 2011) (*en banc*) (vacating summary judgment and ordering dismissal where complaint "fails to sufficiently allege the essential elements of Article III standing"). Even assuming that was not the case, WaterWatch's standing declarations are facially deficient. Mr. Perin alleges an interest in fish, not frogs. ECF 26 ¶¶ 3-4; *N.C. Fisheries Ass'n v. Pritzker*, No. 4:14-CV-138-D, 2015 WL 4488509, at *6 (E.D.N.C. July 22, 2015) ("Plaintiffs have not alleged that any of their members have an 'aesthetic' or 'recreational' interest in sea turtles"). Ms. Priestly, in turn, establishes only that WaterWatch is actively pursuing its mission. ECF 24 ¶¶ 16-22; *El Rescate Legal Servs. v. Exec. Office of*

[spotted frogs]" in the Upper Deschutes sub-basin. *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, --F.Supp.3d--, 2015 WL 9700887, at *6 (W.D. Wash. Jan. 7, 2015). To "irreparably" injure these viewing interests, it is axiomatic that there must be significant population-level effects to the species in question. *Id*. at *7-8; *Winter*, 555 U.S. at 22-23 (plaintiffs must show each element of the proposed injunction is necessary to avoid irreparable harm to their viewing activities). These standards accord with the ESA, which does not confer private rights in individual animals, but provides public rights in the protection of "species." 16 U.S.C. § 1531(b); *Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009) ("[T]o consider any taking of a listed species as irreparable harm would produce an irrational result" because, *inter alia*, the ESA permits incidental takings).[14]

Thus, as this Court and many others have held, "[i]rreparable harm to ESA listed species must be measured at the *species* level," and a "plaintiff must present a 'concrete showing of probable deaths during the interim period and of how these deaths may impact the species.'" *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (citation omitted); *see also Idaho Rivers*, 2015 WL 9700887, at *7-8; *S. Yuba River Citizens League v. NMFS*, No. 2:13-cv-00059-MCE, 2013 WL 4094777, at *7 (E.D. Cal. Aug. 13, 2013);

---

*Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (organization suffers an injury in fact when "defendants' 'practices have perceptibly impaired [the plaintiff's] ability to provide" the services it was formed to provide). Thus, the Court lacks jurisdiction to grant WaterWatch any relief, including preliminary injunctive relief. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.").

[14] Plaintiffs' assertion that a Section 9 violation *per se* establishes irreparable harm improperly conflates the merits and irreparable harm inquiries. *Winter*, 555 U.S. at 32 (an injunction "does not follow from success on the merits as a matter of course"); *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994); *Alabama v. U.S. Army Corps of Eng'rs*, 441 F.Supp.2d 1123, 1135 (N.D. Ala. 2006) (even if the action "resulted in an impermissible take, [plaintiff] would still be required to prove irreparable harm"). Even in Section 9 cases, a plaintiff must show "[a] reasonably certain threat of imminent harm to a protected *species*." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) (emphasis added); *Ctr. for Envtl. Sci., Accuracy & Reliability v. Cowin*, No. 1:15-CV-00884 LJO, 2015 WL 3797693, at *9 (E.D. Cal. June 18, 2015) (discussing *Marbled Murrelet* and other law; holding that a single "take" "is insufficient on its own to establish irreparable harm"); *Wild Equity Inst. v. City and Cty. of San Francisco*, No. C11-058 SI, 2011 WL 5975029 (N.D. Cal. Nov. 29, 2011) (same).

---

*Defenders of Wildlife*, 812 F. Supp. 2d at 1209; *Pac. Coast Fed'n of Fisherman's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210, n.12 (E.D. Cal. 2008). Plaintiffs cannot make this showing. Irreparable harm is not likely to occur during the pendency of this case, either to the spotted frogs in the Upper Deschutes or Plaintiffs' derivative interests in searching for them.

      **A.**    **The Status Of Oregon Spotted Frogs Is Not Likely To Degrade, But Improve, During The Pendency Of This Case.**

The fallacy of Plaintiffs' motion is that the Upper Deschutes spotted frog populations are at imminent risk, such that their status is likely to immediately degrade and prevent the Court from granting meaningful relief (if necessary). *Humane Soc'y of U.S. v. Bryson*, No. 3:12-cv-00642-SI, 2012 WL 1952329, at *5 (D. Or. May 30, 2012) ("The purpose of a preliminary injunction is to prevent harm that would impair this court's ability to grant effective relief after resolving the merits of the case.").

The threats to Upper Deschutes spotted frogs have been occurring for decades. During this time, the spotted frogs have persisted and continue to breed and reproduce in the areas affected by operations of Wickiup and Crane Prairie dams. ECF 21-1 at 81-82 (Ex. 5 at 1-2) (breeding locations and population estimates for spotted frogs in areas influenced by dam operations). Indeed, the Upper Deschutes and Little Deschutes sub-basins represent a stronghold for the entire listed species; spotted frogs are widely distributed through these sub-basins, include some of the largest aggregations of spotted frogs range-wide (*i.e.*, Sunriver, Big Marsh above Crescent Lake), and contain numerous occupied sites in the areas influenced by operation of Crane Prairie, Wickiup, and Crescent Lake dams. 79 Fed. Reg. at 51,665-66 (discussing occupied habitat and breeding sites in the Upper Deschutes and Little Deschutes sub-basins); *id.* at 51,663 (while most populations range-wide are small and isolated, those in the "lower Little Deschutes River are aquatically connected with those below Wickiup Reservoir").

Plaintiffs do not directly confront these facts. Instead, they offer summaries *implying* that spotted frogs have nowhere to perform essential life-history functions. *See* PI Br. at 23 (water "fail[s] to inundate breeding habitat" and "[a]ll suitable rearing and summer foraging habitat" is

dry and unavailable); *id*. at 26 ("All off-channel habitat and nearly all river edge habitat was dry and unusable…"); ECF 23 at ¶ 39 (flows below Wickiup dam "do not occur early enough to inundate breeding habitat"). Plaintiffs overstate the evidence. For example, Plaintiffs repeatedly argue that the East Slough Camp breeding site was "all or mostly dry" in 2013 and 2015, "either preventing or delaying breeding." PI Br. at 9. Breeding in the sub-basin, including at East Slough Camp, was not prevented in these years. *See* ECF 21-1 at 81 (Ex. 5) (showing breeding in 2013 and 2015 at the East Slough Camp site). And Plaintiffs offer mere speculation that breeding was delayed.[15]

Plaintiffs' arguments (PI Br. at 9-10, 29-30) that water management causes rampant egg desiccation and stranding fail for similar reasons, as Plaintiffs fail to grapple with the frog's basic biology. Because the spotted frogs lay eggs in shallow, often temporary pools of water or on gradually receding shorelines, spotted frog eggs are naturally "extremely vulnerable to desiccation [drying out] and freezing as a result of the species' laying habitats," and the spotted frogs have "highly variable mortality rates." 79 Fed. Reg. at 51,659-60. Not every desiccated egg or stranded frog is attributable to water management actions.[16] Nor does every desiccated egg or stranding cause an imminent risk to these populations. *See* PI Br. at 9, 23 (relying on a single stranding incident at East Slough Camp in 2014); *but see* ECF 21-1 at 81 (Ex. 5) (survey results demonstrating successful breeding the next year (2015) at East Slough Camp).

