Beth S. Ginsberg, OSB No. 070890
beth.ginsberg@stoel.com
Jason T. Morgan (*pro hac vice*)
jason.morgan@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA  98101
Telephone:  (206) 624-0900
Facsimile:  (206) 386-7500

David E. Filippi, OSB No. 965095
david.filippi@stoel.com
Kirk B. Maag, OSB No. 105507
kirk.maag@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

*Attorneys for Arnold Irrigation District, Central Oregon Irrigation District, Lone Pine
Irrigation District, North Unit Irrigation District, and Tumalo Irrigation District*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No.: 6:15-cv-02358-TC (consolidated with 6:16-cv-00035-TC) |
| Plaintiffs, | DISTRICTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| U.S. BUREAU OF RECLAMATION, et al., | |
| Defendants, | |
| ARNOLD IRRIGATION DISTRICT, et al., | |
| Intervenor-Defendants. | |

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................iii

I. INTRODUCTION ................................................................................ 1

II. FACTUAL BACKGROUND ................................................................ 6

    A.    The Districts Operate Irrigation Works Essential to Farming in Central Oregon................................................................................ 6

    B.    Frog Populations in the Upper Deschutes Are Stable or Increasing..................... 7

    C.    The Districts Have Taken Substantial Measures to Protect the Frog. .................. 9

    D.    The BOR Is Consulting with the FWS Under ESA Section 7(a)(2)................... 10

III. ARGUMENT ..................................................................................... 10

    A.    Plaintiffs' Request for Injunctive Relief Is Subject to the Higher Standard Applicable to Mandatory Preliminary Injunctions. ............................................. 10

    B.    Plaintiffs Have Failed to Demonstrate that They Are Likely to Suffer Irreparable Harm Absent an Injunction. ........................................................... 12

        1.    Plaintiffs Must Show Irreparable Harm *to Themselves or Their Members*, Not Merely Harm to Frogs.........................................................12

        2.    Plaintiffs Have Provided No Factual Basis to Demonstrate Irreparable Harm Absent an Injunction. ...................................................18

            a.    Plaintiffs Fail to Demonstrate Irreparable Harm to Their Organizations or Members..........................................................18

            b.    Plaintiffs Fail to Demonstrate that the Frog Will Suffer Irreparable Harm Absent an Injunction. .......................................21

        3.    Plaintiffs' Long Delay in Seeking Injunctive Relief Belies Their Claims of Irreparable Harm. .......................................................24

    C.    The Balance of the Equities and Public Interest Weigh Heavily Against Plaintiffs' Injunction Because the Requested Relief Will Actually Harm the Frog. ............................................................................................ 25

    D.    Plaintiffs Are Unlikely to Succeed on the Merits. ............................................. 29

        1.    Plaintiffs Lack Standing.........................................................29

            a.    WaterWatch Lacks Standing.......................................................30

            b.    CBD Lacks Standing.................................................................31

         2.    The BOR Has Initiated Consultation Under ESA Section 7(a)(2) and Complied with the Requirements of Section 7(d).............................31

        3.       Plaintiffs Are Unlikely to Prevail in Demonstrating that the Districts or the BOR Will Engage in Ongoing Take of Frogs. .................32

II. CONCLUSION ..................................................................................................... 35

TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for the Wild Rockies v. Kruger*,
   35 F. Supp. 3d 1259 (D. Mont. 2014) ............................................................25, 28

*All. of the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ........................................................................12

*Audubon Society of Portland v. National Marine Fisheries Service*,
   849 F. Supp. 2d 1017 (D. Or. 2011) ................................................................16

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*,
   515 U.S. 687 (1995).........................................................................................32

*Biodiversity Legal Found. v. Badgley*,
   309 F.3d 1166 (9th Cir. 2002) ........................................................................20

*Cascadia Wildlands v. Kitzhaber*,
   No. 3:12-cv-00961-AA, 2012 WL 5914255 (D. Or. Nov. 19, 2012) ....................18

*Cetacean Cmty. v. Bush*,
   386 F.3d 1169 (9th Cir. 2004) ........................................................................13

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
   631 F.3d 939 (9th Cir. 2011) ..........................................................................30

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985)............................................................................24

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) ........................................................................12

*Ctr. for Envtl. Sci., Accuracy & Reliability v. Cowin*,
   No. 1:15-CV-00884 LJO BAM, 2015 WL 3797693 (E.D. Cal. June 18, 2015) ....................11

*Ctr. for Food Safety v. Vilsack*,
   636 F.3d 1166 (9th Cir. 2011) ..........................................................................3

*Defs. of Wildlife v. Salazar*,
   812 F. Supp. 2d 1205 (D. Mont. 2009).......................................................15, 17

*DISH Network Corp. v. FCC*,
   653 F.3d 771 (9th Cir. 2011) ..........................................................................11

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ..........................................................................12

*In re Endangered Species Act Section 4 Deadline Litig.*,
  Case No. 1:10-mc-00377-EGS (D.D.C.) .................................................24

*In re Excel Innovations, Inc.*,
  502 F.3d 1086 (9th Cir. 2007) ..........................................................12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ..................................................................30, 31

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) ..........................................................13

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ...................................................... passim

*Goldie's Bookstore, Inc. v. Superior Court of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ......................................................12, 20

*Humane Soc'y of U.S. v. Bryson*,
  No. 3:12-CV-00642-SI, 2012 WL 1952329 (D. Or. May 30, 2012) ......................14

*Humane Society of U.S. v. Gutierrez*,
  523 F.3d 990 (9th Cir. 2008) ..........................................................16

*Idaho Rivers United v. U.S. Army Corps of Engineers*,
  No. C14-1800JLR, 2015 WL 9700887 (W.D. Wash. Jan. 7, 2015) ...................passim

*The Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ...........................................................5

*Laughlin River Tours, Inc. v. Bureau of Reclamation*,
  730 F. Supp. 1522 (D. Nev. 1990) ......................................................11

*Lydo Enters., Inc. v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) .........................................................24

*Makua v. Rumsfeld*,
  163 F. Supp. 2d 1202 (D. Haw. 2001) ...................................................14

*Marbled Murrelet v. Babbitt*,
  83 F.3d 1060 (9th Cir. 1996) ......................................................17, 25

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) (per curiam) ......................................................10

*Munaf v. Geren*,
  553 U.S. 674 (2008) ...................................................................10

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ................................................................31

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*,
    23 F.3d 1508 (9th Cir. 1994) ...........................................................16, 17

*Native Ecosystems Council v. Krueger*,
    40 F. Supp. 3d 1344, 1351 (D. Mont. 2014) ......................................25

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    817 F. Supp. 2d 1290 (D. Or. 2011) ....................................................13

*NWF v. NMFS*,
    422 F.3d 782 (9th Cir. 2005) ...........................................................13, 18

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ....................................................21, 24, 25

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
    606 F. Supp. 2d 1195 (E.D. Cal. 2008) ...................................5, 13, 14

*Protect Our Communities Found. v. U.S. Dep't of Agric.*,
    845 F. Supp. 2d 1102 (S.D. Cal. 2012) ...............................................24

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ...................................................................24

*S. Utah Wilderness All. v. Thompson*,
    811 F. Supp. 635 (D. Utah 1993) .........................................................13

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ........................................................................30, 31

*South Yuba River Citizens League v. National Marine Fisheries Service*,
    Nos. 2:13-cv-00059-MCE, 2:13-cv-00042-MCE, 2013 WL 4094777 (E.D.
    Cal. Aug. 13, 2013) .............................................................21, 22, 23

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ................................................................11

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................30, 31

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
    316 F.2d 804 (9th Cir. 1963) ................................................................11

*Valdivia v. Schwarzenegger*,
    599 F.3d 984 (9th Cir. 2010) ................................................................29

*W. Watersheds Project v. Salazar*,
   692 F.3d 921 (9th Cir. 2012) ................................................................24

*Wild Equity Inst. v. City & County of San Francisco*,
   No. C 11-00958 SI, 2011 WL 5975029 (N.D. Cal. Nov. 29, 2011) ..................................17, 22

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)................................................................ passim

**Statutes**

16 U.S.C. § 1531(a)(1)-(2)................................................................15

16 U.S.C. § 1532(6) ................................................................14

16 U.S.C. § 1532(19) ................................................................33

16 U.S.C. § 1532(20) ................................................................14

16 U.S.C. § 1533(d) ................................................................16

16 U.S.C. § 1536 ................................................................ passim

16 U.S.C. § 1536(a)(2) ................................................................ passim

16 U.S.C. § 1536(b) ................................................................15

16 U.S.C. § 1536(d) ................................................................4, 10, 31, 32

16 U.S.C. § 1536(o) ................................................................15

16 U.S.C. § 1538................................................................ passim

16 U.S.C. § 1539................................................................15

16 U.S.C. § 1540................................................................9, 15, 32

Or. Rev. Stat. § 537.130................................................................29

**Regulations**

50 C.F.R. § 17.3 ................................................................33

50 C.F.R. § 17.31 ................................................................16

58 Fed. Reg. 27260, 27261-62 (May 7, 1993)................................................................24

79 Fed. Reg. 51658, 51707 (Aug. 29, 2014)................................................................ passim

**Other Authorities**

*American Heritage Dictionary* (2d ed. 1989) ................................................................................23

## I.  INTRODUCTION

Plaintiffs in these consolidated cases are asking the Court for a mandatory preliminary injunction drastically altering the status quo that has existed in the Upper Deschutes Basin for more than 60 years.  Plaintiffs ask the Court for an injunction that precludes irrigation water storage for certain irrigation districts and effectively shuts off irrigation water to many farmers and ranchers in central Oregon this summer.  Plaintiffs urge this radical change to protect the Oregon spotted frog (a species listed in August 2014 as threatened under the Endangered Species Act ("ESA")) from three dams operated by the irrigation-district-Defendants (the "Districts") in the Upper Deschutes.  Plaintiffs claim these dams are "a primary cause of the Oregon spotted frogs' decline and current precarious status."  Plaintiffs' Brief at 1.