---

[15] These are not isolated examples. *Compare* ECF 23 ¶¶ 66-67 (Simpson asserting that Crane Prairie reservoir habitat conditions were inadequate between 2010 and 2015), *with* ECF 21-1 at 81 (PI Ex. 5) (showing increased numbers of surveyed breeding adults in 2015); *compare* ECF 23 ¶ 79 (implying that breeding cannot occur successfully at the Casey tract site on the Little Deschutes River with flows below 140 cfs), *with* ECF 21-1 at 82 (PI Ex. 5) (showing successful breeding at the Casey tract site in years where the identified flows were absent, such as 2012).

[16] Plaintiffs' example of a stranding at East Slough Camp in 2014 is a case in point. In unqualified terms, Plaintiffs argue the stranding was caused by the "timing of irrigation releases." PI Br. at 9, 23 (citing PI Ex. 5, 10, 14). None of the cited exhibits correlate the desiccated eggs to "irrigation releases." In fact, Exhibit 10 (ECF 21-2 at 17) and Exhibit 14 (ECF 21-4 at 20) show constant (or increasing) irrigation releases from Wickiup dam, but a drop in water flows 45 miles downstream at Benham Falls (which lies immediately upstream of East Slough Camp, *see* Willey Decl. ¶ 22 & Fig. 1). This is a complex system, where river flows and habitat conditions at sites like the East Slough Camp are affected by numerous sources, not just the rate of water flowing out of Wickiup dam. Moran Decl. ¶¶ 22, 34-35 & n.3, 48.

Plaintiffs have only recited general adverse effects to spotted frogs. They have "made no real effort to quantify the effects of continued dam operation on these species, and more importantly have made no attempt whatsoever to quantify any impact occurring during the interim [] period that will elapse" before the merits can be decided. *S. Yuba River Citizens League*, 2013 WL 4094777, at *7. For good reason—the evidence does *not* show "that the existing threats are of such a great magnitude that Oregon spotted frogs are in immediate danger of extinction." 79 Fed. Reg. at 51,707. Plaintiffs agree. They concede that any imminent, population-level harms are purely speculative and conjectural. *See, e.g.*, PI Br. at 3 ("A stochastic event that affects a breeding site *could* significantly reduce the Oregon spotted frog population") (emphasis added); *id.* (noting "*potential* loss of the entire reproductive cohort") (emphasis added); *id* at 9 ("Impacts to breeding habitat *may* cause the loss of an entire reproductive cohort…") (emphasis added); *id.* at 11 (populations "could" be eliminated); ECF 23 ¶ 55 (noting "potential loss" of spotted frogs). A mere "possibility" of irreparable harm does not suffice, as that standard "is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

More critically, the evidence shows that the status of the frogs is likely to improve during this case. The irrigation districts are implementing several "'early action' conservation measures" to immediately improve habitat conditions and benefit spotted frogs (the OSF Proposal). ECF 21-9 at 6-10 (PI Ex. 19). With direct input and assistance from FWS, ECF 21-9 at 33 (PI Ex. 22), the districts are allocating 15,700 acre-feet of water to: maintain Crane Prairie reservoir elevations at a constant volume between 40,000 and 50,000 acre-feet; provide 30 cfs of minimum instream flows below Crescent Lake dam; and provide 700 acre-feet of water for an off-channel wetland enhancement project. US Ex. F at 3-6; Willey Decl. ¶¶ 46-58, 61. The irrigation districts further will ramp up irrigation releases in March to provide at least 600 cfs of flow below Wickiup Dam from March 31 through September 15, ramp down flows in October, and perform monitoring and adaptive management "as per guidance from the [FWS] to optimize

conditions for the [Oregon spotted frog]." US Ex. G at 3.

The evidence shows that these measures are likely to benefit spotted frogs and improve the *status quo*. Crane Prairie reservoir elevations are maintained at constant levels through the frog's breeding and rearing periods, Johnson Decl. ¶ 25 & Fig. 2, which FWS explained is likely to "prevent spotted frogs from depositing egg masses in a location where they are likely to strand," ECF 21-9 at 33 (Ex. 22). Providing 30 cfs below Crescent Lake is an improvement over prior conditions and likely to benefit frogs. Moran Decl. ¶ 38; Willey Decl. ¶ 52. The 600 cfs spring breeding flow releases below Wickiup dam are tied to existing data and are likely to increase the quality of breeding habitat at the Dead Slough breeding site. Moran Decl. ¶ 27 (water levels at this breeding site approached riparian vegetation at 550 cfs, which "provides quality rearing habitat for spotted frog tadpoles once the eggs hatch"); *id*. ¶ 28 (explaining the 600 cfs operation is within the range of conditions that are likely to further improve breeding at this site). Dead Slough contains the only consistently breeding population in the 22-mile stretch of river below Wickiup dam, is important to the recovery of the frogs, and is likely to improve as a result of the districts' conservation actions. *Id*. ¶¶ 25, 27-28.

Plaintiffs disagree, arguing that the measures are inconsequential because FWS said they only were a "step in the right direction." PI Br. at 25. But FWS views these actions as "a step in the right direction *to minimize impacts to the spotted frog*" and, moreover, explained why the measures "should provide a *conservation benefit* to the species." ECF 21-9 at 33 (Ex. 22) (emphasis added); Moran Decl. ¶ 8, 28, 38. Plaintiffs' declarant, too, admits the benefits of these actions. ECF 23 ¶ 98 (agreeing that the Crane Prairie operations "will provide for inundation of suitable habitat").[17] And Plaintiffs cannot seriously dispute that providing 600 cfs of flow below

---

[17]  Plaintiffs' arguments in this regard also are contradictory. On the one hand, they argue that Crane Prairie reservoir provides key habitat for Oregon spotted frogs and that reservoir operations should be modified to benefit frogs. PI Br. at 32; ECF 23 ¶¶ 63-64. On the other hand, they argue that "the existence of the Crane Prairie … on the landscape [is] damaging to frogs." PI Br. at 33; ECF 23 ¶ 93(g). This contradiction is unexplained, and Plaintiffs' latter point that the reservoir is damaging to frogs is false. *See* 78 Fed. Reg. 53,538, 53,570 (Aug. 29, 2013) (proposing to designate Crane Prairie reservoir as critical habitat and thus essential to recovery).