Plaintiffs' emergency is pure fiction.  Indeed, the U.S. Fish and Wildlife Service ("FWS" or "Service"), the federal agency with jurisdiction over the frog, concluded that "the best scientific and commercial information does not indicate at the present time that the existing threats are of such great magnitude that these frogs are in immediate danger of extinction."  79 Fed. Reg. 51658, 51707 (Aug. 29, 2014).  As explained in the attached Declarations of Dr. Lowell Diller (a herpetologist) and Martin Vaughn (a biologist who has spent the last seven years working on a Habitat Conservation Plan ("HCP") for the Upper Deschutes to benefit species including the frog), there is *no evidence* that frogs in the Upper Deschutes are declining in number now, or have declined at any time in the past.  *See infra* Section II.B.  In fact, this area is actually one of the remaining frog "strongholds."  Diller ¶ 24.  This critical point is confirmed by the FWS's listing decision, which states that, to the extent known, the numbers of frogs in and around the Districts' irrigation projects are stable, and in some cases are demonstrating "an increasing population trend."  79 Fed. Reg. 51658, 51666 (Aug. 29, 2014).  In contrast, the frog

has disappeared most everywhere else, including in California, Washington, British Columbia, and most of Oregon. *Id.* Plaintiffs provide no evidence to the contrary. The persistence of the frog in and below the Districts' reservoirs, contrasted with the species' contraction in most other locations throughout its range, provides compelling evidence that the Districts' operations are not inimical to the frog's biological interests. Diller ¶ 11.

The Districts recognize fully that their ongoing operations have historically affected frog habitat (both positively and negatively) and that the FWS has identified the Districts' operations (if not properly managed) as a potential risk to the frog because their operations can, among other things, "inundate and desiccate Oregon spotted frog habitat." 79 Fed. Reg. at 51669. But that is precisely why the Districts began working for the protection of the frog through the HCP process years before the frog was actually listed and have continued to do so since its listing. The Districts are also implementing a series of "Interim Measures" (developed in conjunction with technical experts from state and federal agencies) that target those very threats and improve habitat in the short term (while long-term strategies are under development). Among other things, these Interim Measures will increase flows and stabilize reservoir levels to protect spring breeding.[1] *See infra* Section II.C. These measures are consistent with sound conservation principles and represent a science-based, consensus approach to improving habitat for the frog. Vaughn ¶¶ 18-20, 28. As the FWS has variously explained with respect to certain of these measures, they are "a step in the right direction," are "expected to provide conservation benefits" to the frog, "should prevent spotted frogs from depositing egg masses in a location where they are likely to strand," and are a "direct response to technical advice" from the FWS. Sewell, Ex.

---

[1] Plaintiffs address part of these measures (referred to as the OSF Proposal) but ignore entirely the significant additional spring breeding measures that will commence on March 26, 2016. Vaughn ¶ 28.

22.  Although Plaintiffs' witness (Theresa Simpson, a retired U.S. Forest Service ("USFS") employee) disagrees with the FWS's conclusions (Simpson ¶¶ 98-99) she provides no credible explanation why the FWS was incorrect.  Plaintiffs' efforts to foment an emergency by claiming that nothing is currently being done to protect the frog are simply not true.

There are any number of reasons why the Court can and should deny Plaintiffs' requested relief.  Plaintiffs seek a mandatory preliminary injunction, a form of relief that, as explained in Section III.A below, is "disfavored" and subject to an exacting "doubly demanding" standard.  Plaintiffs have failed to meet that standard for each and every one of the *Winter* factors for granting a preliminary injunction (likelihood of success on the merits, irreparable harm, balancing of the equities, and public interest).

*First*, starting with irreparable harm, as detailed in Section III.B below, Plaintiffs fail to show that they, themselves, will be irreparably harmed absent an injunction.  Plaintiffs, in fact, make *no arguments in their brief* and have *no allegations in their declarations* that they will suffer irreparable harm if an injunction is not granted.  Instead, Plaintiffs claim that it is enough to allege that individual frogs are harmed or killed.  But that is not the law.  Plaintiffs' complete failure to demonstrate irreparable harm to themselves requires denial of their motion.  *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (if party fails to show irreparable harm, court "need not address . . . the remaining elements of the preliminary injunction standard").  Moreover, Plaintiffs fail to show that there will be harm to the frog that is significant to the population or species as a whole.  Vaughn ¶ 6.a; Diller ¶ 9.a.

*Second*, Plaintiffs incorrectly presume that the public interest and the balance of equities support an injunction because Plaintiffs seek to protect threatened species.  As detailed below in Section III.C, Plaintiffs fail to provide any evidence that either of the two radically different

injunctions they propose *will actually protect the frog.*  To the contrary, as Dr. Diller and Mr. Vaughn explain, the sweeping changes proposed by Plaintiffs are not "scientifically prudent," have no "biological basis," and have a "high probability to substantially harm the existing population."  Diller ¶¶  9.d, 24; Vaughn ¶¶ 29, 32.a.ii.  Additionally, as the Districts' expert hydrologist Michael Ramey explains, the requested injunctions will not even produce the hydrological results Plaintiffs intend, and will in many cases produce the opposite.  Ramey ¶¶ 24-29.  In essence, Plaintiffs are asking the Court to embark on a "very expensive and very risky experiment" that will put farmers out of business while harming the frog.  Vaughn ¶ 32.c; Declaration of Richard Macy ¶¶ 6-8, 10.  The balance of the equities and the public interest weigh heavily against such a reckless injunction.  *See* Vaughn ¶ 6.e; Diller ¶ 9.d-e.

*Third*, as discussed below in Section III.D, Plaintiffs have no chance of success on the merits.  Plaintiffs' procedural claims under ESA section 7(a)(2) and 7(d) have no merit because the Bureau of Reclamation ("BOR") has properly initiated consultation under ESA section 7(a)(2) regarding the frog, and in the interim has not irreversibly or irretrievably committed any resources as required by ESA section 7(d).  Plaintiffs' illegal "take" claims under ESA section 9 also fail because Plaintiffs have no direct evidence of death or injury to frogs caused by the Districts' operations, and instead rely on speculation and conjecture.  While Ms. Simpson claims to have observed struggling frogs, her claims of actual injury are speculative and she does not (and cannot) causally link her observations to reservoir operations, as opposed to natural phenomena.  Diller ¶¶ 9.e, 32.  Plaintiffs' section 9 claims will not prevail at trial.

*Lastly*, basic principles of judicial restraint preclude this kind of dramatic and untailored relief.  Plaintiffs are uncertain as to what kind of injunctive relief is allegedly necessary (as they do not explain which of their two proposed injunctions is better for the frog).  Instead, they

provide two drastically different flow regimes (Ramey ¶ 22; Vaughn ¶ 32.a), at least one of which would require the Districts to violate state law and require one of the Districts to breach its contract with the BOR (Declaration of Mike Britton at ¶ 20), and both of which are fraught with error. These ill-conceived proposals will inadvertently flood the City of Tumalo (Ramey ¶ 27); draw down, or even drain, Wickiup and Crane Prairie reservoirs, which will harm frogs residing therein (Ramey ¶ 20; Vaughn ¶ 32.b); and otherwise be unachievable. Ramey ¶¶ 18, 20, 22. Not only will Plaintiffs fail to achieve the benefits they claim the frog desperately needs through their requested injunction (Ramey ¶ 21), they will actually end up harming the frog by, *inter alia*, reducing the suitability of its habitat in key locations. Vaughn ¶¶ 11-17; Diller ¶¶ 38-41.

Plaintiffs provide *no scientific basis* to choose between their proposed regimes, and ask the Court to sort this all out by running the river. But, as one district court judge explained, a "federal court lacks the expertise and/or background in fish biology, hydrology, hydraulic engineering, water project operations, and related scientific and technical disciplines that are essential to determining how the water projects should be operated on a real time, day-to-day basis." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1214 (E.D. Cal. 2008); *see also The Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (court is not to "act as a panel of scientists" that picks and chooses between alternatives).

These technical biological decisions are best resolved by the FWS, the agency that Congress entrusted to protect the frog. The section 7 consultation process is currently underway, and, when completed, will determine what additional changes (if any) are needed to protect the frog. Plaintiffs provide no reason for the Court to get out ahead of this scientifically driven administrative process (or the best available science in the basin). For these reasons, and those discussed more fully below, Plaintiffs' request for preliminary injunction should be denied.