Federal Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction
*Center for Biological Diversity v. U.S. Bureau of Reclamation*; 6:15-cv-02358-TC

Wickiup dam benefits frogs, as 600 cfs is more flow than Plaintiffs' own "run-of-the-river" option would provide. Johnson Decl. at 22 (Fig. 11) (showing that Plaintiffs' option provides the lowest flows of the year—median flows down to 400 cfs—during the frog's breeding season); ECF 25-2 at 13 (Kamman Ex. B at 12) (Fig. 4d, depicting flows well below 600 cfs, at times below 200 cfs, under Plaintiffs' option). That leaves Plaintiffs' retort that the measures do not go far *enough*. *See, e.g.*, ECF 23 ¶ 98 (Simpson discussing continued "potential" for stranding). Plaintiffs miss the point. Actions that improve the status of frogs and serve Plaintiffs' interests in searching for them do not equate to irreparable harm.

In short, despite seeking relief by April 1 to address the spotted frog breeding season, and despite being aware of the districts' actions, Plaintiffs neglected to inform the Court how operations are occurring this year. These actions cannot be ignored. *Winter*, 555 U.S. at 23 (finding it "significant" that the lower court failed to address irreparable harm in view of interim measures being implemented by the Navy). Nor can they be dismissed. Frogs have persisted in these areas for over 70 years, and the districts' conservation actions are materially improving the status of the frogs in these areas. This is not a situation where the frog populations or Plaintiffs' interests in viewing them are likely to be irreparably harmed while the Court addresses the merits, and Plaintiffs cannot substantiate their request for emergency relief. *Univ. of Texas v. Camenisch*, 451 U.S. at 395 (sole function of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held").

### B.    Plaintiffs Have Not Met Their Burden To Show That Injunctive Relief Is Necessary Or That Their Proffered Relief Will Benefit Spotted Frogs.

The facts and evidence belie Plaintiffs' assumptions of irreparable harm, and Plaintiffs' filings confirm that they cannot show entitlement to emergency relief. Specifically, "plaintiffs must show that *each item of injunctive relief they seek* is necessary to avoid irreparable harm to the listed species during the interim period." *S. Yuba River Citizens League*, 2013 WL 4094777, at *8 (emphasis added). In *Winter*, for example, only two of several mitigation measures were at issue, and the Supreme Court explained that plaintiffs must prove that the two disputed measures

are necessary to avoid irreparable harm to their interests in viewing marine mammals. 555 U.S. at 22-23. Plaintiffs have not made, and cannot make, this showing.

Plaintiffs submit two "options" for relief. One option—the "regulated" option—is predicated on holding Crane Prairie reservoir at a constant elevation and providing uniform, static flows below Wickiup dam over the entire year. PI Br. at 31-32.[18] The second option—the "run-of-the-river" option—also is based on holding Crane Prairie reservoir at a static elevation, but eschews static flows below Wickiup dam in favor of uncertain and variable flows. PI Br. at 32-33; ECF 25-2 at 13 (Kamman Decl. Ex. B, Fig. 4d). The premise of each option (static versus variable flows) is incompatible, and the specific elements of each option are irreconcilable. Plaintiffs' regulated option, for instance, states that maintaining flows below Wickiup dam between 650 cfs and 838 cfs is critical for spotted frog breeding. In stark contrast, Plaintiffs' "run-of-the-river" option provides the lowest flows of the year during the breeding season. Johnson Decl. at 22 (Fig. 11); ECF 25-2 at 13 (Kamman Ex. B at 12) (Fig. 4d).

Plaintiffs do not explain these inconsistencies. Nor do Plaintiffs correlate their proposed flows with likely changes to spotted frog habitats at each known occupied site in the Upper Deschutes sub-basin. PI Br. at 31 (relying solely on Simpson declaration); ECF 23 ¶ 93-95 (Simpson, setting forth, without more, "recommendations"). Instead, Plaintiffs presume a benefit and ask the Court to resolve the inconsistencies and contradictions conspicuously present in Plaintiffs' requests. Particularly when seeking mandatory relief, the law requires far more than summarily providing inconsistent recommendations from a single individual developed after no more than 19 field trips to multiple locations in a less-than-three month period covering less than one portion of the frog's life-cycle. ECF 23 at ¶ 18.[19]

---

[18] Plaintiffs contradictorily ask that Wickiup releases be constantly adjusted to ensure that wetlands along 60 miles of river never deviate by more than two inches. ECF 23 ¶ 93(c). Even if this were possible (which it is not), Plaintiffs never reconcile this request with their desire to hold Wickiup releases at a constant level. Nor do Plaintiffs provide any basis for the assumption that wetlands cannot fluctuate by more than two inches without harming frogs. Moran Decl. ¶¶ 22, 48, 52 (explaining that wetlands are dynamic and naturally vary seasonally and diurnally).

[19] The Simpson declaration does not establish a credible foundation to offer recommendations on water management activities or those actions that protect and conserve frogs in this complex

---

Not only does the law require more, the frogs demand it. As shown below, the foundations of Plaintiffs' options are scientifically indefensible and, if adopted, are likely to inflict more harm to spotted frogs than the existing operations of the system.

### 1. Plaintiffs' Proposed Injunctions Are Built On Scientifically Infirm Ground.

Plaintiffs' principal theory is that flows below Wickiup dam that more closely mimic historic flows, or a "natural" hydrograph, will benefit spotted frogs. *See, e.g.*, PI Br. at 30 ("conditions in the Upper Deschutes Basin must move to a state that is closer to natural flow conditions."); ECF 23 ¶ 92 (predicating recommendations on the idea that "flows and habitat inundation that more closely approximate natural conditions" are required). Plaintiffs thus structured two proposals around identifying flow regimes that are "possible" to implement and that, in their subjective view, more closely mimic "natural conditions." PI Br. at 31; ECF 23 ¶ 92; ECF 25 (Plaintiffs' hydrologist, addressing only whether Ms. Simpson's flows are possible after evaluating 11 years of data).

Plaintiffs' theory that a return to more "natural" flow conditions is needed to prevent irreparable harm to frogs is deeply flawed. The "historical" flows Plaintiffs use as the basis for their proposed relief occurred over 70 years ago, before construction and operation of the dams. PI Br. at 7, 33; ECF 21-5 at 30 (Ex. 18) (identifying significant irrigation activities in the sub-basin occurring since the early 1900s). During the past 70 years, the physical river channel has changed. High summer flows, combined with low winter releases, have altered the river's geomorphology.[20] Moran Decl. ¶¶ 9, 17-18, 44, 46; ECF 21-7 at 40 (Ex. 18); ECF 21-8 at 72-73,

---

riverine environment. Simpson admittedly did not engage in any scientific study, nor is Simpson a hydrologist or expert on fluvial geomorphology (the study of physical river systems and how they respond to human-induced changes). The Court should reject Plaintiffs' assertions that a handful of site visits in one year provides a credible basis to alter an entire river system in a manner that does not inflict serious damage on the area's fish and wildlife resources. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (rejecting "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

[20] "Fluvial geomorphology is a science devoted to understanding rivers, both in their natural setting as well as how they respond to human-induced changes in a watershed." www.facstaff.bucknell.edu/brh010/research/fluvial_geomorphology.html (last visited Mar. 2, 2016) ("channel modifications may occur in less than a decade, as is frequently the case with

---

Federal Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction
*Center for Biological Diversity v. U.S. Bureau of Reclamation*; 6:15-cv-02358-TC

75-76 (Ex. 18); Johnson Decl. ¶ 11. Due to physical changes of the river channel and shifts in frog habitat suitability under the current management regime, water flows and volumes that once inundated off-channel frog habitats no longer do so now. Moran Decl. ¶ 17, 46.