## II.  FACTUAL BACKGROUND

**A.      The Districts Operate Irrigation Works Essential to Farming in Central Oregon.**

Pursuant to former and current contracts with the BOR, the Districts operate three dams (Crane Prairie, Wickiup, and Crescent) as part of a coordinated series of irrigation projects that provide water to more than 6,000 farmers, ranchers, and other District members in central Oregon.  Britton ¶ 3.  The BOR improved Crane Prairie Dam on the Upper Deschutes River in 1940, and the Districts have rights to store up to 50,000 acre-feet of water for irrigation in that reservoir.  Declaration of Craig Horrell ¶¶ 4, 6.  The BOR built Wickiup Dam on the Upper Deschutes River in 1949, and the Districts have rights to store up to 200,000 acre-feet of water for irrigation in that reservoir; the contract with BOR, however, does not permit water to be stored for any other purpose (with minor exceptions not relevant here).  Britton ¶¶ 4, 6, 20.  The BOR built Crescent Dam on Crescent Creek (a tributary of the Upper Deschutes River) in 1956 to replace an existing dam, and the Districts have rights to store up to 86,050 acre-feet of water for irrigation in that reservoir.  Declaration of Ken Rieck ¶ 4.

The Districts' members depend on the stored water in these three reservoirs for irrigation.  *See, e.g.*, Horrell ¶¶ 4-5.  That irrigation water is used by the Districts' members to grow crops, irrigate pastures, and water stock.  *Id.*  The water rights held by each District are property rights specific to that individual District (held in trust for members).  The Districts are not similarly situated; certain Districts depend largely on stored water for irrigation while others possess senior water rights that entitle them to a substantial portion of the live flow.  Britton ¶ 15.c.  Any court-ordered change in the operation of those dams necessarily impacts these rights, and the rights of others who are not before the Court (Britton ¶ 15, 20), which will impact some Districts more than others and create economic hardships to central Oregon farmers and ranchers.  Britton

¶¶ 15-19; Horrell ¶¶ 14-17; Rieck ¶¶ 13-16 (discussing impacts of requested injunctions).  The Districts' members have already made significant investments in preparation for the 2016 irrigation season that will be lost if the Court orders the relief sought by Plaintiffs.  Macy ¶ 7.

A 2014 study shows that a loss of only 10 percent of the Districts' irrigation water would have severe annual loss to farmers of $3,961,000, with an annual economic impact to the central Oregon economy of $7,752,000.  Britton ¶ 16.  The losses under the proposed injunctions are likely many times higher than 10 percent and would result in a much greater economic impact, and potentially, the loss of a way of life.  Britton ¶ 17; Macy ¶¶ 9-11.

**B.    Frog Populations in the Upper Deschutes Are Stable or Increasing.**

The Upper Deschutes Basin, including the area directly affected by the Districts' irrigation projects, is one of the last remaining "strongholds" for the Oregon spotted frog.  Diller ¶ 24.  There are currently an estimated 1,542 breeding females that live and reproduce in and below the three reservoirs operated by the Districts.  Diller ¶ 11.  There is no data to suggest the number of frogs in areas influenced by the reservoirs is declining; on the contrary, the available evidence shows that frogs are increasing at some of these sites and are stable at others.  79 Fed. Reg. at 51666; Vaughn ¶ 23; Diller ¶ 25.[2]  Therefore, the risk of a sudden loss of frogs at any one site in the Upper Deschutes (as well as the entire population) is negligible.  Diller ¶ 29.[3]

The construction of Crane Prairie, Wickiup, and Crescent Dams more than 60 years ago altered both the hydrology and the morphology of the Deschutes River.  Ramey ¶ 12.  But there is no evidence that the frog was more abundant or widely distributed before the dams were built.  Diller ¶ 25; Vaughn ¶¶ 12, 23.  While construction and subsequent operation of the dams may

---

[2] The FWS explains that the actual number is likely higher because FWS was unable to survey on private property.  79 Fed. Reg. at 51666; Vaughn ¶ 10.

[3] The only group of frogs that has shown a decline in numbers is that found in the Old Mill Pond, which in unrelated to reservoir operations.  Vaughn ¶ 10.

have eliminated some habitat for the frog, those actions have also created new areas of frog

habitat.  Diller ¶ 11.  Over the ensuing decades, more than 20 generations of frogs have adapted,

behaviorally (and possibly genetically), to this new habitat.  *Id.*  For example, the impoundment

of Crane Prairie Reservoir created new wetland habitat, now home to 300-plus breeding females.

*Id.*; Ramey ¶ 12.  Of the 1,542 breeding females known to exist downstream from the reservoirs,

at least 1,067 of those frogs are living and reproducing in artificially created habitat such as the

reservoirs, the Old Mill Pond, and the weir-controlled wetlands at Sunriver.  Vaughn ¶ 10.

Additionally, certain altered conditions in the Upper Deschutes Basin are actually

*beneficial* to the frog.  Vaughn ¶¶ 14-15; Diller ¶¶ 19-22.  For example, reservoir and river

fluctuations keep dense vegetation (unsuitable for egg laying) from developing, and can provide

a competitive advantage to the frog over invasive predators like the bullfrog.  Vaughn ¶¶ 15, 29;

Diller ¶ 20.  High summer flows also support suitable wetland habitat (which would not exist but

for these high flows) where frogs have become habituated.  Ramey ¶ 26; Diller ¶ 40.

Oregon spotted frogs elsewhere are not doing as well.  Although the frog has persisted

(and even increased) in the habitat afforded by the Upper Deschutes Basin, it has been

completely extirpated from 76 to 90 percent of its historical habitat in Washington, Oregon, and

California.  Diller ¶ 24.  Although Plaintiffs claim the Districts are *the* primary reason for the

frog's listing, that rationale has no support in the listing decision.  *Id.*; 79 Fed. Reg. at 51664

(explaining that the frog elsewhere "has been extirpated from most of its historical range").

The fact that the frog has persisted for more than 60 years (and perhaps even increased in

abundance) in the altered habitat conditions of the Upper Deschutes Basin, whereas the species

has faltered *in most other locations*, is plain evidence that the current habitat conditions in the

Deschutes are not irreparably harming these frogs.  Diller ¶ 11.  As Dr. Diller explains, the frog

"would have long since gone extinct in the region if the construction of the Reservoirs created unsuitable conditions for the species." *Id.*

**C.     The Districts Have Taken Substantial Measures to Protect the Frog.**

For the last seven years, the Districts have been working cooperatively with a diverse set of stakeholders including the BOR, the FWS, conservation groups, and the Confederated Tribe of the Warm Springs, as well as local and state agencies, to develop the Deschutes Basin HCP, pursuant to ESA section 10.  Vaughn ¶ 7.  The HCP is intended to benefit a number of listed species potentially impacted by the irrigation projects, including the frog.  *Id.*  This diverse technical group has spent significant time and resources examining the limiting factors impacting the frog and developing targeted measures that will provide the greatest benefit to the species. Vaughn ¶¶ 7-9.  The "OSF Technical Group," which consists of scientists from FWS, the USFS, the Oregon Department of Fish and Wildlife, the Oregon Water Resources Department ("OWRD"), and the Districts, have developed measures specific to the frog by methodically considering impacts of hydrologic changes intended to enhance frog habitat.  Vaughn ¶¶ 19-20.

Although all available evidence shows that the number of frogs in the basin is not declining and that preliminary injunctive relief is not needed to avoid irreparable harm to this species (Diller ¶ 23), the Districts have proposed, and are now implementing, a suite of Interim Measures designed to benefit the frog in the near term until the ongoing ESA section 7(a)(2) consultation is complete.  Vaughn ¶¶ 18-20, 28; Vaughn Ex. C.

The Interim Measures are discussed in detail by Mr. Vaughn and are summarized as follows:  (1) year-round minimum instream flows of 30 cubic feet per second ("cfs") on Crescent Creek (as compared to the six cfs that would otherwise exist); (2) operation of Crane Prairie Reservoir to provide stable surface water elevation during frog breeding and rearing seasons; (3)

minimum instream flows of 600 cfs below Wickiup Dam from March 31 to September 15 to

benefit spring breeding; and (4) monitoring and adaptive management at frog breeding locations

to evaluate the effect of these measures.  Vaughn ¶¶ 20, 28.  The Interim Measures have the

support of the FWS (Vaughn ¶¶ 21, 28), and are fully consistent with precautionary principles of

wildlife management (Diller ¶ 17).  These measures are more than adequate to ensure that no

irreparable harm occurs to the frog during completion of the consultation process.  Diller ¶ 42.

**D.      The BOR Is Consulting with the FWS Under ESA Section 7(a)(2).**

The BOR initiated formal consultation with the FWS on September 25, 2015, regarding

the effects of operating the irrigation projects pursuant to ESA section 7(a)(2) (16 U.S.C. §

1536(a)(2)).  U.S. Ex. F.  The consultation will be completed by mid-2017.  *Id.*  BOR further

determined, in a written memorandum, that its actions are consistent with ESA section 7(d) (16

U.S.C. § 1536(d)) because the "irrigation districts' continued operation and maintenance of the

Deschutes Project will not irreversibly or irretrievably commit resources" that would foreclose

"the formulation or implementation of any reasonable or prudent alternative measure."  *Id.*

## III.  ARGUMENT

**A.      Plaintiffs' Request for Injunctive Relief Is Subject to the Higher Standard
        Applicable to Mandatory Preliminary Injunctions.**

Issuance of preliminary injunctive relief before the merits of a case have been decided is

an "'extraordinary and drastic remedy.'"  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation

omitted).  An injunction can only issue where a plaintiff makes a "clear showing" and presents

"substantial proof" that an injunction is warranted.  *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997) (per curiam).  The factors considered in whether to grant such relief are well established

and require a plaintiff to demonstrate that (1) it is likely to succeed on the merits; (2) it is likely

to suffer irreparable harm in the absence of such relief; (3) the balance of equities tips sharply in

its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The burden is on the plaintiff to establish each of these four factors. *DISH Network Corp. v. FCC*, 653 F.3d 771, 777 (9th Cir. 2011).