Plaintiffs do not contest these facts. PI Br. at 11 (noting channel morphology and sedimentation changes to the river channel); ECF 23 at ¶ 54 (asserting that Wickiup dam "has altered the river channel morphology"); *id*. ¶ 91 (same); ECF 25 ¶ 11 (same). And these facts disprove Plaintiffs' theory that a return to natural flows "obviously" will benefit spotted frogs. PI Br. at 33. The flows occurring over 70 years ago are not relevant to the "flows that improve the physical and ecological function of the" river that exists today. Moran Decl. ¶ 16.

Plaintiffs' second theory underlying their proposed relief is that immediate, sweeping changes to every aspect of the frog's habitat is both necessary and beneficial. PI Br. at 31-33. Plaintiffs are wrong. Over the past 70 years, the spotted frogs have "likely adapted to utilizing particular habitat within the altered flow regime." Moran Decl. ¶ 17. Moreover, there is uncertainty in how spotted frogs fulfill their life history functions in this system, which is characterized by, *inter alia*, complex hydrology and regulated water management. *Id*. ¶ 10; *see also* Willey Decl. ¶¶ 32-33 (discussing uncertainties present, such as with overwintering habitat). Hydrological changes that are too fast and aggressive insert additional uncertainties and come with the risk of unintended consequences. Moran Decl. ¶¶ 9-10, 17-19. That is, "[s]ignificant modification of these operations without gradual or incremental change has the potential to extirpate frogs at some sites within affected reaches." *Id*. ¶ 9. Immediate and aggressive changes are neither supported scientifically nor in the best interest of the species.

Plaintiffs' proposal to rapidly adjust spring breeding flows aptly illustrates these points. Plaintiffs propose average spring breeding flows of 770 cfs to improve breeding habitat conditions, but they do not relate these flows to habitat conditions at each of the five areas

---

direct human activity in a stream channel. Understanding how these perturbations, operating at different time scales, alter the width, depth, and planform of a channel is critical for identifying potential problem areas in a river system.").

occupied by frogs below Wickiup dam. PI Br. at 31-32; ECF 23 ¶ 93(b). FWS has done so. It explains that these proposed flows are not likely to benefit frogs at three sites (Bull Bend, Slough Camp, Sunriver), may degrade conditions at one site (Old Mill located near Bend), and will reduce the quality of habitat conditions at one site (La Pine SP SW slough, located adjacent to Dead Slough). Moran Decl. ¶¶ 23-24. For the remaining site—Dead Slough—breeding habitat has improved when flows below Wickiup dam are incrementally adjusted from 381.36 cfs to 550 cfs, with conditions further improving at 550 cfs. *Id.* ¶ 27. This is why operations are being adjusted to provide 600 cfs this spring, because the available data and information indicates these flows will further improve habitat conditions and benefit frogs. *Id.* ¶¶ 27-28. Plaintiffs' proposed 770 cfs flows, by contrast, have "increased uncertainty and a higher probability" of "unintended effects on spotted frog breeding." *Id.* ¶ 28. The flows could be beneficial, but they also could harm frogs by, *inter alia*, providing water levels that are too deep or too cold for spotted frog breeding. *Id.* ¶¶ 29-30.

This is the problem with Plaintiffs' motion. They *presume* that their proposed changes will benefit frogs, when the facts and evidence do not support those assumptions. Moran Decl. ¶¶ 32-36 (explaining Plaintiffs' proposed flows are likely to reduce and degrade quality summer rearing conditions at the Sunriver and East Slough Camp sites, the former being one of the largest frog populations range wide). Plaintiffs also fail to acknowledge the serious consequences of getting it wrong; for instance, by confronting their own admissions that spotted frogs in this area "could be eliminated by a single stochastic event"—*i.e.*, Plaintiffs' proposed injunction. PI Br. at 11; *id.* at 9 ("Impacts to breeding habitat may cause the loss of an entire reproductive cohort at that site for that year."); ECF 23 ¶ 41, 55 (same). Sound management for this threatened species calls for carefully "adjusting management operations and using monitoring and adaptive management to evaluate the effects of the operations." Moran Decl. ¶ 31; *id.* ¶¶ 10, 29. It does not call for Plaintiffs' untested, experimental options that are untethered to frog biology, actual habitat conditions, or the actual needs of the species.

In short, Plaintiffs' options are built on infirm grounds and do "not appear to benefit frogs

immediately or in the foreseeable future." Moran Decl. ¶ 46. The Court should reject Plaintiffs' options and defer to the informed expertise of FWS, the expert wildlife agency charged with protecting and conserving these frogs.[21] *Idaho Rivers*, 2015 WL 9700887, at *10-*11 (deferring to the non-party wildlife agency's expertise).

### 2.   Plaintiffs' Specific Requests For Relief Are Unsubstantiated.

Consistent with the absence of a scientific basis for their proposed relief, Plaintiffs offer specific recommendations that are not supported by the evidence. Plaintiffs also offer proposals that are affirmatively contradicted by their own proffered evidence.

As discussed above, Plaintiffs' spring breeding flow proposals are likely to: adversely affect breeding conditions at two sites (Old Mill and La Pine SP SW slough); not benefit frogs at three sites (Bull Bend, Slough Camp, and Sunriver); and have far more uncertain and potentially negative effects than existing operations at one site (Dead Slough). Moran Decl. ¶¶ 23-30. Plaintiffs offer no contrary evidence. They also contradict their own positions, arguing that flows in the range of 650 cfs to 838 cfs are critical, but then proposing a second option (the "run-of-the-river" option) that provides the lowest flows of the year (well under 650 cfs) during the frog breeding season. Johnson Decl. at 22 (Fig. 11). These arguments do not establish that existing operations are irreparably harming frogs or that Plaintiffs' options will avoid any harm.

Plaintiffs argue that summer flows below Wickiup dam should either be capped between 650 cfs and 838 cfs of flow or reduced significantly from existing conditions ("run-of-the-river" option). PI Br. at 31-33; ECF 23 ¶ 93(b) ("maintain 770 cfs flows until September 15 every year"). As FWS explains, this relief is likely to degrade and reduce high-quality summer rearing habitat at one of the most important sites in the Upper Deschutes sub-basin—Sunriver. *See* Moran Decl. ¶¶ 32-33. Habitat conditions at this site were "greatly enhanced" when irrigation releases from Wickiup dam exceeded 1,000 cfs in mid-April and through the summer. *Id*. ¶ 33.

---

[21] FWS's expertise in this area is not disputed, as even Plaintiffs repeatedly rely on FWS to make their case. PI Br. at 1, 7, 8, 10-12, 14, 23-25. Indeed, they go so far as to request FWS's expertise be applied as part of any injunction. ECF 23 ¶ 93(b).