A plaintiff's burden is even *higher* when that party is seeking a mandatory injunction. The purpose of a preliminary injunction is to "preserve the status quo" until the court can reach the merits of the case. *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 808 (9th Cir. 1963). A mandatory preliminary injunction, by contrast, "orders the responsible party to take action" and "'goes well beyond simply maintaining the status quo.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (citation omitted). Mandatory injunctions are "particularly disfavored" and "the district court should deny such relief unless the facts and law clearly favor the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotations omitted). The plaintiffs' burden of proof is "doubly demanding," *Garcia*, 786 F.3d at 740, and courts must be "extremely cautious" about issuing such relief, *Stanley*, 13 F.3d at 1319.

Here, Plaintiffs are seeking a mandatory preliminary injunction. Plaintiffs seek to prevent the Districts from storing water for irrigation, and to impose fundamental changes in the way the projects are operated – in some cases on a daily basis. Ramey ¶¶ 17-20; Vaughn ¶ 32.b. This request "goes well beyond simply maintaining the status quo" by ordering the Districts "to take action," *Garcia*, 786 F.3d at 740 (quotations and citations omitted); *see also Ctr. for Envtl. Sci., Accuracy & Reliability v. Cowin*, No. 1:15-CV-00884 LJO BAM, 2015 WL 3797693, at *8 (E.D. Cal. June 18, 2015) (request to remove salinity barrier to protect endangered fish was a "mandatory injunction" subject to higher standard); *Laughlin River Tours, Inc. v. Bureau of Reclamation,* 730 F. Supp. 1522, 1522 (D. Nev. 1990) (action seeking to "compel[] the defendants to release sufficient waters" was a "mandatory injunction"). Plaintiffs therefore must

meet the high standard applicable to mandatory injunctions.[4]

**B.     Plaintiffs Have Failed to Demonstrate that They Are Likely to Suffer Irreparable Harm Absent an Injunction.**

     **1.     Plaintiffs Must Show Irreparable Harm *to Themselves or Their Members*, Not Merely Harm to Frogs.**

To warrant equitable relief, "plaintiffs must establish that irreparable harm is *likely*, not just possible." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). A "[s]peculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Superior Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984). Likewise, "conclusory allegations are insufficient to establish irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1099 (9th Cir. 2007). This requirement holds with equal force where the alleged harms are environmental in nature. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (alleged harm to woodpecker habitat from logging "at most, showed such a possibility, but no likelihood of irreparable harm"); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (there can be "no presumption of irreparable injury" in environmental cases, including those alleging violations of the ESA).

Moreover, it is not enough for a plaintiff to show irreparable harm to the environment. Rather, a plaintiff must show that the injury to the environment in turn is likely to cause irreparable harm *to the plaintiff*. *See Winter*, 555 U.S. at 20 (explaining that a party seeking injunctive relief must show that "*he* is likely to suffer irreparable harm" (emphasis added)).

---

[4] The Ninth Circuit applies a "sliding scale" approach in some circumstances, allowing a plaintiff to secure an injunction by showing "serious questions going to the merits" and "a balance of hardships that tips sharply towards the plaintiff." *All. of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). That standard does not apply in mandatory injunction cases which "require[] more than a possible or fairly debatable claim; it requires a showing that the law 'clearly favors[s]'" the plaintiff on the merits, as well as "a clear showing of irreparable harm." *Garcia*, 786 F.3d at 744, 746 (citation omitted; second brackets in original).

Plaintiffs are, as a matter of law, distinct from the frog and must demonstrate irreparable harm to *their* interests. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) (animals "do not have statutory standing to sue" under the Administrative Procedures Act or ESA).

The recent decision in *Idaho Rivers United v. U.S. Army Corps of Engineers*, No. C14-1800JLR, 2015 WL 9700887 (W.D. Wash. Jan. 7, 2015), is instructive.  In that case, the plaintiffs (the Nez Perce Tribe) sought to enjoin maintenance dredging arguing irreparable harm to its cultural interest in lamprey and ESA listed salmon based on a "high likelihood" of injury or death to "individual lamprey" and the "take" of a small number of listed salmon.  *Id*. at *7, *9 n.12.  The court flatly rejected that argument, finding that "courts require a showing that the identified harm to the species is '"significant" vis-à-vis the overall population,' and not just that individual animals are likely to be injured."  *Id*. at *7 (quoting *Pac. Coast*, 606 F. Supp. 2d at 1210).  Other courts, including this Court, have reached the same result.[5]

The court in *Idaho Rivers* rooted its analysis on two basic rationales.  First, the court explained that the identified harm ultimately must be *irreparable to the plaintiff*.  In that case, the Nez Perce Tribe had presented evidence that it had a relationship with "the Pacific lamprey species as a whole, and not with individual animals."  *Id*. at *9.  The court held that evidence "that individual lamprey will likely suffer irreparable harm does not equate to irreparable harm to the Tribe."  *Id.*  In so holding, the court in *Idaho Rivers* distinguished cases where a plaintiff had

---

[5] *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (ruling that irreparable harm "must be measured at the *species* level" in the context of an ESA challenge (citing *NWF v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005))); *S. Utah Wilderness All. v. Thompson,* 811 F. Supp. 635, 642 (D. Utah 1993) (Plaintiffs failed to establish that they would suffer irreparable injury since "the coyote population [would] remain viable. . . .  This is not to say that the injuries [p]laintiffs assert are not real, but rather that this court finds that the injury is not irreparable."); *see also Fund for Animals v. Frizzell,* 530 F.2d 982, 986-87 (D.C. Cir. 1975) (death of "10,000 snow geese, or from 10 to 15 percent of the fall flight," was not irreparable absent "substantial possibility that the harvest of excessive numbers of these waterfowl will irretrievably damage the species").

demonstrated an "affinity" for particular animals, *e.g., Humane Soc'y of U.S. v. Bryson*, No. 3:12-CV-00642-SI, 2012 WL 1952329, at *6 (D. Or. May 30, 2012) (finding irreparable harm to plaintiff for death of individual sea lions for "which these plaintiffs have developed an affinity" because those sea lions are therefore not "fungible"), or where a species is so precarious that "the loss of a single individual could result in the extinction of the species," *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1221 (D. Haw. 2001).

That reasoning applies with equal force in this case. Plaintiffs have not shown an "affinity" for particular frogs, and, in fact, do not even provide a declaration from a member who alleges to have seen an Oregon spotted frog in the Upper Deschutes Basin. *See infra* Section III.B.2.a. Plaintiffs' alleged interest in the frog (and it is doubtful that they have any interest at all, as demonstrated in Section III.B.2.a below) is therefore "fungible."

Nor can Plaintiffs show that the status of the frog is so precarious that "the loss of a single individual could result in extinction." Rather, as the listing decision explains, the frog is threatened (the lesser of the two categories for ESA protection), not endangered, and thus *as a matter of law, not in immediate risk of extinction*. 16 U.S.C. § 1532 (6), (20) (defining threatened and endangered); 79 Fed. Reg. at 51707 ("[T]he best scientific and commercial information does not indicate at the present time that the existing threats are of such a great magnitude that Oregon spotted frogs are in immediate danger of extinction . . . ."); Vaughn ¶ 24. As such, assuming, *arguendo*, that Plaintiffs can demonstrate an aesthetic or a recreational interest in the frog, they must show harm to the frog (and their interests therein) that is "'significant' vis-à-vis the overall population," and not just that individual animals are likely to be injured. *Pac. Coast*, 606 F. Supp. 2d at 1210.

The second rationale underlying the *Idaho Rivers* decision comes directly from the ESA

itself.  As the court explained, the ESA *expressly permits take* (including killing) of threatened

and endangered species through an incidental take statement and other means. 16 U.S.C. §§

1536(o)(2), 1539; *Idaho Rivers*, 2015 WL 9700887, at *7.  Accordingly, "if the demise of

individual animals was all that was necessary to demonstrate a likelihood of irreparable harm,

then logically every permitted take of animals under the [ESA] . . . would satisfy this factor of

the *Winter* test for preliminary injunction." *Idaho Rivers*, 2015 WL 9700887, at *7.  The court

rejected the "notion that the 'take' of even one listed salmon or steelhead is an irreparable harm

. . . in favor of a standard that assesses effects on the species as a whole." *Id*. at *9 n.12; *see also*

*Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009) (explaining that

treating harm to an individual animal in the ESA context as irreparable would lead to "an

irrational result" because "[t]he ESA permits incidental takes").

    This rationale is well founded in the statute.  The stated purpose of the ESA is to protect

"species" not individual animals.  16 U.S.C. § 1531(a)(1)-(2).  The ESA achieves that result

through the consultation process, which ensures agency actions are not "likely to jeopardize the

continued existence of any endangered species or threatened species." *Id.* § 1536(a)(2).  While

the ESA generally prohibits the take of *endangered* species, that prohibition is not categorical.