Eliminating these high flows as requested under Plaintiffs' options may reduce rearing habitat and "place all life stages of spotted frogs at greater risk" to predation and mortality. *Id.*

Similar circumstances exist at East Slough Camp, as Plaintiffs' proposed flows "will not inundate wetlands." Moran Decl. ¶ 34. "Either the wetland will not be inundated by river flows or the area (e.g., acreage) of inundation will be greatly reduced thereby limiting breeding and rearing habitat." *Id.*; *see also id.* ¶ 36 (explaining that "this sub-population of spotted frogs could be harmed" under Plaintiffs' proposal). Plaintiffs' own proffered evidence says the same thing. *See* ECF 21-4 at 20-21 (Ex. 14) (showing more favorable habitat conditions on May 2, 2014, when Wickiup flows exceeded 1,000 cfs); ECF 23 ¶ 36 (Simpson, providing that "high flows" occurring under existing operations provided "extensive, well-connected, complex riverine wetland habitat"). Put simply, "[r]eplacing the known benefit of mid-April flows [under existing conditions] with Plaintiffs' uncertain suggestion may have *serious unintended negative impacts* on spotted frogs." Moran Decl. ¶ 33 (emphasis added).

In the winter months, Plaintiffs argue that flows must be increased to 600 cfs below Wickiup dam. PI Br. at 32. Plaintiffs' "run-of-the-river" option would be even more severe, providing the highest flows of the year in the winter months. Johnson Decl. at 22 (Fig. 11). Plaintiffs provide no evidence that this dramatic and immediate increase in water volume, and influx of cold water, will benefit spotted frogs that for over 70 years have overwintered under very different environmental conditions.[22] Nor could they. Spotted frogs generally overwinter in placid bodies of water or those with low currents (springs and creeks), 79 Fed. Reg. at 51,661, and limited observational information suggests they overwinter in groups, Moran Decl. ¶ 43. Substantially increasing flows as Plaintiffs request "has the potential to affect current overwintering sites and species behavior." *Id.* ¶ 42. "Therefore, selected overwintering locations

---

[22] Similarly, Plaintiffs fail to justify the need for relief during the frog's transition period between summer rearing and overwintering habitat. Plaintiffs ask for a month-long drawdown of irrigation flows, PI Br. at 32, despite the absence of evidence that current operations are taking frogs, and despite the fact that the districts are engaging in a coordinated, monitored ramp down operation this year. Moran ¶¶ 39-40. Plaintiffs cannot show that the current ramp down operations are irreparably harming frogs, such that affirmative relief is required.

within the river may be lost," which would result in "mortality or reduced productivity." *Id*. ¶ 43. Further, these high flow volumes are not large enough to open up new off-channel frog habitat. *Id*. ¶ 44. By seeking this relief, Plaintiffs risk eliminating existing habitat, failing to open up new habitat, and harming and killing frogs in the process. *Id*. ¶¶ 42-45.

Plaintiffs' attempts to rely on FWS to bolster their winter flow proposal are specious, as they mispresent the record. Plaintiffs argue that FWS "recommends more than 500 cfs for winter flows below Wickiup Dam." PI Br. at 11 (citing PI Ex. 9, 12, 15); *id*. at 24 (repeating this statement). In Exhibit 9, however, FWS staff was expressly discussing "breeding conditions," not overwintering flows. ECF 21-2 at 2-3 (PI Ex. 9); Moran Decl. ¶ 27. Exhibit 12, in turn, identifies "[p]otential mitigation actions" as including "[l]ong term increases in winter flows," not a recommendation to provide short-term flows (much less flows greater than 500 cfs). ECF 21-4 at 3 (PI Ex. 12). And Exhibit 15 is an email by a U.S. Forest Service hydrologist that does not even discuss spotted frogs or suitability of their habitat. ECF 21-4 at 23-27 (PI Ex. 15). Plaintiffs' need to extend the narrative beyond what the facts can support simply illustrates the defects in their motion.[23]

Finally, Plaintiffs seek to modify Crane Prairie and Wickiup reservoir operations. For Crane Prairie, Plaintiffs provide no evidence that existing operations are irreparably harming frogs. The districts' early conservation actions would hold Crane Prairie elevations constant through the breeding season, Johnson Decl. ¶ 25 & Fig. 2, and these elevations are within the range that even Plaintiffs' declarant identifies as providing suitable frog habitat. *Compare* ECF 23 ¶ 57 (contending 4,440 to 4,445 feet elevations provide suitable habitat), *with* Johnson Decl. ¶

---

[23]  This is not the only instance where Plaintiffs mischaracterize FWS's work. They argue that FWS has called for higher flows from Crescent Lake dam, PI Br. at 26, citing Exhibit 12 and 15. Exhibit 12, however, identifies "potential" actions as including "*[s]haping* flows from Crescent Lake." ECF 21-4 at 3 (PI Ex. 12) (emphasis added). They also cite Exhibit 15, which says nothing about frogs or frog habitat. ECF 21-4 at 23 (PI Ex. 15). Nor is this the only instance where Plaintiffs mischaracterize the facts. PI Br. at 29 (asserting that dam operations "will continue to kill generations of frogs," but providing no evidence); *compare* PI Br. at 26-27 (claiming frogs are forced to use the river channel and move around frequently), *with* 79 Fed. Reg. at 51661-62 ("Oregon spotted frogs at the Sunriver site routinely make annual migrations of 1,640 to 4,265 ft …between the major breeding complex and an overwintering site.").

25 & Fig. 2 (showing reservoir elevation between 4443.0 to 4444.0 feet from mid-March through mid-July under the OSF Proposal). Plaintiffs also provide no basis for contending that their preferred Crane Prairie reservoir elevation (4443.3) is critical. Moran Decl. ¶ 37.[24] For Wickiup reservoir, Plaintiffs' options would alter this habitat. Johnson Decl. ¶¶ 33, 38 (Figs. 9, 13). FWS, however, has identified habitat features in the reservoir that are essential to the conservation of the species. Moran Decl. ¶ 19; Willey Decl. ¶ 62. Plaintiffs offer no basis for trading Wickiup reservoir habitat in favor of allocating water elsewhere, especially where every aspect of Plaintiffs' proposals to shift flows is divorced from the evidence and more likely to harm spotted frogs than the existing operation of Wickiup dam.

Plaintiffs' proposals are plainly divorced from the evidence. Elements of their own proposed relief confirm this; for instance, their need for "monitoring and reporting measures" as a check to "ensure that practices are not harming [Oregon spotted frogs]." Simpson Decl. ¶ 95. Had Plaintiffs established, with evidence, that their affirmative injunctive relief is narrowly tailored to avoiding imminent irreparable harm to Oregon spotted frog, then long-term "trend" monitoring and other efforts to ensure their own proposals will not threaten spotted frogs would be unnecessary. *Id.*[25] *See Nat. Res. Def. Council v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) ("Injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion.") (citation omitted).