The ESA exempts take (including lethal take) authorized by an incidental take statement under

section 7(b), so long as that take does not "jeopardize" the species, as well as take authorized

under a section 10 incidental take permit, so long as that take "will not appreciably reduce the

likelihood of the survival and recovery of the species in the wild." *Id.* § 1539(a)(2)(B)(iv); *id.* §

1536(o).  Notably, in establishing the hierarchy of protection for listed species, Congress did not

prohibit the take of *threatened* species.[6]  The ESA itself, therefore, does not contemplate that the take of individual animals is irreparable unless that action would "likely jeopardize" the continued existence of the species or "appreciably reduce" the fitness of that species.  Given that the frog is a threatened (not *endangered*) species, even Plaintiffs refrain from making that sort of extraordinary claim.

This rationale is also well supported by the case law.  In *Humane Society of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008), the Ninth Circuit denied a stay request (subject to the *Winter* standard for preliminary injunctions) intended to protect listed species.  Although the evidence was undisputed that, absent a stay, "212 to 2,094 Endangered Species Act-listed spring Chinook salmon" constituting "0.3 to 4.4 percent of these protected fish" would be *killed*, the court concluded that these deaths will not "result in an irreparable harm."  *Id*.  Similarly, this Court in *Audubon Society of Portland v. National Marine Fisheries Service*, 849 F. Supp. 2d 1017, 1049 (D. Or. 2011), refused to find irreparable harm to salmon based on the "take" authorized in a biological opinion ("BiOp") absent evidence that the BiOp's findings and conclusions were erroneous.

Plaintiffs argue they need only show "'a violation of the ESA is likely in the future.'"  Plaintiffs' Brief at 28 (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994)).  But as the court explained in *Idaho Rivers*, that argument misreads *Burlington Northern*:

> Plaintiffs assert that numerous cases in this Circuit have rejected the notion that irreparable harm is measured at the species level. . . .  The cases Plaintiffs rely upon, however, are distinguishable. In *National Wildlife Federation v. Burlington*

---

[6] Instead, Congress gave the Service discretion to prohibit take of threatened species.  16 U.S.C. § 1533(d).  FWS has a "blanket" regulation that extends protections to all threatened species.  50 C.F.R. § 17.31.

> *Northern Railroad, Inc*., the Ninth Circuit affirmed the district
> court's denial of injunctive relief based on the absence of evidence
> of future deaths of members of a protected species, namely grizzly
> bears. This is not tantamount to a statement that the death of
> individual animals would constitute irreparable harm. In fact, the
> court clarified that the standard for an ESA injunction is the
> showing of "a definitive threat of future harm to protected
> species."

*Idaho Rivers,* 2015 WL 9700887, at *8 n.10 (citations omitted). Thus, *Burlington Northern*

confirms what common sense and the ESA require: a plaintiff must show "'a definitive threat of

future harm to protected *species*,'" not just to individual animals. *Id*. (citation omitted; emphasis

added); *see also Defs. of Wildlife,* 812 F. Supp. 2d at 1209 n.2 (distinguishing *Burlington*

*Northern* using same reasoning).

Plaintiffs cite a string of cases (Plaintiffs' Brief at 28), beginning with *Marbled Murrelet*

*v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996), for the proposition that the standard is different in ESA

section 9 cases. But each of the cited cases was decided in the context of a permanent injunction

awarded by the court *after reaching the merits of a case*, not in the context of the extraordinary

remedy of preliminary injunction. *See, e.g.*, *id*. at 1062 (discussing propriety of injunction after

"eight-day bench trial" on the merits). The scope of injunctive relief available after a decision on

the merits is necessarily broader than that available in the context of a preliminary injunction,

and "[n]o court has held that as a matter of law, the taking of a single animal or egg, no matter

the circumstance, constitutes irreparable harm" required to support a preliminary injunction.

*Wild Equity Inst. v. City & County of San Francisco*, No. C 11-00958 SI, 2011 WL 5975029, at

*7 (N.D. Cal. Nov. 29, 2011) (ESA Section 9 case distinguishing *Marbled Murrelet* and similar

cases as related to injunctions after the merits of a case are decided).

In short, Plaintiffs must ultimately show irreparable harm to their own interests, which at

the very least requires showing a significant impact to the frog at a population or species level.

As detailed below, Plaintiffs cannot meet this standard.

> **2.    Plaintiffs Have Provided No Factual Basis to Demonstrate Irreparable Harm Absent an Injunction.**

>> **a.    Plaintiffs Fail to Demonstrate Irreparable Harm to Their Organizations or Members.**

Plaintiffs' motion fails at the outset because it does *not even argue* that WaterWatch, Center for Biological Diversity ("CBD"), or any of their members will suffer irreparable harm in the absence of an injunction.  Plaintiffs therefore fail to make "a clear showing of irreparable harm," and their motion must be denied for that reason alone.  *Garcia*, 786 F.3d at 746.

Plaintiffs' complete silence on this critical point is hardly surprising under the circumstances.  This is not a case where the defendant is about to take some action (such as cutting down a forest) that will eliminate a species' critical habitat.  *Cf. Cascadia Wildlands v. Kitzhaber*, No. 3:12-cv-00961-AA, 2012 WL 5914255, at *2 (D. Or. Nov. 19, 2012).  Nor is this a situation where the status quo is causing a population decline in the area affected by the agency action.  *Cf. NWF v. NMFS,* 422 F.3d 782, 796 (9th Cir. 2005).  To the contrary, there is no evidence that the frogs currently affected by the reservoirs are declining in number. 79 Fed. Reg. at 51666; Diller ¶ 25; Vaughn ¶ 23.

Plaintiffs' declarations confirm the absence of an irreparable harm.  WaterWatch's first declarant, Jeffrey Perin, expresses no recreational, aesthetic, commercial, or other interest *at all* in the frog; his interest is "as a fly-fisherman" and fishing guide and in ensuring that flows are managed for the benefit of those fisheries "instead of only for irrigation."  Perin ¶ 3.  The closest Mr. Perin comes to identifying an interest in the frog is his belief that "what is harming the frog is also harmful to the fish" that he depends on for his livelihood as a river guide.  Perin ¶ 11.  But Mr. Perin makes no claim that he will suffer irreparable harm to his business if the status quo is

maintained for another year until the Court reaches the merits of the case or until the section 7(a)(2) consultation is completed.  His business interests are unrelated to the frog or the purpose of the ESA.  *Garcia,* 786 F.3d at 746 (fear of death "too attenuated from the purpose of copyright" law to establish irreparable harm).  Moreover, the Districts' Interim Measures will likely improve the status quo, ensuring Mr. Perin's interests in fish and flows (and frogs, if he has any) will suffer no irreparable harm.

WaterWatch's second declarant, Kimberley Priestley, also fails to demonstrate a cognizable irreparable injury.  She identifies no personal, recreational, or aesthetic interest in the frog in the Upper Deschutes Basin and does not claim that she will suffer irreparable harm absent an injunction. She claims only that she is concerned that "additional delays will result in the extirpation of the Oregon spotted frog in the Upper Deschutes River," and that she is "personally and professionally concerned" that maintaining the status quo "will continue to cause harm to the Oregon spotted frog unless operations are changed."  Priestley ¶¶ 13, 21.  Her concerns for the frogs do not suffice for purposes of establishing irreparable harm to her personally, and, even if they could, she never explains why a sudden extirpation is likely to occur if the status quo for the last 60-plus years is maintained for one or two more seasons.  Like the first, this second WaterWatch declaration fails to make "a clear showing of irreparable harm."  *Garcia*, 786 F.3d at 746; *see also Idaho Rivers,* 2015 WL 9700887, at *9 n.11 (finding no irreparable harm where Corps has been conducting similar maintenance activity for "more than 50 years" and therefore "this is not a case where consequences of the Corps' dredging activities are largely unknown").

Apparently recognizing that WaterWatch members have no actual connection to the frog, Ms. Priestley further asserts that "WaterWatch will suffer harm to its mission, goals, and objectives – indeed its very organizational purpose – if the Upper Deschutes is not returned to a

more natural flow regime."  Priestley ¶ 16.  But the ESA was intended to protect species, not

"flow regimes."  Moreover, while she also contends that her organization "suffers financial

harm" when it "cannot pursue its mission goals" because potential donors will contribute

elsewhere, these concerns are unrelated to the ESA (*Biodiversity Legal Found. v. Badgley*, 309

F.3d 1166, 1177 (9th Cir. 2002) (injunction must be "necessary to effectuate the congressional

purpose behind the [ESA]")), and are otherwise purely speculative (*Goldie's Bookstore,* 739

F.2d at 472 ("[s]peculative injury does not constitute irreparable injury")).  Finally, she makes no

claim that WaterWatch's mission will be *irreparably injured* if the status quo (under which

WaterWatch has operated for its entire existence) is maintained until the Court reaches the merits

of this case, or until the section 7 consultation is completed.[7]

   CBD's declarant, Tierra Curry, also fails to demonstrate (or even allege) irreparable

harm.  Ms. Curry recreates in the Upper Deschutes Basin and curiously claims that she has never

seen an Oregon spotted frog there (despite visiting Sunriver where there are at least 727 breeding

female frogs).  Curry ¶ 12.[8]  Ms. Curry gets "frustrated" when she is "unable to observe Oregon

spotted frogs in areas where their habitat should exist."  Curry ¶ 13.  She explains that  "when I

do not encounter frogs in a place where they are supposed to be, I do not feel like I am in the

wild and my experience is diminished."  Curry ¶ 15.  Ms. Curry apparently plans to look for the

frog again this summer "at La Pine State Park and below Wickiup Reservoir," and is afraid she

will be frustrated again.  Curry ¶ 14.  But her prior inability to locate the frog – despite their

significant presence at Sunriver and elsewhere in the basin – predates the frog's listing under the

---

[7] Nor does she address the Districts' Interim Measures, which will likely improve the status quo.