### 3.    Plaintiffs' Requested Relief Is Not Implementable.

Plaintiffs fail to justify individual aspects of their recommendations, and they do not seriously address whether their proposals even can be implemented. Plaintiffs' entire showing in

---

[24]  The same problems exist for Plaintiffs' proposal to increase releases from Crescent Lake. They present no evidence that the existing operations are irreparably harming frogs, much less that their proposal will meaningfully improve conditions. Moran Decl. ¶ 38; Willey Decl. ¶ 64.

[25] Plaintiffs' proposed monitoring measures also are flawed, as Simpson fundamentally misunderstands how wetlands can (or should) be monitored. Moran Decl. ¶¶ 47-52. Nor is Simpson's proposal for countless individuals to spend inordinate amounts of time and resources trekking throughout the Upper Deschutes sub-basin twice weekly (*e.g.*, ECF 23 ¶¶ 93(c), (e), 95) narrowly tailored to avoiding irreparable harm. *S. Yuba River Citizens League*, 2013 WL 4094777, at *8 (finding "planning steps or studies" untethered to avoiding irreparable harm).

this regard is the Kamman declaration, which evaluates 11 years of water data to address the "long-term feasibility of Ms. Simpson's preliminary flow and water level recommendations." ECF 25 ¶ 7. There are substantive problems with this analysis. Kamman, for example, relies on 11 years of water data (2004 to 2015), ECF 25-2 at 1, but provides no scientific justification for cherry-picking this subset of the available water year data. In fact, this data set biases the analysis by excluding high and low water years and years with back-to-back high or low water years. Johnson Decl. ¶ 42 & Fig. 14. Nor did Kamman identify his methods and assumptions or otherwise address factors that influence dam operations, including state law restrictions (state water rights), reservoir seepage and evaporation (effect of storage losses on maintaining reservoir elevations and providing flow releases), and facility operational constraints (ability of the dams to perform the operations). *Id*. ¶¶ 41-45.

Based on a full accounting of the available water year data and other relevant factors, *see* Johnson Decl. ¶¶ 16-20, it is not possible to implement Plaintiffs' vaguely defined proposals in the majority of years as they assert. Under Plaintiffs' "regulated" scenario, the dams cannot be operated in the majority of years to simultaneously maintain Plaintiffs' flow objectives from Wickiup dam and hold Crane Prairie to a storage elevation of 4443.3 feet (PI Br. at 31-32). *See id*. ¶ 32-34 & Figs. 7-9. If the Crane Prairie storage elevation is prioritized, Wickiup reservoir will drain in most years (eliminating spotted frogs and proposed critical habitat) and flow targets below Wickiup dam are reduced significantly. *Id*. ¶ 33. If, on the other hand, flow targets below Wickiup dam are prioritized, then Crane Prairie reservoir drains, with the attendant loss of essential spotted frogs and proposed critical habitat at that site. *Id*. ¶ 34 & Figs. 8-9.

Similar problems exist under Plaintiffs' "run-of-the-river" option. Plaintiffs' simplistic assumption that this option requires "natural flows to pass through the system," PI Br. at 33, ignores the complexities involved, including seepage and other losses from the reservoirs, Johnson Decl. ¶ 38. For example, if natural flow is passed through Crane Prairie and Wickiup dams, the reservoirs drain. *Id*. ¶ 45 ("When full, Crane Prairie loses about 73 cfs per day to seepage and evaporative loss, these losses are sufficient to drain Crane Prairie by its entire

volume in one year."). If natural flows are used to supplement reservoir elevations (so that the reservoirs do not drain), lower flows below Wickiup are provided, the projects operate in violation of state law for portions of the year, *id*. ¶¶ 43-45, and flows that inundate downstream frog habitat (*i.e.*, at East Slough Camp and Sunriver) are not provided, Moran Decl. ¶¶ 32-36.[26]

Plaintiffs address none of these factors. By failing to do so, Plaintiffs have not shown that their requested relief can be implemented, let alone implemented in a way that does not affirmatively harm frogs. All of these points confirm why relief should not be granted. The *status quo* conditions for frogs are improving and benefiting Plaintiffs' derivative interests in viewing the species. Plaintiffs' request for relief, in turn, cannot withstand any level of scrutiny, much less the heightened scrutiny that applies to requests for mandatory relief. Under these facts, Plaintiffs' motion should be denied. *Heckler v. Lopez*, 463 U.S. 1328, 1333-34 (1983) (mandatory injunction "is an *extraordinary* remedial process which is granted, not as a matter of right but in the exercise of sound juridical discretion") (emphasis added, citation omitted).

## II. PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THEIR ESA CLAIMS AGAINST RECLAMATION.

In addition to failing to establish irreparable harm, Plaintiffs cannot show any likelihood of success on the merits of their ESA claims against Reclamation. Under the ESA, Reclamation must consult with FWS and otherwise comply with the ESA for any action it affirmatively authorizes, funds, or carries out. 16 U.S.C. § 1536(a)(2). Plaintiffs allege that Reclamation "operates" the dams and has violated ESA Sections 7(a)(2), 7(d), and 9 in performing that action. Plaintiffs' claims fail for a simple reason—Reclamation does not operate the projects.

Under Section 7(a)(2), Reclamation must consult with FWS over any agency action that may affect listed species. "Action" has a particularized definition under the ESA and means

---

[26] Under this option, there also is "considerably more day to day variability" in releases from the reservoir than under existing conditions, Johnson Decl. ¶ 6(c), conditions that Plaintiffs elsewhere assert are harmful to frogs, PI Br. at 7; ECF 23 ¶ 92. Indeed, Plaintiffs' larger point that historic flows were "much more stable than current system operations," ECF 23 ¶ 92, ignores the dynamic processes at work in the sub-basin, including natural hydrologic events (rain storms, etc.), *see* Johnson Decl. ¶¶ 46-48 & Fig. 15-16 (responding to Simpson's assertions that the dams, not natural events, caused "short spikes in flow" that are harmful for frogs).

activities "authorized, funded, or carried out" by an agency. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. "Of particular significance is the affirmative nature of these words—'authorized, funded, carried [out]'—and the absence of a 'failure to act' from this list." *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1107-08 (9th Cir. 2006). To state a viable ESA claim, a plaintiff must show that the agency "affirmatively authorized, funded, or carried out the underlying activity." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (*en banc*).