[8] Perhaps Ms. Curry should consult with Ms. Simpson, who has had no problem repeatedly finding the frog in its natural habitat in each of her many trips to the Deschutes last fall. Simpson ¶¶ 18, 44, 83-85, 88.

ESA and does not rise to the predicate level of irreparable harm required for an injunction of this magnitude.  Her fear of not finding them in the future is pure speculation.

In short, none of these declarations demonstrate that irreparable harm is likely absent an injunction.  The irrigation projects have been operated in the same manner for many decades; the only difference this year is that the Districts are implementing a significant suite of mitigation measures designed to improve the status quo.  To the extent Plaintiffs actually have some recreational or other interest in seeing the frog, those recreational opportunities have not changed in decades, and are unlikely to do so in the immediate future.  Indeed, "[w]here no new harm is imminent, and where no compelling reason is apparent, the district court was not required to issue a preliminary injunction against a practice which has continued unchallenged for several years."  *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

> **b.  Plaintiffs Fail to Demonstrate that the Frog Will Suffer Irreparable Harm Absent an Injunction.**

Even assuming Plaintiffs could demonstrate that they will personally suffer irreparable harm, in turn, if the frog is significantly harmed, they have made no showing that the frog itself will likely suffer such harm absent an injunction.

The decision in *South Yuba River Citizens League v. National Marine Fisheries Service*, Nos. 2:13-cv-00059-MCE, 2:13-cv-00042-MCE, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013), is directly analogous.  Environmental groups sought a mandatory preliminary injunction under ESA sections 7 and 9 requiring the National Marine Fisheries Service ("NMFS") to impose mitigation measures on the operation of two longstanding hydropower projects, even though the NMFS was in the process of reinitiating consultation under the ESA.  *Id*. at *3.  The district court refused to grant the injunction.  As the court explained, the plaintiffs were required to show that the "requested relief is necessary to avoid irreparable harm *during the interim period* that the

relief is to be provided," and in that case, the consultation was to be completed in 10 months. *Id.* at *7. The court found no irreparable harm because one dam "has been in place[] and has blocked fish passage . . . for more than seventy years," and the other dam "was constructed over a century ago," and therefore any effects "have been ongoing for decades." *Id.* This result is "hardly surprising" "[g]iven the decades that the dams in question have been in place," and "the problematic nature of establishing irreparable harm based on a 10-month window." *Id.* at *8.

Another court reached much the same result in *Wild Equity Institute*, 2011 WL 5975029. In that case, the plaintiffs filed a lawsuit under ESA section 9 and sought a preliminary injunction based on the city's longstanding water pumping activities at a golf course that destroyed red-legged frog egg masses, a species listed as threatened. The plaintiffs argued that the "take" from lost egg masses was sufficient to establish irreparable harm. *Id.* at *8. The court disagreed, explaining that irreparable harm in the ESA context requires a showing that the "action sought to be enjoined will reduce appreciably the species' likelihood of survival or recovery or appreciably diminish the value of their critical habitat." *Id.* at *7 (quotations, citation, and brackets omitted). The plaintiffs in that case did not (and could not) meet that standard because local populations around the golf course were actually increasing, and the defendant was taking measures to reduce the level of take. *Id.* at *8. Thus, as here, "the circumstances do not warrant the exceptional act of prohibiting activity that has gone on for decades before the case can be decided on its merits." *Id.*

Plaintiffs' preliminary injunction request in this case suffers from precisely the same failings. The three irrigation projects have been in place for nearly seven decades. The Upper Deschutes Basin is a "stronghold" for the frog. Diller ¶ 24. The frogs have habituated to the managed river basin and the resulting flows have created new habitat that would not exist but for

the Districts' operations.  Diller ¶ 11.  And, the Districts are taking substantial measures to address the effects of their operations pending completion of the BOR's consultation with the FWS.  While Plaintiffs speculate about a possible "stochastic event" [9] that may occur in the future, Plaintiffs have not come forward with any evidence of population declines in the Upper Deschutes Basin.  Plaintiffs' Brief at 11; Vaughn ¶ 23.  As in *South Yuba, Wild Equity Institute*, and *Idaho Rivers,* "the circumstances do not warrant the exceptional act of prohibiting activity that has gone on for decades before the case can be decided on its merits."

Rather than demonstrating irreparable harm to their own interests, Plaintiffs rest their entire argument on the premise that "harm in the form of desiccated egg masses and dead frogs is irreparable: it cannot be undone."  Plaintiffs' Brief at 29.  But that truism misses the point.  The question is whether "the identified harm to the species is '"significant" vis-à-vis the overall population,' and not just that individual animals are likely to be injured."  *Idaho Rivers*, 2015 WL 9700887, at *7 (citation omitted).[10]

Equally problematic, Plaintiffs fail entirely to explain why the Districts' Interim Measures are insufficient to avoid any irreparable harm (assuming there was any).  For example, Plaintiffs maintain that frogs are impaired by variations in water flow below Wickiup Dam, which could result in egg desiccation (Plaintiffs' Brief at 7-8), and insist that they must have relief by "the first week of April" to protect those egg masses (Plaintiffs' Brief at 30).  But Plaintiffs ignore the fact that under the Interim Measures, the Districts will be providing minimum instream flows below Wickiup Dam of *600 cfs that will be fully in place by March 31, 2016.*  Vaughn ¶ 28.  Simply put, Plaintiffs fail to demonstrate that *they* will suffer irreparable

[9] A "stochastic" event is, by definition, an event "characterized by conjecture" and "involving chance" and therefore entirely speculative.  *American Heritage Dictionary* (2d ed. 1989).

[10] Even if harm to an individual frog or egg mass were enough, as detailed below in Section III.D.3, Plaintiffs have not demonstrated the Districts have caused such harm.

harm, and fail entirely to show irreparable harm to the frog in the absence of an injunction.

### 3.   Plaintiffs' Long Delay in Seeking Injunctive Relief Belies Their Claims of Irreparable Harm.

Plaintiffs' claims of irreparable harm are also fatally undermined by their delay in seeking injunctive relief to protect their interests in the frog.  The Ninth Circuit has repeatedly held that delay in seeking preliminary injunctive relief shows "a lack of urgency and irreparable harm."  *Oakland Tribune*, 762 F.2d at 1377; *see also Garcia*, 786 F.3d at 746 (delay of months before seeking injunction "undercut Garcia's claim of irreparable harm"); *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012).  The reason is that a "preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights," and that "[b]y sleeping on its rights a plaintiff demonstrates the lack of need for speedy action."  *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quotation and citation omitted).  Even short delays (a year or less) fully demonstrate a lack of urgency.[11]

The facts here are more extreme than those at issue in the cases cited above.  The threats Plaintiffs allege from the Districts' operations have been present since at least 1949.  Vaughn ¶ 11; Britton ¶ 6.  The petition to list the frog was submitted in 1989; the FWS found that its listing as threatened was warranted in 1993.  58 Fed. Reg. 27260, 27261-62 (May 7, 1993).  Plaintiffs took no action to protect the frog for *17 years*, when CBD finally filed an action seeking to compel a listing decision.  *See In re Endangered Species Act Section 4 Deadline Litig.*, Case No. 1:10-mc-00377-EGS (D.D.C.).  CBD settled that lawsuit by agreeing to give the FWS nearly *two*

---

[11] *See Protect Our Communities Found. v. U.S. Dep't of Agric.*, 845 F. Supp. 2d 1102, 1113 (S.D. Cal. 2012); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1989) (nine-month and six-month delays undermined claims of irreparable harm); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (delay of 10 weeks "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury" (quotations and citation omitted)).

*and a half additional years* to issue a proposed listing decision (while requiring a much faster response for other species), and then *another full year* to issue a final decision. *Id.* at Dkt. 42-1 (settlement agreement). And even after the frog was listed in August 2014, Plaintiffs still proceeded casually, waiting *another year and a half* to seek injunctive relief. These facts demonstrate "a lack of urgency and irreparable harm." *Oakland Tribune,* 762 F.2d at 1377.

## C.    The Balance of the Equities and Public Interest Weigh Heavily Against Plaintiffs' Injunction Because the Requested Relief Will Actually Harm the Frog.

Every litigant seeking the extraordinary relief of a preliminary injunction must show that the balance of the equities and the public interest favor injunctive relief. *Winter,* 555 U.S. at 22. In the context of an ESA case, "Congress has determined that under the ESA, the balance of hardships always tips in favor of endangered or threatened species." *See, e.g.*, *Marbled Murrelet*, 83 F.3d at 1073. However, a plaintiff seeking a preliminary injunction has the burden to "present the court with some basis on which it can conclude that an injunction would in fact benefit the protected species." *All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1267 (D. Mont. 2014). In "a situation where the species in question would perhaps best be served by the absence of an injunction," the "balance of the equities and public interest prongs [tips] in the Defendants' favor." *Id.*; *see also Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1351 (D. Mont. 2014) ("speculative harms to such species" outweighed by "strong public interest in protecting municipal water supplies from catastrophic wildfire").