In 2015, Reclamation initiated consultation with FWS over its proposed action of authorizing or approving changes to its contracts with the irrigation districts that may be necessary to implement spotted frog conservation actions. ECF 21-9 at 2-3 (ECF 19). Plaintiffs disagree with that decision, arguing that Reclamation instead must consult generally over project "operations." PI Br. at 22 ("BOR is violating" the ESA "with [its] continued operation of these facilities"). But Reclamation validly entered into contracts decades ago transferring project operations to the irrigation districts, and the districts—not Reclamation—are operating the dams. Deflitch Decl. ¶¶ 13-20, 33-39.[27] As the Ninth Circuit has held, a non-federal entity's operation of a dam under a license (or, here, a contract) "is not a federal agency action." *Cal. Sportfishing Prot. All. v. FERC*, 472 F.3d 593, 598 (9th Cir. 2006). Nor does Reclamation's proactive efforts to further spotted frog conservation "federalize[]" the districts' operations of the projects. *Ctr. for Biological Diversity v. FWS*, 807 F.3d at 1047 (rejecting similar arguments that "entering into an MOA in an attempt to proactively offset potential negative effects to the [listed species]" converted the underlying activity into a federal agency action under the ESA).[28]

---

[27] The act of entering into the contracts in the 1930s and 1950s does not trigger the requirement to consult, as the ESA is not retroactive. *TVA v. Hill*, 437 U.S. 153, 173, 186 n.32 (1978) (ESA consultation requirements apply only to "projects *which remain to be* authorized, funded, or carried out" by the Federal agency) (emphasis added).

[28] Nor would Reclamation's inspections suffice to trigger an obligation to consult on project operations. *See* Deflitch Decl. ¶ 17 (discussing Reclamation's role in inspecting the dams and providing recommendations). Plaintiffs are not alleging that Reclamation must consult on "inspections" or recommendations linked to its inspections, but on project operations. *Cf. Marbled Murrelet*, 83 F.3d at 1075 (agency advice to private company is not agency action for purposes of Section 7).

Plaintiffs' disagreement therefore is not founded on Reclamation's actual operation of the projects, but on the fact that it owns and "has authority over[] operation" of the dams. PI Br. at 15. This argument, too, fails. Ninth Circuit precedent holds that mere ownership of land and the discretion to take action does not equate to "affirmative" agency action triggering an ESA consultation. *Matejko,* 468 F.3d at 1108 (in suit involving non-federal diversions on Federally owned land, holding that "the existence of such discretion [to regulate the diversions] without more is not an 'action' triggering a consultation duty"); *Cal. Sportfishing*, 472 F.3d at 599 (license terms giving "FERC the discretionary authority to require changes in the operation of the project . . . in and of themselves are not sufficient to … mandate consultation").[29] Thus, the mere discretion to act is not a legally cognizable "action" that would trigger a requirement for Reclamation to consult on project operations.

Plaintiffs tangentially refer to Reclamation's 2003 consultation where it consulted on project operations, and Plaintiffs suggest that this consultation dictates the same outcome now. It does not. Reclamation's basis for consulting over operations in 2003 was that it has the "authority to operate, largely defined by Reclamation ownership." ECF 21-5 at 28 (PI Ex. 18). As discussed, Ninth Circuit precedent issued *after* 2003 clarified that the authority or discretion to act, unaccompanied by an affirmative agency action, does not create a legal obligation to consult. Reclamation also re-evaluated the prior 2003 consultation and determined that the current approach is consistent with the facts; namely, the contracts transferring operations to the districts, the districts' actual operation of the projects pursuant to their state water rights, and incorporation of project operations as non-federal actions in the ESA Section 10 HCP process, among other factors. *See* US Ex. H at 3-8. Contrary to Plaintiffs' claims, the 2003 consultation "does not have the effect of transforming a non-federal action [project operations] into a federal

---

[29] There are sound reasons for these holdings. Federal agencies have broad discretion to take any number of actions, and requiring consultation over the mere existence of agency discretion, unattached to an actual proposal to take action, would frustrate the purposes of the ESA. *WildEarth Guardians v. EPA*, 759 F.3d 1196, 1209 (10th Cir. 2014) ("[R]equiring consultation on everything the agency might do would hamstring government regulation in general and would likely impede rather than advance environmental protection.").

action." *Ctr. for Biological Diversity v. FWS*, 807 F.3d at 1047 n.13. Nor does the law preclude Reclamation from changing its approach to better align with the facts. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 654-55, 658-59 (2007) (where the agency (EPA) previously consulted with FWS, holding that it is "fully entitled" to change its mind, "as long as the proper procedures were followed").

Reclamation has not violated Section 7(a)(2), and Plaintiffs' arguments that Reclamation is violating Section 7(d) and Section 9 of the ESA fail for the same reasons. Section 7(d) provides that agencies shall not make "any irreversible or irretrievable commitment of resources" during a consultation. 16 U.S.C. § 1536(d). Section 9 makes it unlawful to, without a permit or exemption, perform an act that causes the "take" of spotted frogs. *Id*. § 1538(a)(1)(G); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 696 n.9, 700 n.13 (1995) (Section 9 claim must be supported by proximate cause and foreseeably, linking a defendant's act to the take of a species). Reclamation has not taken its proposed action of approving changes under its contracts and therefore has not irreversibly or irretrievably committed resources or "taken" a species. *See* US Ex. F at 6-8. Nor has Reclamation violated these provisions by "operating" the dams, as it is not performing that action. *See Cascadia Wildlands v. Kitzhaber*, 911 F.Supp.2d 1075, 1083-84 (D. Or. 2012) (dismissing Section 9 claims against the Oregon State Lands Board under Fed.R.Civ.P. 12(b) because it delegated management authority to the Oregon Board of Forestry; therefore, State Lands was not causing "take" or liable under the ESA).

Plaintiffs' burden in seeking affirmative relief is "doubly demanding;" they must show that the facts and law "*clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia*, 786 F.3d at 740. Reclamation has taken and will continue to take those steps necessary to ensure that any "action" it authorizes, funds, or carries out complies with the ESA. Reclamation initiated consultation with FWS on its proposed action of approving changes under its contracts, and this consultation facilitates early implementation of conservation measures that benefit spotted frogs. Moreover, this consultation will examine all effects of project operations,

as required under the ESA. *See supra*, n.11. Plaintiffs' disagreement with this consultation does not state a cognizable legal claim or otherwise establish the need for emergency injunctive relief. *DISH Network Corp. v. FCC*, 653 F.3d 771, 777 (9th Cir. 2011) (where a plaintiff fails to show a likelihood of success on the merits, "we need not consider the remaining three" *Winter* factors).

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST TIP STRONGLY AGAINST GRANTING PLAINTIFFS' PROPOSED INJUNCTIONS.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (citation omitted). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). These factors—balance of harms and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In ESA cases, "the balance of hardships and the public interest tip heavily in favor of endangered species." *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987). Contrary to Plaintiffs' claims, PI Br. at 19, this does not mean that the Court is foreclosed from balancing harms or considering the public interest. Harm to the listed species and efforts to protect those species are undeniably relevant considerations properly balanced. *Humane Soc'y of U.S. v. Bryson*, 2012 WL 1952329, at *9 (balancing the harm to "Defendants' ability to protect endangered and threatened salmonid stocks and aid in their recovery"); *Idaho Rivers*, 2015 WL 9700887, at *10 (balancing harm to efforts to protect listed species). Further, where Plaintiffs make little to no showing of success on the merits or irreparable harm, other national, state, tribal, and private interests are properly considered. *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (affirming denial of an injunction in a case involving the desert tortoise, a threatened species, where the district court properly considered, *inter alia*, protecting jobs).