Here, Plaintiffs simply presume that the public interest and equities weigh in their favor and make the common mistake of "conflat[ing] the interests of the plaintiff and the interests of the endangered or threatened species." *All.*, 35 F. Supp. 3d at 1266. Plaintiffs provide no evidence that the injunctions they are requesting will actually benefit the frog. Plaintiffs instead propose two different injunctions (the "Regulated Option" and the "Run-of-the-River Option")

that actually result in "substantially different flow regimes." Ramey ¶ 22. Yet, "Plaintiffs are unable to provide a biological basis for proposing a single flow regime." Vaughn ¶ 32.a.

Without any scientific substantiation, Plaintiffs base their radically different injunction proposals on the (false) premise that flows and habitat that "more closely approximate natural conditions in the Upper Deschutes Basin" are inherently better for the frog. Simpson ¶ 92.[12] There are two independent reasons why Plaintiffs' "natural conditions" argument fails.

*First*, there is no scientific basis for the premise that "natural conditions" are superior. As explained by both Dr. Diller and Mr. Vaughn, there is no evidence the frog was more abundant or widely distributed in the Deschutes prior to the construction of the irrigation projects. Diller ¶ 25; Vaughn ¶ 12. Indeed, more than half of the current number of frogs in the Upper Deschutes Basin are found in areas such as Sunriver and Crane Prairie Reservoir, which are manmade and do not reflect "natural conditions." *Supra* Section II.B.

*Second*, their proposed relief will not (and in fact cannot) turn back time and magically return the river to "natural conditions." As Mr. Ramey explains, the three reservoirs have altered the physical morphology of the river itself, including its depth and width and the manner in which the river interacts with the floodplain. Ramey ¶¶ 12, 22. Over the past 60-plus years, the managed system has created new wetland habitats that are now dependent on the altered hydrology of the Upper Deschutes. Ramey ¶ 12. Turning on the faucet to ratchet up flows will not return the habitat to "pre-reservoir" conditions. Ramey ¶ 21.

---

[12] There are serious questions as to whether Ms. Simpson possesses the requisite academic training or practical experience to qualify as an expert under the *Daubert* standard regarding the effects of the Districts' operations on the frog. While she has conducted field work on the frog, and has a working knowledge of its habitat, she is neither a herpetologist like Dr. Diller nor a hydrologist like Mr. Ramey. Nor has she been steeped in the scientific discussions over the last seven years between the Districts and state, federal, and tribal wildlife managers on what is best for the frog in light of the substantial data gaps in the best available science.

More importantly, Plaintiffs' injunction is highly likely to result in serious negative impacts to the frog. The dramatic and abrupt changes proposed by Plaintiffs "would not be scientifically prudent" and will violate precautionary principles of conservation biology. Diller ¶¶ 15-16. Immediately increasing winter flows from 20 to 30 cfs to 600 cfs is "irresponsible," as are changes that could completely drain or deplete reservoir water storage (Vaughn ¶ 12; Diller ¶ 16); these measures will result in precisely the kind of stochastic event that Plaintiffs claim they are trying to avoid. *See* Diller ¶¶ 38-41; Vaughn ¶¶ 25-29, 32.e.

The radically different options proposed also demonstrate that Plaintiffs have not carefully (if at all) thought through what the frog *actually* needs or whether their proposed injunction will *actually* produce those results. This lack of foresight is unsurprising given that Plaintiffs demonstrate very little, if any, actual interest in the frog. Their declarants display an "interest in this litigation" (not an interest in the frog) and in preserving the "best trout fisheries" (Perin ¶ 3), and their organizations' "mission, goals, and objectives" to ensure that the river is "returned to a more natural flow regime" (Priestley ¶ 16). Those who *do* have a vested interest in the frogs' future – the Districts and their hydrologists and wildlife biologists, and the tribal, state, and federal wildlife managers who have been working for years to develop the best strategies for the frog – are not so cavalier. They have been careful *not* to experiment with the frog's fate by embarking on dramatic and sudden flow regime changes, especially given the gaps in available data. Although Plaintiffs profess to know better than the experts, and propose injunctive relief that conveniently coincides with their "mission" to restore the river to a "natural flow regime," they provide no evidence that this injunction is in the frog's best interests.

Indeed, Plaintiffs' cursory hydrological analysis (by Gregory Kamman) is limited to

confirming that there is enough water in the reservoirs to achieve Plaintiffs' request,[13] and contains no analysis of the ecological impact of immediately and radically changing the hydrograph that has existed for more than 60 years.  Ramey ¶ 7.   In so doing, Plaintiffs overlook numerous negative consequences.  Their reservoir management proposals will increase vegetation density (rendering breeding habitat unsuitable) and aid invasive fish and bullfrogs that prey on the frog, which could, in turn, "completely extirpate Oregon spotted frogs."  Diller ¶¶ 20-22.  In addition, the Wickiup releases they demand will drastically reduce the number of days of wetland connectivity (a feature Plaintiffs claim is essential) for the mainstem Deschutes breeding sites.  Ramey ¶ 26.  Their minimum instream flow demand of 40 cfs below Crescent Reservoir would counter-productively result in less water for habitat they believe is essential. Ramey ¶ 28.  And, if the above were not enough, Plaintiffs' Run-of-the-River option could draw down, and even drain, Wickiup and Crane Prairie Reservoirs and seriously harm the numerous frogs residing there.  Ramey ¶ 20; Vaughn ¶ 32.b.  Given these adverse consequences, the frogs here are "best . . . served by the absence of an injunction."  *All.,* 35 F. Supp. 3d at 1267.

If granted, the requested relief would result in other externalities, including an increase in the frequency and severity of flooding in the City of Tumalo (Ramey ¶ 27), the elimination of the use of stored water for irrigation for at least one irrigation district (Horrell ¶ 14), and the abridgement of others' vested water rights (Britton ¶ 20).  It would also require at least one of the Districts to store water in violation of its contract with the BOR, which allows storage exclusively for irrigation and other narrow purposes not relevant here.  Britton ¶ 20.

Plaintiffs' injunction will create widespread economic hardship for ranchers and farmers

---

[13] While Mr. Kamman purports to agree with Ms. Simpson's notions as to what the frogs need, he has absolutely no foundation to express such an opinion.  He is neither a wildlife biologist nor a herpetologist and has no prior experience with the frog.

and will adversely affect the central Oregon economy.  *See* Britton ¶¶ 15-19; Horrell ¶¶ 14-17; Rieck ¶¶ 13-16.  Beyond the economic hardship, the injunction threatens the way of life of many family farmers by impairing their ability to operate a financially viable farm.  Macy ¶¶ 9-11.

The injunction would also require the Districts to violate state water law.  In order to meet their proposed flow requirements, the Districts would have to impound "live flow" in the summer months, but the Districts have no legal right to do so.  Britton ¶ 20.  Only the OWRD can authorize such an impoundment.  Or. Rev. Stat. § 537.130   Plaintiffs are not entitled to an injunction that violates state law.  *Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010) ("federalism principles require the reconciliation of the state law and federal injunctions").

An injunction will also compromise the ongoing HCP process.  Vaughn ¶ 30.  The Deschutes Basin HCP is a rare example of collaboration between disparate federal, state, and local governmental entities, private parties, and tribal stakeholders to foster species enhancement.  *Id*.  The process, if carried to fruition, will provide far greater long-term benefits to the frog than any injunction could achieve.  Diller ¶ 18.   Plaintiffs risk fracturing that cooperative coalition by forcing economic ruin on the farmers and ranchers who rely on these projects for stored irrigation water, and creating an unnecessary judicial showdown between rural Oregon property (water) rights and Plaintiffs' unsubstantiated concerns for the frog.

At bottom, Plaintiffs "are proposing a very expensive and very risky experiment" that lacks the necessary scientific controls and foundation.  Vaughn ¶ 32.c.  The frog, the general public, and central Oregon farmers and ranchers are best served by denying Plaintiffs' motion.

**D.    Plaintiffs Are Unlikely to Succeed on the Merits.**

      **1.    Plaintiffs Lack Standing.**

To satisfy the constitutional standing requirements of Article III, a plaintiff must show,

among other things, that "(1) it has suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical;" and "(2) the injury is

fairly traceable to the challenged action of the defendant." *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).  In environmental cases, the relevant

showing "is not injury to the environment but injury to the plaintiff." *Id.* at 181.  A plaintiff must

make "a factual showing of perceptible harm," and it is not enough to allege that "some

(unidentified) members have planned to visit some (unidentified) small parcels affected by" the

agency action "and will suffer (unidentified) concrete harm as a result." *Summers v. Earth*

*Island Inst.*, 555 U.S. 488, 497-99 (2009) (quotation and citations omitted).  Furthermore, a

"mere 'interest in a problem,' no matter how longstanding the interest and no matter how

qualified the organization is in evaluating the problem, is not sufficient." *Sierra Club v. Morton*,

405 U.S. 727, 739 (1972).

### a.    WaterWatch Lacks Standing.

WaterWatch lacks standing because its complaint fails entirely to make any allegations of

injury to itself or its members.  This failure alone requires its dismissal. *Chapman v. Pier 1*

*Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011).

Even if its complaint contained adequate standing allegations, its declarations fail to

demonstrate an injury in fact or causation.  Mr. Perin's interest (as detailed above) is in ensuring

adequate flows for fly fishing.  The closest he comes to discussing the frog is his claim that

"what is harming the frog is also harmful to the fish."  Perin ¶ 10.  This speculation is not a "'a

factual showing of perceptible harm.'" *Summers,* 555 U.S. at 499 (citation omitted).  Moreover,

any injury related to river flows is caused by legal water appropriations dating back over a

century.  Mr. Perin's speculative injuries are not "fairly traceable" to any alleged ESA violation.