Plaintiffs' proposed relief is likely to inflict substantial harm on a multitude of interests and is not in the public interest. First and foremost, Plaintiffs' proposals—if attempted—would

require spotted frogs in the Upper Deschutes sub-basin to immediately adjust their life-history strategies and conform to radically changed reservoir and riverine environments. *See* Argument, Section I, *supra*. The evidence does not establish that these changes will benefit frogs, and the risk that the proffered changes will harm frogs is substantial. Moran Decl. ¶¶ 9-10. The likely harm to frogs from implementing Plaintiffs' proposal tips the balance *sharply* against issuing preliminary injunctive relief. *See Humane Soc'y*, 2012 WL 1952329, at *9 (denying injunction that would harm, not help, ESA-listed species).

Second, Plaintiffs' relief would immediately hamper efforts to adjust and test operational changes in a way that heeds the existing data and informs long-term protection and conservation efforts. US Ex. G. As FWS explains, these early conservation actions are set up to allow for both immediate changes that benefit frogs and careful monitoring and evaluation to determine what works. Moran Decl. ¶¶ 8, 10, 28-29; Willey Decl. ¶¶ 46-58, 61. This approach increases protections to spotted frogs without, at the same time, risking their fate. *Id.* Plaintiffs' proposed relief impedes these efforts[30] and runs directly contrary to the expert agency's professional judgment that a gradual and measured restoration approach that carefully adjusts operations and uses monitoring and adaptive management is the best way to conserve the species. Moran Decl. ¶¶ 10, 29, 31; *see also Idaho Rivers*, 2015 WL 9700887, *10 ("[A]n injunction that hinders full implementation of" measures identified by the expert wildlife agency—there, in a biological opinion—"is not in the public interest and weighs against issuing the preliminary injunction").

Third, Plaintiffs' complaints with ongoing adverse effects to frogs do not show imminent, irreparable harm to these frog populations. Thus, their complaints do not outweigh harm to third

---

[30] Plaintiffs' proposals for radical alterations of the system also run contrary to the ESA. Under the ESA, proposals for dramatic changes that will affect a listed species—like Plaintiffs' proposed injunctions—must proceed through structured, expert review processes under either Section 7(a)(2) for federal actions or Section 10 for non-federal actions. By asking the Court to itself alter the system, Plaintiffs seek to bypass these processes and thus the very measures Congress established to ensure the protection of this listed species. *See also* ECF 23 ¶ 93(e) (recommending the physical capture and relocation of frogs based on vague criteria, when this action would be illegal without first receiving a scientific research permit from FWS issued after notice and review proceedings, 16 U.S.C. § 1539(a)(1)(A), (c)).

parties that will occur under Plaintiffs' proposed injunction. Hundreds of central Oregon residents rely on these reservoirs for their livelihood, and they will be immediately harmed by the reduction or elimination of irrigation supply.[31] Moreover, downstream communities like Tumalo, Oregon, depend on responsible river management to reduce flood risk, which can cause severe impacts to both property and human health and safety. Plaintiffs' injunction significantly, and unjustifiably, increases those risks. *See* Johnson Decl. ¶¶ 29, 35, 39.

Fourth, as directed against Reclamation, Plaintiffs' injunction would frustrate long-standing contracts properly entered into under Federal law. Under the contracts, the districts have the legal right to operate the projects. Further, Reclamation may only assume control of operations in accordance with the terms of the contracts or when the contracts are breached, and those circumstances are not present here.[32] Similarly, Plaintiffs' proposed injunction would require the storage of water that would otherwise be released to meet the demands of downstream senior water right holders, in violation of state water law. Johnson Decl. ¶¶ 43-45. Particularly in the absence of compelling circumstances not present here, injunctive relief that frustrates long-standing contracts and forces parties to violate state law is contrary to the public interest. *See People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 533 (7th Cir. 1997) (an equitable "decree should not command the defendants to do something that is entirely beyond their control") (citation omitted).

Finally, Plaintiffs' motion seeks to usurp the ongoing collaborative processes occurring in the Upper Deschutes sub-basin. The experts and numerous State, federal, tribal, and other organizations are expending millions of dollars and countless hours to work through these issues in a professional, scientific, and collaborative manner. *See, e.g.*, Moran Decl. ¶¶ 11-13; Deflitch Decl. ¶¶ 40-44; Willey Decl. ¶¶ 14-16. Outside of litigation, Plaintiffs recognize the critical

---

[31] The irrigation district defendants and intervenors address, in more detail, this imminent harm.

[32] *See, e.g.*, US Ex. D at 26-27 (¶ 23(a)) (specifying that, if there is a "default … of any of the provisions of this contract" and that default is not corrected, the United States may "take over the operation and maintenance of the transferred works."); US Ex. B at 15 (same).

importance of these collaborative processes.[33] Yet now, Plaintiffs ask that the difficult issues

now give way to judicially-created solutions based solely on the assumptions and unfounded

recommendations of one individual. This request is both improper and unnecessary. As the

Seventh Circuit explained in analogous circumstances:

> Even if one were to conclude that the harms are in equipoise, however, there is a final reason why preliminary injunctive relief is not warranted. As things now stand, the case for judicial intervention is refuted by the fact that the competent federal and state actors are actively pursuing an array of efforts to solve the problem.

*Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 796 (7th Cir. 2011). The balancing of

harms and public interest do not tip in favor of granting Plaintiffs' requested relief.

## <u>CONCLUSION</u>

Plaintiffs' motion for preliminary injunctive relief should be denied. Oregon spotted frogs

and their habitats are likely to improve during the pendency of this case. Granting Plaintiffs'

motion, by contrast, is likely to exacerbate the very harms Plaintiffs seek to avoid—harm to

Oregon spotted frogs. Plaintiffs' injunction is also ill-defined and will immediately inflict

substantial harm on third parties, including central Oregon farmers. Finally, the public interest

strongly weighs against Plaintiffs' efforts to radically alter an entire river system in an

emergency judicial proceeding, when scientific and collaborative processes are underway in the

Deschutes Basin and addressing these issues. For all of these reasons, the Court should deny

Plaintiffs' motion.


Dated this 2nd day of March 2016.


JOHN C. CRUDEN, Assistant Attorney General
SETH M. BARSKY, Section Chief

*/s/ Michael R. Eitel*

---

[33] US Ex. I (WaterWatch supporting, as the appropriate forum to work through difficult scientific issues in the Basin, processes that "capitalize[] on the history of collaboration in the Deschutes" and have "balanced representation from agricultural, municipal, and instream interests").

MICHAEL R. EITEL
Senior Trial Attorney (Neb. Bar #22889)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1479 | Fax: (303) 844-1350
Email: Michael.Eitel@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on March 2, 2016, the foregoing was electronically filed through the Court's electronic filing system, which will generate automatic service upon on all Parties enrolled to receive such notice.

*/s/ Michael R. Eitel*
Michael R. Eitel, Trial Attorney
U.S. Department of Justice