Ms. Priestley also fails to allege a concrete injury related to the frog, asserting only generically that she is "personally and professionally concerned" about it. Priestley ¶ 13. But a "mere 'interest in a problem' . . . is not sufficient." *Morton*, 405 U.S. at 739. Ms. Priestley further states that WaterWatch has (unidentified) "members" who like to "view wildlife" at (unidentified) places in the "Deschutes Basin." Priestley ¶¶ 14-15. But it is well settled that a plaintiff cannot demonstrate standing with allegations that "some (unidentified) members" will visit an area "and will suffer (unidentified) concrete harm as a result." *Summers*, 555 U.S. at 497-98. WaterWatch lacks standing and its claims should be dismissed.[14]

**b.    CBD Lacks Standing.**

CBD sued only BOR and therefore must trace its injury to the BOR's conduct. CBD bases its standing solely on the Curry Declaration. Ms. Curry, as explained above, alleges she is frustrated because she is unable to find the frog in the Deschutes due to habitat degradation. But this habitat degradation occurred many decades ago, and her testimony reveals that her "frustration" dates back 15 years to 2001. Curry ¶ 12. There is no credible argument that these long-standing injuries were *caused* by the BOR's alleged failure to comply with its ESA obligations, which were first triggered in August 2014. CBD therefore lacks standing.

**2.    The BOR Has Initiated Consultation Under ESA Section 7(a)(2) and Complied with the Requirements of Section 7(d).**

Plaintiffs' two procedural claims against the BOR are devoid of merit. First, Plaintiffs claim that the BOR has violated section 7(a)(2) by failing to initiate consultation with the

---

[14] WaterWatch is not saved by Ms. Priestley's claim that WaterWatch will "suffer harm to its mission, goals, and objectives." Priestley ¶ 16. These claims are a "mere 'interest in a problem,'" insufficient to confer standing. *Morton*, 405 U.S. at 739; *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (allegation that regulation "frustrated" the plaintiffs' objectives "is the type of abstract concern that does not impart standing"). Moreover, whether WaterWatch will "suffer financial harm" because it will lose donors and volunteers is entirely "conjectural or hypothetical" not "actual or imminent." *Laidlaw*, 528 U.S. at 180.

Districts regarding Crane Prairie and Wickiup Dams.  The fatal flaw in this argument is that the BOR has, in fact, initiated consultation with the FWS on the irrigation projects' effects on the frog.  Sewell, Ex. 22.  This claim, therefore, will not succeed.[15]

Second, Plaintiffs claim that the BOR has violated section 7(d), which precludes an agency from making "any irreversible or irretrievable commitment of resources" that forecloses "any reasonable and prudent alternative measures."  16 U.S.C. § 1536(d).  Yet, the BOR issued a detailed memorandum explaining that its actions comply with ESA section 7(d), that it "has not made any commitment of resources whatsoever," that it retains sufficient discretion to impose reasonable and prudent alternatives during consultation, that the proposed mitigation measures likewise do not foreclose such alternatives, and that the mitigation measures are likely to improve habitat conditions for the frog.  U.S. Ex. F.  Plaintiffs do not address BOR's memorandum or explain why its conclusions are arbitrary and capricious.  As such, Plaintiffs have failed entirely to demonstrate that "the facts and law clearly favor the moving party." *Garcia,* 786 F.3d at 740 (internal quotation marks and citation omitted).

### 3.    Plaintiffs Are Unlikely to Prevail in Demonstrating that the Districts or the BOR Will Engage in Ongoing Take of Frogs.

To prove a violation of ESA section 9 at trial, Plaintiffs must demonstrate that the defendants (a) took some action; (b) that caused (in fact and proximately); (c) some ongoing "take" to a frog.  16 U.S.C. §§ 1538(a)(1)(A), 1540(g)(1)(A) (defendant must be "in violation" of ESA); *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 700 n.13 (1995) (take claims subject to "'but for' causation" as well as "ordinary requirements of proximate causation and foreseeability").  "[T]ake" includes "wound" or "kill" as well as

---

[15] Plaintiffs maintain that the scope of consultation is too narrow.  This argument has no merit either as the BOR explained clearly that "our evaluation considers the entirety of Deschutes Project operations and maintenance."  U.S. Ex. F.

"harm."  16 U.S.C. § 1532(19).  "Harm" is defined to "mean[] an act which actually kills or injures wildlife," and could include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.  In short, Plaintiffs must prove that the Districts' actions are proximately causing the frog's death or injury.

Plaintiffs do not even *identify* the elements of their section 9 cause of action, let alone marshal the facts required to demonstrate that those elements are met.  For this reason alone, Plaintiffs have failed to meet their "doubly demanding" burden of showing that "the facts and law clearly favor the moving party."  *Garcia,* 786 F.3d at 740 (quotations and citation omitted).

Equally dispositive, Plaintiffs muster no credible evidence to show that the Districts' actions are either killing or injuring frogs.  Plaintiffs' only example of a documented frog death comes from evidence of desiccated eggs discovered in May 2014 when water levels dropped at East Slough.  Plaintiffs' Brief at 9.  This evidence does not show *illegal take at all*, because the event *predates* the listing of the species in August 2014.  Regardless, Mr. Ramey explains that this egg desiccation *cannot* be causally linked to the Districts because water levels in the East Slough appear linked to *groundwater*, not surface water, and the 2014 stranding in East Slough occurred during a time when flows in the Deschutes River *were actually increasing*.  Ramey ¶ 23; Diller ¶ 35.  In other words, at certain water levels, there is no direct correlation between surface water levels and the amount of water in the East Slough, and Plaintiffs, therefore, cannot prove causation.  Indeed, Plaintiffs' singular focus on flows ignores the critical role that groundwater plays in the hydrology of frog habitat on the Deschutes mainstem.  Ramey ¶¶ 8-10.

Plaintiffs will not be able to demonstrate future take.  Even if this past egg desiccation could be linked to the Districts' actions, Plaintiffs have no evidence (and do not even argue) that

similar egg strandings are likely to occur moving forward given the Interim Measures instituted, including the 600 cfs instream flow that will be in place as of March 31, 2016 and the stable reservoir levels that are designed to benefit breeding and rearing.  Vaughn ¶ 28; Diller ¶ 28.

Plaintiffs' only other evidence of "injury" comes from Ms. Simpson, who opines that certain frogs she observed for brief periods were "likely to have increased mortality," that "mortality rates were high," or that observed frogs were highly likely not to survive.  Simpson ¶¶ 83-89.  But as Dr. Diller explains, these allegations are "highly speculative" and, in fact, dubious given the persistence of the frog for decades in this exact habitat.  Diller ¶¶ 28, 37.  Moreover, the "high mortality" rates that Ms. Simpson complains about are part of the *natural cycle for the frog.*  Diller ¶ 31 (frogs are r-selected species with high reproduction rates with low survival); 79 Fed. Reg. at 51559-60 (normal "laying habits" make eggs "extremely vulnerable to desiccation").  Under the best conditions, few Oregon spotted frogs ever reach adulthood or "live near the species' maximum life span."  Diller ¶ 31.  As a result, "it is often difficult to determine whether harm to an individual Oregon spotted frog, tadpole, or egg mass is likely the result of natural phenomenon or the direct result of some other action (e.g. operation of reservoirs to change water flows)."  *Id.*  Simply put, Ms. Simpson's allegations of take are "highly speculative" and will not prevail at trial.  *Id.*; *see also* Diller ¶¶ 30-37 (Plaintiffs' evidence fails to show operation of reservoirs causes harm to frog).

Plaintiffs have put forward no actual evidence of take, and their conjectural theories based on (likely unqualified) expert testimony have serious factual and causation problems. Plaintiffs will not succeed on the merits of these claims.

## IV.  CONCLUSION

For all of these reasons, Plaintiffs' motion for preliminary injunction should be denied. The Districts respectfully submit that the frog would be best served by allowing the FWS – the entity with the unique expertise to grapple with the issues presented at bar – to complete its ESA section 7(a)(2) consultation without interruption or interference.[16]


Respectfully submitted this 2nd day of March, 2016.

STOEL RIVES LLP


/s/ Beth S. Ginsberg
Beth S. Ginsberg, OSB #070890
Jason T. Morgan, WSBA #38346 (*pro hac vice*)
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900
(206) 386-7500 Fax
beth.ginsberg@stoel.com
jason.morgan@stoel.com

David E. Filippi, OSB #965095
david.filippi@stoel.com
Kirk B. Maag, OSB #105507
kirk.maag@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

*Attorneys for Arnold Irrigation District, Central Oregon Irrigation District, Lone Pine Irrigation District, North Unit Irrigation District, and Tumalo Irrigation District*

---

[16] The Districts object to Plaintiffs' request to waive bonding and ask for briefing on that issue if the Court is inclined to grant any injunctive relief.

Page 35   -   Opposition to Plaintiffs' Motion for Preliminary Injunction

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of March, 2016, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court – District of Oregon by using the CM/ECF system.  Participants in this Case No. 15-cv-02358-TC, and 6:16-cv-00035-TC, who are registered CM/ECF users, will be served by the CM/ECF system.


*/s/ Beth S. Ginsberg*
Beth S. Ginsberg, OSB #070890


Certificate of Service