KARL G. ANUTA (OSB #861423)
Law Office of Karl G. Anuta, P.C.
735 S.W. First Avenue, 2nd Floor
Portland, OR 97204
kga@integra.net
Phone: (503) 827-0320 | Fax: (503) 228-6551
*Local Counsel for Plaintiff WaterWatch of Oregon*

JANETTE K. BRIMMER (WSB #41271)
*[Appearing Pro Hac Vice]*
ANNA M. SEWELL (WSB # 48736)
*[Appearing Pro Hac Vice]*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
jbrimmer@earthjustice.org
asewell@earthjustice.org
Phone: (206) 343-7340 | Fax: (206) 343-1526
*Lead Counsel for Plaintiff WaterWatch of Oregon*

LAUREN M. RULE (OSB #015174)
ELIZABETH H. ZULTOSKI (OSB #105482)
Advocates for the West
3115 NE Sandy Blvd., Suite 223
Portland, OR 97232
lrule@advocateswest.org
ezultoski@advocates.org
Phone: (503) 914-6388
*Counsel for Plaintiff Center for Biological Diversity*

THE HONORABLE JOLIE RUSSO
THE HONORABLE ANN AIKEN

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

**CENTER FOR BIOLOGICAL DIVERSITY**,

**Plaintiff**,

v.

**U.S. BUREAU OF RECLAMATION**,

Case No. 6:15-cv-02358-JR
Consolidated with
Case No. 6:16-cv-00035-JR

PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR)

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

**Defendant**,

and

**ARNOLD IRRIGATION DISTRICT, CENTRAL OREGON IRRIGATION DISTRICT, LONE PINE IRRIGATION DISTRICT, NORTH UNIT IRRIGATION DISTRICT, TUMALO IRRIGATION DISTRICT,**

**Intervenor Defendants**.

---

**WATERWATCH OF OREGON**,

**Plaintiff**,

v.

**U.S. BUREAU OF RECLAMATION, CENTRAL OREGON IRRIGATION DISTRICT**, **NORTH UNIT IRRIGATION DISTRICT**, and **TUMALO IRRIGATION DISTRICT**,

**Defendants**,

and

**ARNOLD IRRIGATION DISTRICT, LONE PINE IRRIGATION DISTRICT,**

**Intervenor Defendants**.

INJUNCTION

Case No. 6:16-cv-00035-JR

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................3

I.      PLAINTIFFS HAVE STANDING TO BRING THIS ACTION AND TO
MAINTAIN A REQUEST FOR PRELIMINARY INJUNCTION...................................3

II.     THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION ARE MET.................6

     A.     Plaintiffs Have Demonstrated a Likelihood of Success on the Merits. ..................7

          1.     Defendants have a duty to prove that ongoing actions will avoid
take.........................................................................................................7

          2.     Continued operation of the System will cause take. ...................................9

     B.     BOR's Arguments That It Is Not Violating the ESA are Unavailing....................13

          1.     BOR must reinitiate consultation and take action to protect the
species. ..................................................................................................13

          2.     BOR cannot "change its mind" and evade consultation obligations. ........14

          3.     BOR authorizes activities that result in take...............................................16

     C.     The Harm to Oregon Spotted Frogs Will Be Irreparable......................................17

          1.     The law does not define irreparable harm under Section 9 as
species-level harm..................................................................................17

     D.     Plaintiffs' Proposals Are Achievable and Will Minimize Harm to Frogs in
All Seasons, While Defendants' Proposal Continues to Allow Significant
Harm. .................................................................................................................23

     E.     Even With Balancing the Relative Harms and Public Interest, the Balance
Tips In Favor of Protecting Frogs. ......................................................................27

CONCLUSION.................................................................................................................31

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - i

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF AUTHORITIES

**Cases**

*Am. Tunaboat Ass'n v. Baldrige,*
   738 F.2d 1013 (9th Cir. 1984) ........................................................................ 22

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987) .......................................................................................... 18

*Arizona Cattle Growers' Ass'n v. Salazar,*
   606 F.3d 1160 (9th Cir. 2010) .......................................................................... 8

*Big Country Foods, Inc. v. Board of Educ.,*
   868 F.2d 1085 (9th Cir. 1989) .......................................................................... 19

*Brower v. Evans,*
   257 F.3d 1058 (9th Cir. 2001) .......................................................................... 22

*California ex rel. Lockyer v. U.S. Dep't of Agric.,*
   575 F.3d 999 (9th Cir. 2009) ............................................................................ 18

*Cetacean Cmty. v. Bush,*
   386 F.3d 1169 (9th Cir. 2004) .......................................................................... 3

*Coho Salmon v. Pac. Lumber Co.,*
   30 F. Supp. 2d 1231 (N.D. Cal. 1998) ............................................................ 3

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .......................................................................... 22

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
   789 F.3d 1075 (9th Cir. 2015) .......................................................... 13, 14, 18

*County of Okanogan v. NMFS,*
   347 F.3d 1081 (9th Cir. 2003) .............................................................. 14, 30

*Ctr. for Biol. Diversity v. Salazar,*
   804 F. Supp. 2d 987 (D. Ariz. 2011) .............................................................. 16

*Ctr. for Biological Diversity v. C.L.,*
   2016 WL 233193 (D. Idaho Jan. 8, 2016) .............................................. 18, 21

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
   2011 WL 6813200 (N.D. Cal. Decl., 28, 2011) ............................................ 18

*Defenders of Wildlife v. Bernal,*
   204 F.3d 920 (9th Cir. 2000) .................................................................. 13, 18

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Defenders of Wildlife v. Flowers*,
    414 F.3d 1066 (9th Cir. 2005) ........................................................................ 8

*Defenders of Wildlife v. Jackson*,
    791 F. Supp. 2d 96 (D.D.C. 2011) ................................................................. 8

*Defenders of Wildlife v. Martin*,
    454 F. Supp. 2d 1085 (E.D. Wash. 2006) ............................................... 8, 9, 17

*El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*,
    959 F.2d 742 (9th Cir. 1991) .......................................................................... 5

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*,
    255 F.3d 1073 (9th Cir. 2001) ....................................................................... 3

*Federal Crop. Ins. Corp. v. Merrill*,
    332 U.S. 380 (1947) ...................................................................................... 27

*Forest Conserv. Council v. Rosboro Lumber*,
    50 F.3d 781 (9th Cir. 1995) .......................................................................... 18

*Fund for Animals, Inc. v. Espy*,
    814 F. Supp. 142 (D.D.C. 1993) ................................................................... 27

*Greenpeace Foundation v. Mineta*,
    122 F. Supp. 2d 1123 (D. Haw. 2000) .......................................................... 19

*Humane Soc'y of the United States v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ...................................................................... 14

*Idaho Rivers United v. United States Army Corps of Engineers*,
    2015 WL 9700887 (W.D. Wash. Jan. 7, 2015) ......................................... 4, 19

*Intertribal Sinkyone Wilderness Council v. Nat'l Marine Fisheries Serv.*,
    970 F. Supp.2d 988 (N.D. Cal. 2013) ............................................................ 22

*Kandra v. United States*,
    145 F. Supp. 2d 1192 (D. Or. 2001) ....................................................... 14, 16

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) ...................................................................... 14

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 2000) ................................................................. 14, 30

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ........................................................................ 17

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - iii

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Loggerhead Turtle v. County Council of Volusia County*,
  896 F. Supp. 1170 (M.D. Fla. 1995) .......................................................................... 17, 18

*Marbled Murrelet v. Pac. Lumber Co.*,
  83 F.3d 1060 (9th Cir.1996) .................................................................................... 18

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007) ................................................................................................. 15

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  422 F.3d 782 (9th Cir. 2005) .............................................................................. 18, 27

*Nat'l Wildlife Fed'n v. NMFS*,
  839 F. Supp. 2d 1117 (D. Or. 2011) ........................................................................ 16

*National Wildlife Fed'n v. Burlington Northern Railroad*,
  23 F.3d 1508 (9th Cir.1994) .............................................................................. 20, 21

*National Wildlife Federation v. Nat'l Marine Fisheries Serv.*,
  235 F. Supp. 2d 1143 (W.D. Wash. 2002) ............................................................... 19

*Native Ecosystems Council v. Krueger*,
  946 F. Supp. 2d 1060 (D. Mont. 2013) ...................................................................... 8

*Natural Res. Def. Council v. Houston*,
  146 F.3d 1118 (9th Cir. 1998) ........................................................................... 14, 30

*Natural Res. Defense Council v. Kempthorne*,
  506 F. Supp. 2d 322 (E.D. Cal. 2007) ..................................................................... 16

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*,
  817 F. Supp. 2d 1290 (D. Or. 2011) ........................................................................ 19

*O'Neill v. United States*,
  50 F.3d 677 (9th Cir. 1995) ............................................................................... 14, 30

*Or. Natural Desert Ass'n v. Tidwell*,
  716 F. Supp. 2d 982 (D. Or. 2010) .......................................................................... 13

*Oregon Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ................................................................................. 19

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
  606 F. Supp. 2d 1195 (E.D. Cal. 2008) ................................................................... 19

*Pac. Rivers Council v. Brown*,
  2002 WL 32356431 (D. Or. Decl., 23, 2002) .......................................................... 16

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - iv

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

*Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
    138 F. Supp. 2d 1228 (N.D. Cal. 2001) .................................................................. 30

*S. Yuba Citizens League v. NMFS*,
    629 F. Supp. 2d 1123 (E.D. Cal. 2009) ................................................................... 8

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
    2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) ..................................................... 19

*Seattle Audubon Soc. v. Sutherland*,
    2007 WL 2220256 (W.D. Wash. Aug. 1, 2007) .................................................. 18

*Sierra Club v. Babbitt*,
    65 F.3d 1502 (9th Cir. 1995) ................................................................................. 18

*Sierra Club v. Martin*,
    71 F. Supp. 2d 1268 (N.D. Ga. 1999) ................................................................... 19

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978) ........................................................................................... 7, 27

*Trout Unlimited v. Lohn*,
    559 F.3d 946 (9th Cir. 2009) ................................................................................... 8

*United States v. Akers*,
    785 F.2d 814 (9th Cir. 1986) ................................................................................. 27

*Washington Toxics Coalition v. EPA*,
    413 F.3d 1024 (9th Cir. 2005) ................................................................................. 8

*Wild Equity Inst. v. City & Cty. of San Francisco*,
    2011 WL 5975029 (N.D. Cal. Nov. 29, 2011) .................................................... 20

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................. 17

**Statutes**

16 U.S.C. § 1532(19) ...................................................................................................... 7

16 U.S.C. § 1532(6) ........................................................................................................ 2

16 U.S.C. § 1533(d) ........................................................................................................ 7

16 U.S.C. § 1538(a)(1)(B) ............................................................................................ 19

16 U.S.C. § 1540 ............................................................................................................ 3

16 U.S.C. §§ 1538(a)(1)(B) ........................................................................................... 7

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

50 C.F.R. § 17.3 ............................................................................................................... 7

50 C.F.R. § 17.31 ............................................................................................................. 7

50 C.F.R. §§ 17.21(c) ....................................................................................................... 7

**Other Authorities**

Endangered and Threatened Wildlife and Plants; Threatened Status for Oregon Spotted Frog,
     79 Fed. Reg. 51,658 (Aug. 29, 2014) ........................................................................ passim

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - vi

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

# INTRODUCTION

Bureau of Reclamation ("BOR") and Irrigation Districts (the "Districts") do not dispute

the core issue in this case: that management and operation of the Upper Deschutes River Basin

system of dams and reservoirs is harming and continues to harm threatened Oregon spotted frogs

every season of every year.[1] Yet, except for a few weeks of flow in spring, Defendants propose

nothing more than business as usual (Second Kamman Decl., ¶¶ 2-5), while spending three or

more years (on top of eight already spent) making another effort at a Habitat Conservation Plan

("HCP"). BOR Opp. at 11 (2019 target completion); Moran Decl., ¶ 13 (2019); Willey Decl., ¶

16 (2020).[2] Defendants' arguments are not supported by either the law or the facts.

Oregon spotted frogs are listed as a threatened species under the Endangered Species Act

("ESA"), and dams and reservoirs operated for irrigation are identified as a primary cause of the

frogs' precarious status in the Upper Deschutes and Little Deschutes sub-basins. *See*

Endangered and Threatened Wildlife and Plants; Threatened Status for Oregon Spotted Frog, 79

Fed. Reg. 51,658, 51,668-69, 51,706 (Aug. 29, 2014). True to that finding, the Upper Deschutes

System harms spotted frogs. Further, the harm is to more than a single frog, a single egg mass or

even a single breeding site. Rather, the harm happens at multiple sites every season, at every life

stage, in every year. The ESA requires changes to the System operations to avoid such harm

until a final HCP is completed.

Defendants' arguments are filled with a blizzard of detail to confuse the issue, yet much

---

[1] Again, the Upper Deschutes system at issue in this case is the existence and operation of the Crane Prairie and Wickiup dams and reservoirs on the mainstem Deschutes River and Crescent Lake dam and reservoir on the Crescent Creek/Little Deschutes tributary. All of these dams and reservoirs were built and are now operated for the purpose of irrigation. Together, Plaintiffs will refer to them as the Upper Deschutes system or the "System."

[2] None of these timelines are enforceable, being only statements of expectation or best intention. Moran Decl., ¶ 13.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

of it is irrelevant.  Moreover, these arguments were created as post hoc litigation positions that are unsupported by the actual facts in evidence.  In particular, it is absurd for Defendants to argue that Oregon spotted frogs have "adapted" to the System and are doing just fine.  BOR Opp. at 1, 21; Moran Decl., ¶ 17; Districts' Opp. at 8; Diller Decl., ¶ 11.[3]  The reason U.S. Fish and Wildlife Service ("USFWS") has listed the spotted frog as a threatened species is because it formally found the frog is in danger of becoming "endangered," which places the frog one small step from extinction.  16 U.S.C. § 1532(6), (20).  Moreover, in making that determination, USFWS identified that the specific harm occurring to frogs in the Upper Deschutes and Little Deschutes sub-basins is largely due to the Districts' activities.  79 Fed. Reg. at 51,668-70.  Defendants' "adaptive" argument in favor of business as usual, created solely in response to this legal proceeding, is unsupported by science and wholly inconsistent with USFWS's own findings a scant eighteen months ago.

Similarly, Defendants' arguments that spotted frogs might be harmed by a return to more natural flows, which include higher winter flows, are ridiculous and unsupported.  Defendants make these assertions to support their claim that their "proposal" to achieve minimum flows of 600 cfs starting March 31 of each year is best for frogs.  But, other than starting irrigation releases a few weeks earlier than usual, their proposal is business as usual in the Upper Deschutes Basin.  Defendants' proposal is geared toward preserving high irrigation releases in summer, which eliminates the possibility of higher winter flows.[4]  In order to support this paradigm, Defendants create an argument that there is too much uncertainty and possible harm

---

[3] While BOR is more careful in its assertions admitting that frogs are "stressed" under the current System, BOR also bases its reluctance to change current operations on the claim that frogs have been subjected to this "stressful" environment for seventy years.  Moran Decl., ¶¶ 9, 10.

[4] High, unbounded summer flows mean that the reservoirs are effectively drained by the end of summer, leaving nothing for winter flows.  It is that desire to maintain high summer flows for irrigation that drives the refusal to provide for winter flows.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

from increasing winter flows in the river. Again, this post hoc theory is contradicted by ample

evidence describing the harm to frogs from low winter flows and government agency

recommendations of much higher minimum winter flows. As is set forth below, Plaintiffs have

demonstrated the requirements for a preliminary injunction to change operations in the Upper

Deschutes System in order to protect threatened Oregon spotted frogs until an HCP is completed.

## ARGUMENT

I.     PLAINTIFFS HAVE STANDING TO BRING THIS ACTION AND TO MAINTAIN A
       REQUEST FOR PRELIMINARY INJUNCTION.

Under the ESA, "any person" may bring a citizen suit to enjoin any person from violating

the terms of the Act. 16 U.S.C. § 1540. Organizations with environmental protection missions

frequently bring these citizen suits under the ESA.[5] *See, e.g.*, *Envtl. Prot. Info. Ctr. v. Simpson

Timber Co.*, 255 F.3d 1073, 1079 (9th Cir. 2001) (holding an environmental organization had

standing to bring a citizen suit under the ESA). An organization can satisfy standing either

through demonstrating injury to itself (organizational standing) or injury to its members

(representational standing). *See, e.g.*, *Coho Salmon v. Pac. Lumber Co.*, 30 F. Supp. 2d 1231,

1238 (N.D. Cal. 1998). Furthermore, in the ESA citizen suit context, the requirement for

standing is broader because the statute specifically encourages members of the public to bring

suit to enforce the law. *See id*. at 1240 ("as noted by the Supreme Court in *Bennett,* the

prudential requirement for standing is broadened for suits brought under the citizen suit

provision of the ESA because 'the overall subject matter of [the ESA] is the environment (a

matter in which it is common to think all persons have an interest) and that the obvious purpose

---

[5] The Districts' assertion that animals do not have standing to sue on their own behalf, while
true, is irrelevant in these consolidated cases, where two organizations of humans are plaintiffs.
*See Cetacean Cmty. v. Bush*, 386 F.3d 1169 (9th Cir. 2004) (animals cannot themselves act as
plaintiffs, requiring representation by an organization of humans).

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - 3

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

of the [citizen suit] provision in question is to encourage enforcement by so-called "private attorneys general." '  In keeping with this concern, numerous courts have permitted environmental groups to sue under the citizen suit provisions of the ESA and identical provisions contained in other environmental statutes.") (internal citations omitted).

In an apparent attempt to confuse the requirements for standing with the requirement to prove irreparable harm for a preliminary injunction, the Districts rely on a single Western District of Washington decision to argue an ESA plaintiff must demonstrate that irreparable injury to a species in turn causes irreparable harm to the plaintiff.  The law does not support this conflation of the two standards.  The sole case relied on by the Districts to support this argument, *Idaho Rivers United*, does not mention standing a single time, and in any event does not support this proposition by the Districts.  *Idaho Rivers United v. United States Army Corps of Engineers*, 2015 WL 9700887 (W.D. Wash. Jan. 7, 2015).[6]

Plaintiffs have both organizational standing and standing through their members. WaterWatch has worked for the last decade to achieve more natural flows throughout the Deschutes Basin for all wildlife, including specific efforts geared toward the protection of the Oregon spotted frog.  WaterWatch has devoted significant resources to participating in the multi-species HCP process, submitting organization comments to USFWS on the Oregon spotted frog

---

[6] This Western District of Washington opinion in fact stands for the opposite conclusion to that urged by the Districts.  Rather than finding that a plaintiff *cannot* rely on a demonstration of harm to a species (as the Districts claim), the court found that irreparable harm to a species *can* satisfy the requirement that a preliminary injunction plaintiff prove irreparable harm.  The court explained:

> The harm Plaintiffs alleged to the Tribe, however, is based derivatively on the harm they allege to the Pacific lamprey. . . . Thus, to establish a likelihood of irreparable harm to the Nez Perce Tribe, Plaintiffs must demonstrate a likelihood of irreparable harm to the Pacific lamprey.

*Id*. at *6.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

listing and critical habitat decisions, and advocating for public involvement in those decisions. Priestley Decl., ¶ 12; Second Priestley Decl., ¶ 3-4. WaterWatch's members have provided financial support for the organization's work on the frog. Second Priestley Decl., ¶ 4. WaterWatch has spent organization time and money on efforts to protect the frog, which it otherwise could have used for other purposes. Priestley Decl., ¶ 20. Furthermore, WaterWatch's organizational goal of restoring more protective and natural flows in the Deschutes Basin is directly harmed by the operation of the System. Priestley Decl., ¶¶ 16-20.

BOR cites *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review* for the proposition that an organization has standing when defendants' practices impair the organization's ability to offer its services, and without explanation incorrectly assumes the declaration of Kimberley Priestley fails to make this demonstration. BOR Opp. at n.13. BOR neglects to mention that Ms. Priestley made the precise allegation that was deemed sufficient in *El Rescate Legal Servs., Inc. Compare El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) ("The allegation that the EOIR's policy frustrates these goals and requires the organizations to expend resources in representing clients they otherwise would spend in other ways is enough to establish standing") *with* Priestley Decl., ¶¶ 16-20.

Individually, WaterWatch members and staff Kimberley Priestley and John DeVoe have a demonstrated affinity for spotted frogs in the Deschutes Basin. Mr. DeVoe has spent and continues to spend significant time on the Upper Deschutes fishing, camping, and recreating with his family. DeVoe Decl., ¶¶ 15-17. As he attests, frogs are an integral part of the healthy and complete ecosystem that he enjoys and wants to protect in the Deschutes. *Id*. at ¶¶ 18, 21. He is injured when components of that ecosystem, including the frogs that he listens to and considers

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7330*

integral, are harmed by System operations.  *Id*. at ¶ 21.  Similarly, WaterWatch member and

Board member Jeff Perrin makes clear that both personally and professionally, he is injured

when wildlife, including fish and frogs, are harmed by the System operations.  Perrin Decl., ¶¶ 3,

8-11.  WaterWatch Senior Policy Analyst Kimberley Priestley has also experienced personal

distress caused by the plight of the frogs, in addition to her professional concerns.  Second

Priestley Decl., ¶ 5.

Finally, Center for Biological Diversity ("CBD") has demonstrated organizational and

representational standing.  CBD has worked for more than a decade to list and protect the

Oregon spotted frog throughout its range, devoting resources to the Oregon spotted frog listing

petition, litigation, public education, and advocacy about the frog.  Curry Decl., ¶ 4.  Tierra

Curry, CBD's amphibian and reptile campaign director, has personally been injured by the

decimation of the spotted frog in the Upper Deschutes, a species she has observed in the wild and

seeks out when recreating in Oregon.  *Id*. at ¶¶ 12-15.  The Districts have it backwards when they

claim that Ms. Curry's inability to find the small remaining number of spotted frogs in the Upper

Deschutes is reason to claim that she lacks standing.  The decimation and absence of frogs is the

injury supporting standing, not the absence of standing.  To suggest otherwise is a contortion of

the law.

II.     THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION ARE MET.

Despite the volume of Defendants' pleadings and declarations, the issue to be determined

here is really just a two-step inquiry:  is the harm to Oregon spotted frogs that is an

acknowledged result of System operations irreparable, and, if so, is the better solution one of

Plaintiffs' proffered proposals or Defendants' mostly "business as usual" proposal?  The harm

caused by the System occurs in all seasons, at all frog life stages, and occurs each year at

multiple occupied breeding sites.  Defendants' proposed solution to these well-documented and

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

wide-ranging harms is to provide a few measures to address some of the breeding issues while ignoring the harm occurring in other seasons.[7]  Conversely, Plaintiffs' proposal is based upon the natural hydrograph and is geared toward protecting all life stages and all seasonal habitat at many locations.  As explained below, Plaintiffs have demonstrated likely success on the merits, likely irreparable harm absent an injunction, and that their proposed injunction is tailored to minimize harm to spotted frogs during the ESA consultation and HCP processes.

      A.     <u>Plaintiffs Have Demonstrated a Likelihood of Success on the Merits.</u>

           *1.*     *Defendants have a duty to prove that ongoing actions will avoid take.*

The ESA prohibits "take" by any person or by a federal agency of a threatened or endangered species, 16 U.S.C. §§ 1538(a)(1)(B), 1533(d); 50 C.F.R. §§ 17.21(c), 17.31, with "take" defined to include harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect a species, and "harm" including significant habitat modification or degradation that kills or injures wildlife by significantly impairing essential behaviors such as breeding, feeding, and sheltering. 16 U.S.C. § 1532(19); 50 C.F.R. § 17.3.  Here, Defendants largely acknowledge that take is occurring but advocate for little to no change.  This position is contrary to the purpose of the ESA and Defendants' substantive duties under that Act.

The listing of a species under the ESA means that the status quo is unacceptable and changes must be made to activities that are harming that species.  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978).  Thus, the ESA mandates "institutionalized caution" and aims to "preserve the ability of natural populations to survive in

---

[7] Although Defendants' proposal improves breeding conditions by initiating flows in the Upper Deschutes by March 31, it likely does not begin sufficiently early because Oregon spotted frog eggs have been documented as early as March 14.  Sewell Decl., Ex. 8 at 5, Ex. 9; Second Simpson Decl., ¶ 6; Second Kamman Decl., ¶¶ 2-5.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

the wild" and "promote populations that are self-sustaining." *Arizona Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1167 (9th Cir. 2010); *Trout Unlimited v. Lohn*, 559 F.3d 946, 957 (9th Cir. 2009). "Congress clearly intended that [agencies] give the highest of priorities and the benefit of the doubt to preserving endangered species." *Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1074 (9th Cir. 2005). A "core protection of the ESA" to fulfill this purpose is the prohibition on take under Section 9. *S. Yuba Citizens League v. NMFS*, 629 F. Supp. 2d 1123, 1125 (E.D. Cal. 2009).

Defendants sidestep the well-established institutionalized caution approach to listed species and seem to think it is permissible to continue harming a threatened species while they fulfill their ESA procedural duties. As explained in Plaintiffs' Motion and Memorandum, however, Defendants cannot continue ongoing actions unless they show that those actions will not violate their substantive duties under the Act. Pls'. Mtn. at 20-21. As explained by the Ninth Circuit and other courts, defendants have the burden of proving their ongoing actions are non-jeopardizing to the species in order to continue those actions. *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005); *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1095-97 (E.D. Wash. 2006); *Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 113-14 & n.21 (D.D.C. 2011); *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1076 (D. Mont. 2013).

Those cases were in the context of Section 7 claims and thus focused on the duty to avoid jeopardy, but the same principle would apply under Section 9—Defendants have the burden to prove that any ongoing actions are not going to cause take. Indeed, shortly after the Oregon spotted frog was listed as a threatened species, the U.S. Forest Service ("USFS") issued a memo stating that ongoing actions can only continue during the consultation process if "the adverse

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

effects from any element of the action that could take the listed species are *completely avoided*."
Second Sewell Decl., Ex. 32 (U.S. Forest Service memo) (emphasis added).  Defendants have not met their burden here to show that the ongoing operation of the System will completely avoid take pending the completion of ESA consultation and the HCP process.  In contrast, as explained below, take will continue to occur.  Rather than simply trying to rebut Plaintiffs' proposals, Defendants have a duty to proffer their own interim proposal that *avoids* take, which requires minimum winter flows over 500 cfs in the mainstem.  *See Defenders of Wildlife v. Martin*, 454 F. Supp. 2d at 1098 (enjoining activity that caused take pending completion of consultation).

2. *Continued operation of the System will cause take.*

USFWS has explicitly recognized that System operations are a primary threat to spotted frogs in the Upper Deschutes and Little Deschutes sub-basins, and has made the following statements regarding the harm from these operations:

> Regulated water releases from Crane Prairie and Wickiup Reservoirs result in extreme seasonal fluctuations in stream flows that have affected the amount of overwintering and breeding habitat available for Oregon spotted frogs.
>
> …
>
> At the onset of the storage season in October, the east side of Slough Camp drains rapidly of water, which could result in stranding of frogs that have bred and reared in this location.
>
> …
>
> Egg mass stranding has been observed on three separate occasions along the Little Deschutes River, downstream of the confluence with Crescent Creek, prior to the release of irrigation water (Demmer 2012, pers. comm.).
>
> …
>
> Overwintering habitats may be limited when flows from Crescent Lake typically cease in October at the onset of the storage season.

79 Fed. Reg. at 51,670 (listing rule).

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

The main risk to survival of eggs is stranding in shallow or receding water. This can remove an entire year's cohort from a local population.

Sewell Decl., Ex. 3 at 5 (USFWS proposal).

> In the Upper Deschutes River sub-basin, regulated water releases from Crane Prairie and Wickiup Reservoirs result in extreme seasonal fluctuations in stream flows that have affected the amount of overwintering and breeding habitat available for Oregon spotted frogs along the mainstem Deschutes River between Wickiup Reservoir and Bend, Oregon. . . . Low winter flows typically drain surface water from floodplain ponded habitats, and frogs are limited for overwintering habitat. Because water releases from Wickiup Reservoir typically occur in early to mid-April, potential breeding habitats downstream of Wickiup Dam on the mainstem Deschutes River may not have sufficient water during the breeding season.

Sewell Decl., Ex. 6 (USFWS letter). USFWS has documented take on numerous occasions in the past few years (both before and after their formal listing) due to egg mass stranding and desiccation, or observation of a dead frog. Sewell Decl., Ex. 5, Ex. 6 at 15, Ex. 10, Ex. 14 at 1, 4-6, Ex. 16 at 5-6.[8]

Tellingly, USFWS specifically declined to exempt the incidental take caused by the Districts' activities because those activities are a primary threat to the species. 79 Fed. Reg. 51,705-51,706. In declining to exempt the Deschutes Basin Districts' incidental take under an ESA 4(d) rule, USFWS explained that, "[g]iven the storage, release, and diversion of water in the Upper Deschutes River and the Little Deschutes River were identified in our proposed listing rule as sources of Oregon spotted frog habitat loss or modification, the information provided by DBBC did not provide the information we needed . . ." *Id.* Thus, USFWS has not only

---

[8] The Districts assert that egg mass desiccation documented before spotted frogs were finally listed in August of 2014 somehow does not count as evidence supporting a preliminary injunction and that Plaintiffs have documented only one take. Whether the Districts are legally liable for take on those occasions under the ESA is a separate question not at issue here. Take defined as harm to spotted frogs and their habitat has occurred and has been documented repeatedly under System operations. This is evidence that take will continue under current operations and under Defendants' proposal, supporting a preliminary injunction.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

recognized that Defendants' actions are harming frogs, but has also specifically declined to excuse those takes under the law.

Even the Districts' own expert, Martin Vaughn, has acknowledged that the Districts' activities are adversely affecting spotted frogs. *See* Sewell Decl., Ex. 8 (DBHCP 2015 study plan prepared for the Districts by Biota Pacific). Mr. Vaughn's consulting company issued a study plan which linked spotted frog harm to irrigation practices, stating that sudden water fluctuations have been observed to result in the stranding and desiccation of eggs from March to May, and explaining that because populations are small and isolated, continued pressures could greatly reduce or eliminate entire populations. *See id.* The study plan concludes that "remaining populations have continued to decline despite habitat restoration and management actions." *Id.* at 2-3.[9]

Photos and PowerPoint presentations obtained within the last week from the USFS in response to a July 2015 FOIA request show the extreme fluctuations in Upper Deschutes River water levels, leaving frog habitat dry at many sites early in the breeding season and in the late fall and winter. *See, e.g.*, Second Sewell Decl., Ex. 33. Both the USFWS and the USFS have explicitly recommended winter flows above 500 cfs in order to ameliorate some of the worst annual harm to frogs. *See* Sewell Decl., Ex. 7 at 4; Second Sewell Decl., Ex. 33 at 62-65, Ex. 34.[10]

Direct observations of a stranded juvenile frog during fall drawn-down and the very limited amount of suitable overwinter habitat that exists along the Upper Deschutes and Little

---

[9] These prior statements are in marked contrast to Mr. Vaughn's post-litigation declaration that spotted frog populations are stable, and we should not reduce fluctuations in flow because we lack information to know the full effects of those fluctuations. Vaughn Decl., ¶¶ 20, 12-13.

[10] Plaintiffs inadvertently cited the incorrect exhibit in reference to this fact in their Motion, but the exhibit demonstrating this fact was introduced at that time (Sewell Decl., Ex. 7 at 4). Plaintiffs did not, as BOR suggests, intentionally misrepresent this information to the Court.

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - 11

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Deschutes rivers under current winter flows have also been documented by Plaintiffs' expert Theresa Simpson as recently as fall 2015. Simpson Decl., ¶¶ 43-50. As Ms. Simpson states, it is likely that the observed stranded juvenile frog died due to the fall draw-down and resulting low water levels in the river. Simpson Decl., ¶ 44. The evidence discussed here and in Plaintiffs' motion clearly shows that System operations radically and significantly modify and degrade spotted frog habitat every year by impairing frog breeding, feeding, and sheltering, particularly during the breeding and overwintering seasons. *See* Pls'. Mtn. at 6-15. These harms plainly meet the definition of "take" under the ESA.

Moreover, the documented take will continue to occur this year as the limited changes proposed by Defendants will not prevent take from occurring. Defendants' proposal fails to cap summer flows, which usually far exceed their proposed 600 cfs minimum between late April and September, 79 Fed. Reg. at 51,670, and fails to provide any minimum winter flows or a sufficiently slow fall ramp-down. Thus, frogs will continue to be harmed by fluctuating water depths during late breeding and rearing seasons, quickly receding waters in fall, and a severe lack of suitable overwinter habitat, all of which increase frog mortality. *See* Simpson Decl., ¶¶ 33-55; Second Simpson Decl., ¶¶ 9-14. *See also* Second Kamman Decl., ¶ 2 (Defendants' proposal making things worse in the winter months). In fact, Defendants' proposal actually increases the speed of fall ramp-down by allowing a seven-day ramp-down period, instead of the ten-day period used in 2014, for example. *See* Eitel Decl., Ex. G at 3. Even under a ten-day ramp-down, numerous frogs and fish are stranded. Second Priestley Decl., Ex. 1. A seven-day ramp-down will only increase the likelihood of stranding and killing frogs. Without capping summer flows and providing minimum winter flows and a slower fall ramp-down, harm to frogs in the coming year is certain to occur.

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - 12

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Plaintiffs have shown by a preponderance of the evidence—that it is more likely than not—that Defendants' ongoing actions are reasonably likely to cause take of "one or more" spotted frogs. *Or. Natural Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1005 (D. Or. 2010); *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000). Accordingly, Plaintiffs are likely to be successful on the merits of proving that Defendants are violating ESA Section 9.

B.  BOR's Arguments That It Is Not Violating the ESA are Unavailing.

BOR argues that Plaintiffs' ESA claims against the agency fail for various reasons, but none of its arguments are persuasive, and, in fact, the majority of its response is inapplicable. BOR Opp. 28-32. BOR spends much of its response arguing that it does not have a duty to conduct a new consultation over "project operations," but Plaintiffs never asserted that it did. Instead, the ESA required BOR to *reinitiate* the prior 2003-2005 consultation, and comply with ESA Sections 7(d) and 9 in the interim until that reinitiated consultation is complete.

1.  *BOR must reinitiate consultation and take action to protect the species.*

The Ninth Circuit's recent decision in *Cottonwood Environmental Law Center v. U.S. Forest Service* clarifies that reinitiation of consultation must occur if the agency retains any discretionary control or authority over the action and a new species is listed that may be affected by the action. 789 F.3d 1075, 1086-88 (9th Cir. 2015). Even if BOR does not conduct the day-to-day operation of the dams and reservoirs, it still owns those facilities and retains discretionary control and authority over them and their water deliveries. BOR's DeFlitch Declaration and other exhibits describe various inspections BOR conducts at Crane Prairie and Wickiup dams, as well as its authority over water allocation in the reservoirs. DeFlitch Decl., ¶ 17; Eitel Decl., Ex. F at 1-4, Ex. H at 5-6; Sewell Decl., Ex. 19 at 1. Indeed, one BOR memo specifically noted that BOR must approve changes to the water accounting rules for Crane Prairie and Wickiup reservoirs, and "[t]he consequence of this approval, are changes to the operation and

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

maintenance of the Deschutes project." Eitel Decl., Ex. H at 4. Thus, BOR's own documents show that it retains discretionary control and authority over operation of Crane Prairie and Wickiup dams and reservoirs, and therefore must reinitiate the 2003-2005 consultation due to the listing of the Oregon spotted frog. *Cottonwood*, 789 F.3d at 1086-88.

Moreover, as noted in numerous cases, BOR must comply with the ESA and has authority to alter water deliveries when necessary to protect listed species despite contracts with irrigation districts and state water rights. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 2000); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998); *O'Neill v. United States*, 50 F.3d 677, 682-84 (9th Cir. 1995); *Kandra v. United States*, 145 F. Supp. 2d 1192, 1201, 1204 (D. Or. 2001); *see also County of Okanogan v. NMFS*, 347 F.3d 1081, 1084-86 (9th Cir. 2003) (imposing instream flow requirements for National Forest streams to protect listed fish despite state water rights). The contracts here are similar to those discussed in *O'Neill*, where the United States was not liable for irrigation water shortages caused by drought, errors in operation, or *any other causes*. *O'Neill*, 50 F.3d at 683; Eitel Decl., Ex. B at 19, Ex. C at 11, Ex. D at 19-20 (irrigation contracts). The *O'Neill* Court stated that water unavailability resulting from the mandates of valid legislation constituted a shortage by reason of "any other causes," and thus the Government had discretion to limit water deliveries to comply with other federal laws. *O'Neill*, 50 F.3d at 684.

>    2.    *BOR cannot "change its mind" and evade consultation obligations.*

BOR's position that it has changed its mind about whether it needed to consult in 2003 is not entitled to deference because it is a post hoc litigation position created after Plaintiffs filed this suit, and attempts to interpret the ESA, which is a statute it does not administer. BOR Opp. 30-31; Eitel Decl., Ex. H (post hoc memo); *Humane Soc'y of the United States v. Locke*, 626 F.3d 1040, 1049-50 (9th Cir. 2010) (post hoc litigation positions not entitled to deference);

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (no deference to agency's interpretation of statute outside its administration).  Moreover, this is not a situation where the agency changed its mind before it completed the consultation, as in the case cited by BOR.  BOR Opp. at 31 (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 654-55, 658-59 (2007)).  Here, BOR completed consultation over the continuing operation of Upper Deschutes River projects, and in fact continues to abide by that consultation.  *See* Sewell Decl., Ex. 18 (2003 Biological Assessment); Second Sewell Decl., Exs. 27-31 (2005 Biological Opinion and 2010-2013 annual progress reports).  Indeed, BOR acknowledged the continuing application of the 2003-2005 consultation in its memo.  Eitel Decl., Ex. F at 4.  Once the Oregon spotted frog was listed as a threatened species, BOR had a duty to reinitiate that consultation, and to comply with ESA Sections 7(d) and 9 until that consultation was completed.

On that thin reed of changing its mind, instead of reinitiating the prior consultation, BOR initiated a new, narrower consultation that addresses only potential effects to the Oregon spotted frog from approving the extremely limited changes to the water allocations in Crane Prairie and Wickiup reservoirs the Districts have been willing to make.[11]  Sewell Decl., Ex. 19 at 1.  Even assuming this narrow consultation was appropriate (rather than reinitiating the prior consultation), BOR still has a duty to comply with ESA Sections 7(d) and 9 pending completion of the new consultation.  And that duty dictates immediate changes to the operation of Crane Prairie and Wickiup dams.

As Plaintiffs noted in their Motion, courts have interpreted Section 7(d) to prohibit activities that would continue to harm the listed species while agencies conduct consultation.

---

[11] The Tribe's brief explains why BOR should have reinitiated over the prior consultation rather than embark on the new narrow consultation:  reinitiation would consider impacts to all the species—including the downstream salmon and steelhead about which the Tribe is concerned.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Pls'. Mtn. at 21. With regard to irrigation deliveries, this Court has explained that water releases that did not meet minimum instream flow requirements for salmon were irretrievable and would foreclose implementation of an alternative that involved higher instream flows, contrary to Section 7(d). *Kandra*, 145 F. Supp. 2d at 1210. The same is true here, where water flows that are below the minimum needed to protect Oregon spotted frogs are irretrievable once they occur, yet BOR has not used its authority under the ESA to reallocate water and require higher flows in winter to protect a listed species. Instead, BOR issued a "7(d) determination" *after* Plaintiffs initiated this lawsuit, authorizing the Districts to continue operating according to their existing contracts and according to portions of the Districts' frog proposal that do not require BOR approval. Eitel Decl., Ex. F at 7. As noted above, this proposal has no requirement for winter flows in the Upper Deschutes River, relying only on unspecified "adaptive management" at some point in the future. *Id.* at 8. In addition to the lack of specifics, the "adaptive management" is completely discretionary as to whether any adjustments to operations would be made. Eitel Decl., Ex. F at 8, Ex. G at 8; *Natural Res. Defense Council v. Kempthorne*, 506 F. Supp. 2d 322, 350-57 (E.D. Cal. 2007); *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117, 1125-28 (D. Or. 2011); *Ctr. for Biol. Diversity v. Salazar*, 804 F. Supp. 2d 987, 1001-04 (D. Ariz. 2011) (all rejecting reliance on mitigation or adaptive management that was uncertain and unenforceable). BOR's 7(d) determination is unreasonable, does not show the agency is complying with its substantive duty under the statute, and fails to provide BOR with the cover it seeks.

### 3. BOR authorizes activities that result in take.

Finally, BOR's argument that it is not liable for "take" of Oregon spotted frogs is also flawed. BOR claims that because it does not "operate" the dams, it is not causing take of frogs. BOR Opp. 31. BOR is correct that there must be proximate cause between a defendant's act and the harm to the species to be liable for take. *Id.* However, that proximate cause exists where a

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

defendant authorizes third-party activities that harm a listed species. *See Pac. Rivers Council v. Brown*, 2002 WL 32356431, at *12 (D. Or. Decl., 23, 2002) (liable for take by approving logging operations); *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1090-91, 1098-99 (E.D. Wash. 2006) (caused take by authorizing snowmobiling on National Forest land); *Loggerhead Turtle v. County Council of Volusia County*, 896 F. Supp. 1170, 1180-81 (M.D. Fla. 1995) (caused take by authorizing vehicular beach access). BOR admits it has authority over the allocation of water in the reservoirs and must approve any changes to those allocations. Eitel Decl., Ex. F at 2-4, Ex. H at 4-7. BOR's Section 7(d) determination is itself an action that authorizes continued water allocations and deliveries pending the new consultation. Eitel Decl., Ex. F at 6-8; *Defenders of Wildlife*, 454 F. Supp. 2d at 1097. Because these allocations and deliveries will continue to harm spotted frogs in the interim, BOR is causing take, in violation of ESA Section 9. *Defenders of Wildlife*, 454 F. Supp. 2d at 1098-99.[12]

    C.    <u>The Harm to Oregon Spotted Frogs Will Be Irreparable.</u>

        *1.    The law does not define irreparable harm under Section 9 as species-level harm.*

A plaintiff seeking a preliminary injunction must show "that he is likely to suffer irreparable harm in the absence of preliminary relief . . . ." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least

---

[12] The 2005 Biological Opinion by National Marine Fisheries Service ("NMFS") further belies BOR's position. It includes an incidental take statement that identifies the expected incidental take of steelhead caused by BOR operations, and puts forth terms and conditions to minimize that take, including a requirement to release water from Bowman Dam and Wickiup Dam to ensures a minimum streamflow downstream to protect steelhead. Second Sewell Decl., Ex. 27 (2005 Biological Opinion) at 57-59. Clearly, NMFS construed BOR's authority over the facilities as causing the take.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

of long duration, i.e., irreparable.  If such injury is sufficiently likely, therefore, the balance of

harms will usually favor the issuance of an injunction to protect the environment." *California ex*

*rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009) (quoting *Amoco Prod.*

*Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).  The Ninth Circuit recently reaffirmed that in

ESA cases, "the equities and public interest factors *always* tip in favor of the protected species."

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (emphasis

added).  "[C]ourts may not use equity's scales to strike a different balance."  *Nat'l Wildlife Fed'n*

*v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005).[13]

Defendants nonetheless argue that likely future takings of frogs is insufficient proof of

irreparable harm unless those takings are significant to the species as a whole.  BOR Opp. at 13-

14; Dist. Def. Opp. at 21-23.  Ninth Circuit case law does not support this assertion.  Under the

well-established law of this circuit, "[a] reasonably certain threat of imminent harm to a

protected species is sufficient for issuance of an injunction."  *Marbled Murrelet v. Pac. Lumber*

*Co.*, 83 F.3d 1060, 1066 (9th Cir.1996); *see also Defenders of Wildlife v. Bernal*, 204 F.3d at

925; *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995); *Forest Conserv. Council v.*

*Rosboro Lumber*, 50 F.3d 781, 785 (9th Cir. 1995); *Ctr. for Biological Diversity v. U.S. Fish &*

*Wildlife Serv.*, 2011 WL 6813200, at *4-5 (N.D. Cal. Decl., 28, 2011); *Ctr. for Biological*

*Diversity v. C.L.*, 2016 WL 233193, at *7-8 (D. Idaho Jan. 8, 2016); *Seattle Audubon Soc. v.*

*Sutherland*, 2007 WL 2220256, at *14, *16 (W.D. Wash. Aug. 1, 2007) (citing *Loggerhead*

*Turtle v. Volusia County*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995)).

---

[13] Defendants argue that some higher standard applies because Plaintiffs here seek a "mandatory injunction" as opposed to a preservation of the status quo.  Preservation of the status quo equals dead and harmed frogs, which in turn is a violation of the take prohibition of the ESA.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Although some district courts in the Ninth Circuit have incorrectly required proof of species-level harm in order to justify a preliminary injunction, the vast majority of these cases were either not ESA cases, or were procedural ESA violation cases without Section 9 takings claims. *See, e.g.*, *Idaho Rivers United v. United States Army Corps of Engineers*, 2015 WL 9700887 (W.D. Wash. Jan. 7, 2015) (no ESA claims); *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*, 817 F. Supp. 2d 1290 (D. Or. 2011) (no ESA Section 9 claims); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013) (no ESA Section 9 claims); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195 (E.D. Cal. 2008) (no ESA Section 9 claims).

Regardless of the merit of these district court decisions under Section 7, these cases do not address or affect the standard under Section 9 of the ESA. Section 9 prohibits any person from harming or killing an individual member of a listed species. 16 U.S.C. § 1538(a)(1)(B); *Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007) ("§ 9 of the ESA issues a blanket prohibition on the taking of any member of a listed species."). The purpose of Section 9 is to prevent harm to or death of individual animals. To require a plaintiff to demonstrate that the prohibited take rises to the level of causing jeopardy to the species in order to obtain an injunction illogically requires a plaintiff alleging a take to also demonstrate jeopardy to the species – a finding that is usually made in the course of consultation under Section 7.[14] Again,

---

[14] Other courts have also rejected this view and have granted injunctive relief in situations where an action poses a risk of harm to a species even though it would not result in harm to the prospects of the entire species. *See, e.g.*, *National Wildlife Federation v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1161 (W.D. Wash. 2002) (enjoining dredging in the Snake River based on a finding that "active spawning redds of the Snake River Fall Chinook could be disturbed."); *Greenpeace Foundation v. Mineta*, 122 F. Supp. 2d 1123, 1134, 1138 (D. Haw. 2000) (enjoining lobster fishery because continued fishing might cause injury to individual monk seals). Moreover, requiring plaintiffs to demonstrate impact to the "species as a whole" mischaracterizes the concept of irreparable injury, which has nothing to do with the magnitude of

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

the Ninth Circuit has not imposed such a high standard for an injunction under Section 9, requiring only that plaintiff show that an unlawful take is at least likely in the future. *National Wildlife Fed'n v. Burlington Northern Railroad*, 23 F.3d 1508, 1511 (9th Cir.1994).

Defendants cite only one Section 9 case to support their assertion that species-level harm is required for a preliminary injunction. This unpublished Northern District of California opinion puzzlingly applied the Section 7 standard to its discussion of irreparable harm, and relied only on Section 7 cases. *Wild Equity Inst. v. City & Cty. of San Francisco*, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011). That opinion's failure to apply the Section 9 standard for injunctions described in binding Ninth Circuit cases negates its reliability on this issue.

As a more recent District of Idaho Section 9 decision explained, the approach advocated by Defendants fails to apply this Circuit's standard; namely, that a plaintiff need only show a likely future ESA violation *of the type alleged* to obtain an injunction:

> The defendants cite no § 9 case at the Circuit level holding that plaintiffs have the burden of showing that the likely loss of individual species would be significant for the species as a whole. Indeed, the law in this Circuit appears otherwise: "We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA. This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps. However, what we require is a definitive threat of future harm to protected species, not mere speculation." *National Wildlife Federation v. Burlington Northern Railroad*, 23 F.3d 1508, 1512 at n. 8 (9th Cir. 1994). In that case, brought under § 9 of the ESA, the Circuit required that "the plaintiff must make a showing that a violation of the ESA is at least likely in the future." *Id.* at 1511. The Circuit held that "[w]hile we do not require that future harm be shown with certainty before an injunction may issue, we do require that a future injury be sufficiently *likely*." *Id.* (emphasis in original). *See also Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000) (holding

---

the harm. *See Big Country Foods, Inc. v. Board of Educ.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (party must demonstrate threat of irreparable injury "irrespective of the magnitude of the injury"); *Sierra Club v. Martin*, 71 F. Supp. 2d 1268, 1327 (N.D. Ga. 1999) ("The question of irreparable injury does not focus on the significance of the injury, but rather whether the injury, irrespective of its gravity, is irreparable – that is, whether there is any adequate remedy at law for the injury in question.").

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

> "that a reasonably certain threat of imminent harm to a protected species is sufficient for issuance of an injunction under Section 9 of the ESA").
>
> In accord with this Circuit authority, the Court holds that in order for plaintiffs to satisfy the irreparable harm prong of the injunction test, they "must make a showing that a violation of the ESA is at least likely in the future." *National Wildlife,* 23 F.3d 1508, 1512 at n. 8. The Court will not require plaintiffs to show a significant threat to the species as a whole.

*Ctr. for Biological Diversity v. C.L.*, 2016 WL 233193, at *7-8 (D. Idaho Jan. 8, 2016). The same reasoning should be applied here to conform not only to Ninth Circuit precedent, but also the purpose of the statute. *Nat'l Wildlife*, 23 F.3d at 1512 n.8 ("We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA. This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can be achieved through incremental steps.").

The best available science in this case indicates that multiple spotted frogs at multiple sites within the Upper Deschutes and Little Deschutes sub-basins will be harmed this year without the preliminary injunction. This harm is not restricted to just a few individuals, but instead will likely injure or kill many juvenile and adult frogs along the rivers and around the reservoirs when water levels drop too low to provide suitable habitat. The continued loss of frogs at sites that already have very small abundance, low genetic diversity, and little or no connection to other occupied sites is a significant impact on the sub-basin populations as a whole. 79 Fed. Reg. 51,658, 51,569, 51,686-88. Contrary to Defendants' assertions that the Upper Deschutes and Little Deschutes sub-basin populations are stable or increasing, USFWS has announced it "does not consider" these populations to be of "adequate size or viability." USFWS found that approximately 5,814 breeding adults would be needed at Sunriver *alone* to ensure a high probability of long-term survival at that site. 79 Fed. Reg. 51,701. At the time of the listing decision, there were approximately 581 breeding adults at Sunriver (one of the largest

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

sites in the sub-basin), and only 3,530 breeding adults in the *entire* Upper Deschutes sub-basin.

*Id.* Recent population data shows that most of the sites along the Upper Deschutes River, Little

Deschutes River, Crescent Creek, and around the reservoirs have fewer than 50 breeding females

and are at risk of extirpation due to their small size and isolation from other breeding sites.

Sewell Decl., Ex. 5, Ex. 7 at 2; 79 Fed. Reg. 51,686. *See also* Second Simpson Decl., ¶¶ 32-38.

Importantly, all of these small, at-risk sites are affected by System operations, in contrast

to sites that have larger populations, such as Sunriver, Old Mill, and Big Marsh, which are not

affected by System operations because they have their own water management system or are

upstream of the System facilities. Second Simpson Decl., ¶¶ 10, 33, 38-39.[15] This contrast

provides further proof that System operations are causing harm that perpetuates the small size

and isolation of many occupied sites in the sub-basins, keeping them at risk of extirpation. The

combined factors of low genetic diversity, inadequate population sizes, and lack of connectivity

with other breeding sites lead to a conclusion that the loss of additional eggs or frogs could have

devastatingly large impacts to these sub-basins and the species as a whole. Second Simpson

Decl., ¶¶ 12-15, 33-39.[16] The operation of the System results in and will continue to result in

_____

[15] The claim in the Diller Declaration that it is not known if the Upper Deschutes had larger populations historically is unfounded. Diller Decl., ¶ 25. Not only do the large populations in areas unaffected by irrigation flows refute that claim, but also the report to which Diller refers does not actually support his statement, as explained in Ms. Simpson's second declaration, ¶ 10, n.2. Instead, that report and another USFWS document both assert that the Upper Deschutes Basin historically had larger populations and wider distribution of spotted frogs. Second Simpson Decl., ¶ 10; Sewell Decl., Ex. 3 at 1.

[16] Any uncertainty in the best available science must, consistent with the intent of Congress, be resolved in favor of protecting the species, always giving the species the "benefit of the doubt." *See, e.g.*, *Brower v. Evans*, 257 F.3d 1058, 1070 (9th Cir. 2001) (citing *Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013 (9th Cir. 1984)). *See also Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (Congress intended to give benefit of the doubt to the species); and *Intertribal Sinkyone Wilderness Council v. Nat'l Marine Fisheries Serv.*, 970 F. Supp.2d 988, 997 (N.D. Cal. 2013) (agency obligation to "insure" action will not likely jeopardize a species requires agency to give benefit of the doubt to the species and to place the burden of risk and uncertainty

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

irreparable harm to Oregon spotted frogs throughout the Upper Deschutes Basin, warranting an

injunction to protect frogs while the ESA consultation and HCP processes proceed.

      D.      <u>Plaintiffs' Proposals Are Achievable and Will Minimize Harm to Frogs in All
              Seasons, While Defendants' Proposal Continues to Allow Significant Harm.</u>[17]

The primary thrust of Defendants' argument in favor of business as usual on the Upper

Deschutes System is that Oregon spotted frogs have "adapted" to the highly-altered irrigation

system, and that moving the river back to a more natural condition will somehow hurt them.

These arguments were crafted to support their litigation position—allowing for the System status

quo—but the evidence is entirely contrary to their assertions.

Evidence provided with Plaintiffs' Motion and Memorandum supports the need for year-

round changes to water flows, rebutting Defendants' position that summer and winter flows can

remain at current levels.  The Oregon spotted frog is listed as threatened under the ESA, meaning

that the best available science demonstrates to the satisfaction of the USFWS that the spotted

frog is in danger of becoming endangered.  An endangered species under the ESA is one that is

on the brink of extinction.  Plainly, spotted frogs are not "adapted" to their current situation.

Moreover, the effects of dams, reservoirs, and diversions for irrigation on wetland habitat and

frogs are cited as a cause of the frogs' current precarious status, and specifically a primary threat

to the frogs in the Upper Deschutes and Little Deschutes sub-basins.  79 Fed. Reg. at 51,668-70.

Observations by agency scientists and Ms. Simpson in the last several years demonstrate

that the System continues to harm frogs and frog habitat every year.  USFWS has documented

stranded and desiccated egg masses, and government PowerPoint slides show wildly fluctuating

---

on the action (here operation of the System), not on the species).

[17] Plaintiffs focus primarily on the run-of-the-river proposal in this reply because it is an easier
plan to implement and provides significant protection for frogs, but their alternate proposal is
also feasible and would significantly benefit frogs as well.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

inundation levels between seasons.  Sewell Decl., Ex. 5, Ex. 6 at 15, Ex. 10, Ex. 14 at 1, 4-6, Ex.

16 at 5-6; Second Sewell Decl., Ex. 33.  Ms. Simpson personally observed the effects of a rapid

fall draw-down in 2015, which led to the severely limited overwinter habitat available along the

rivers and around the reservoirs.  Simpson Decl., ¶¶ 44-50.[18]  These annual and ongoing effects

have limited frogs to isolated sites with small numbers of breeding females that are well below

what is considered a viable, self-sustaining size.  Second Simpson Decl., ¶ 34.  This evidence

does not show that frogs have adapted; rather, it shows that frogs continue to die every year and

remain at very low levels due to the operations of the System.[19]

It is similarly without merit for Defendants to claim that Plaintiffs' run-of-the-river

proposal will actually harm frogs, as opposed to Defendants' proposal which largely perpetuates

the current harmful state.  USFWS and the USFS have both documented that low winter flows

and extreme fluctuations in flows between seasons harm spotted frogs in these sub-basins.  79

Fed. Reg. at 51,670; Sewell Decl., Exs. 4-7, 10; Second Sewell Decl., Ex. 33.  Both USFWS and

the USFS have recommended more than 500 cfs for winter flows in the Upper Deschutes River

to support frogs and other species.  Sewell Decl., Ex. 7 at 4; Second Sewell Decl., Ex. 33 at 62-

---

[18] None of Defendants' biology experts discuss personal observations of spotted frogs in the
Upper Deschutes Basin or anywhere else.  In contrast, Plaintiffs' expert has been observing
spotted frogs, their behaviors, and their seasonal habitat use for almost twenty years.  Simpson
Decl., ¶¶ 10-17.  Indeed, Ms. Simpson's continuing research and monitoring of spotted frogs
resulted in her discovering new occupied sites in the nearby Williamson sub-basin, which
resulted in USFWS revising its proposed critical habitat rule for the frog.  79 Fed. Reg. 34,687;
Second Sewell Decl., Ex. 35 (email from Ms. Simpson).  While Defendants' experts claim they
do not know much about the frog's winter habitat use in the Upper Deschutes (Willey Decl., ¶
32; Vaughn Decl., ¶ 17), Plaintiffs' expert documented habitat conditions and spotted frog use of
habitat during nineteen visits to the area before, during, and after the fall draw-down in 2015.
Simpson Decl., ¶¶ 18, 44-49.

[19] Again, the fact that the population of frogs at Sunriver is stable or even increasing supports
Plaintiffs' argument as the Sun River Nature Center has its own source of water and water level
management system that is separate from the river and generally unaffected by the System's
operation.  Second Simpson Decl., ¶¶ 33, 35.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

65, Ex. 34.  Defendants argue that the "benefits" of the current System—extremely high and unnatural flows in the summer months that are the desire of the Districts—mean that many acres of wetlands are flooded each summer.  That may be true, and Ms. Simpson's original declaration includes that observation, but that condition also means many frogs are left stranded far from the river during the rapid fall draw-down, and those that survive the draw-down must crowd into the little suitable overwinter habitat that exists while the reservoirs refill, increasing predation risk and frog mortality.  Second Simpson Decl., ¶ 5; *see also* Second Kamman Decl., ¶¶ 2-5.  As explained by Ms. Simpson, the harm to frogs from rapid fall draw-down and minimal winter flows far outweighs any benefit from high summer flows.  Second Simpson Decl., ¶¶ 16, 19.

Finally, it is wholly without merit for Defendants to claim that returning flows to a more natural condition is somehow harmful to spotted frogs.  Plaintiffs suggest changes to the currently harmful System operations that will follow the natural hydrograph as much as the current system of dams and reservoirs will allow.  Kamman Decl., ¶ 8 and Ex. B at 10-12; Second Kamman Decl., ¶ 9.  Each of Plaintiffs' proposals would protect frogs across all seasons and life stages.  *See* Pls'. Mtn. 31-34; Simpson Decl., ¶¶ 93-96.  Most importantly, they would eliminate the sharp and extreme changes in river flows that currently occur in a matter of days or weeks, which leaves eggs desiccated in spring and juveniles and adults stranded and dying or vulnerable to predation and freezing in isolated shallow pools or mid-river channels in fall and winter.  Simpson Decl., ¶¶ 92-93; Second Simpson Decl., ¶¶ 4-5; Kamman Decl., Ex. B at 10, 13.  Gradual operational changes in water levels give frogs time and aquatic pathways in which to respond to natural fluctuations and to move between seasonal habitat areas.  Plaintiffs' proposals would also stabilize water levels in Crane Prairie and Wickiup reservoirs and maintain inundation of edge vegetation around the reservoirs rather than dropping to levels that eliminate

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

all or most habitat around the reservoirs in summer and fall.  Kamman Decl., Ex. B at 10;

Simpson Decl., ¶¶ 74-76 and 93(g); Second Simpson Decl., ¶¶ 29.

Defendants claim that Plaintiffs' proposals are not feasible, but these assertions are based

on a misunderstanding of Mr. Kamman's work.  Mr. Kamman explains Defendants' incorrect

assumptions in his second declaration, and also explains why Plaintiffs' proposals are indeed

feasible, focusing on the run-of-the-river option.  Second Kamman Decl., ¶¶ 10-11.  Mr.

Kamman's modeling of the run-of-the-river approach is accurate and shows that the reservoirs

will not run dry, as BOR claims.  Second Kamman Decl., ¶ 11.  He also demonstrates that the

regulated approach is based on available water supply (not set in stone cfs figures as BOR seems

to think) and therefore flows would be adjusted based on the water supply.  Second Kamman

Decl., ¶ 10.  Mr. Kamman demonstrated that Plaintiffs' proposals will result in more stable flows

and reservoir levels, and flows that inundate important frog habitat year-round in accordance

with Ms. Simpson's observations and analysis of the seasonal habitat needs of frogs.  Kamman

Decl., Ex. B; Second Kamman Decl., ¶¶ 6, 8, and 11.

Defendants' proposal, on the other hand, will continue to cause the extreme fluctuations

in flows between seasons, including the highly detrimental rapid fall draw-down, as well as

extremely low winter flows that are known to harm frogs.  *See generally* Johnson Decl.;

Kamman Decl., Ex. B.  Defendants make no attempt to model an approach that would provide

higher winter flows and less fluctuation between seasons, instead simply refuting the values

Plaintiffs used in their regulated approach.  But Defendants chose to ignore the known harm to

frogs occurring in fall and winter in order to avoid sacrificing high summer flows for the

Districts.  Defendants' proposal to start irrigation flows a few weeks early will not provide much

benefit if the hoped-for increase in reproduction is negated by high mortality in fall and winter.

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

Second Simpson Decl., ¶¶ 16, 19.

Defendants' bevy of unknown and unarticulated risks that *might* arise from Plaintiffs' proposals do not justify allowing the *known and observed* harm to frogs to continue to occur under Defendants' proposal. Defendants' violations of the ESA through continuing take of frogs demands an injunction that avoids or minimizes that take in all seasons. Any other result is a clear violation of the law. Plaintiffs have demonstrated that their proposals are feasible and will address harm in all seasons, and thus are appropriate forms of relief tailored to avoid further ESA violations and irreparable harm to spotted frogs in the Upper Deschutes Basin.

    E.    <u>Even With Balancing the Relative Harms and Public Interest, the Balance Tips In Favor of Protecting Frogs.</u>

In ESA cases, courts do not apply traditional equitable balancing because the "plain intent of Congress in enacting the statute was to halt and reverse the trend toward species extinction, whatever the cost," and, thus, "the balance has been struck in favor of affording endangered species the highest of priorities . . . ." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184, 194 (1978). Accordingly, the Ninth Circuit recently reaffirmed that in ESA cases, "the equities and public interest factors *always* tip in favor of the protected species." *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1091 (emphasis added). "[C]ourts may not use equity's scales to strike a different balance." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005).[20] Even if the Court does balance the harms and public interest, however, the balance weighs in favor of the threatened species.

---

[20] This principle is consistent with courts' approach to finding that it is in the public interest to ensure enforcement and compliance with environmental laws. "[T]here is a strong public interest in meticulous compliance with the law by public officials," *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) (*citing Federal Crop. Ins. Corp. v. Merrill*, 332 U.S. 380, 387-88 (1947)); and "the public interest <u>requires</u> strict enforcement of the [CWA] to effectuate its purpose of protecting sensitive aquatic environments." *United States v. Akers*, 785 F.2d 814, 823 (9th Cir. 1986) (emphasis added).

REPLY IN SUPPORT OF MTN. FOR PRELIM. INJUNCTION
(Consolidated Case No. 6:15-cv-02358-JR) - 27

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

Plaintiffs recognize that Defendants are moving forward with processes that will hopefully make long-term changes to System operations to protect spotted frogs in the Upper Deschutes Basin via an HCP. Indeed, Plaintiff Waterwatch has been participating in that very process. Priestley Decl., ¶ 12. While Plaintiffs encourage all parties to continue to pursue that result, they are concerned about the length of time it will take to complete the process, and the harm that will continue to occur to frogs in the interim. The HCP process was initiated in 2008 and only recently was a draft plan issued—a draft that both USFWS and Oregon Department of Fish and Wildlife ("ODFW") criticized. Second Sewell Decl., Ex. 37 (USFWS comments), Ex. 36 (ODFW letter calling draft "biologically insufficient and unsupportable"). Defendants estimate that it will take another four to five years to complete the HCP, an unenforceable timeline that may not even be realistic given the protracted process thus far with only minimal will for change. Moran Decl., ¶ 13 (2019); Willey Decl., ¶ 16 (2020). Even the narrow ESA consultation that BOR has initiated will not be completed for almost a year and a half assuming the agencies meet all of their expected timelines, which is rare based on Plaintiffs' experience. The history of the HCP and the unenforceability of the deadlines to complete these processes warrant an injunction to prevent continuing harm to spotted frogs in the interim.

While Plaintiffs are sensitive to the need for and importance of irrigation with the region, the evidence demonstrates that those needs can be met while still protecting frogs if irrigators implement conservation measures. *See* Second Priestley Decl., ¶¶ 10-13. Recently, consultants working with Basin work-groups have studied water use in the Upper Deschutes Basin and have demonstrated that vastly more water is currently diverted from the river than is actually delivered on farm, and that even less is actually applied to crops. *See* Sewell Decl., Ex 23 at 7, 9, 15. For example, almost three times more water is diverted by Central Oregon Irrigation District than is

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

actually applied to crops.  *Id.* at 7.  There are significant inefficiencies and waste in the current system that, if addressed, will ensure water is available for crops and to comply with the ESA. *Id.*; *see also* Priestley Second Decl., ¶¶ 10-13; Second Kamman Decl., ¶¶ 13-14.

Plaintiffs also recognize amicus Confederated Tribes have an interest in resources affiliated with the Deschutes River, and certainly respect those interests.  The Tribes express generalized concerns that Plaintiffs' proposals may harm its varied interests, but do not explain specifically what that harm would be or how it would come about when the affected resources are so far downstream.  *See generally* Tribe Br.; Brunoe Decl.  For example, the Tribes express generalized concerns about impacts to downstream salmon, Tribe Br. 15, but the 2005 Biological Opinion included terms and conditions to protect those fish, which will continue to be in effect even if Plaintiffs' requested relief is granted.  *See* Second Sewell Decl., Ex. 27 at 58-60.  The only other evidence the Tribes point to about potential harm to its interests is the declarations filed by Defendants, but as Plaintiffs have discussed throughout this brief, that harm is unsubstantiated and unsupported, particularly with respect to effects many miles downstream below Bend.  The Tribes are an important party to the HCP process, but have not explained how Plaintiffs' proposals to restore river flows to more natural conditions would injure their interests.

Finally, Defendants' assertion that a preliminary injunction as requested by Plaintiffs will "force" BOR and/or the Districts to break state water law is a misstatement of that body of law. As explained above, BOR retains authority over the water allocations in Crane Prairie and Wickiup reservoirs (operation of the reservoirs and agreements regarding order of fill and release).  *See supra* pp. 13-14 (citing DeFlitch Decl., ¶ 17; Eitel Decl., Ex. F at 1-4, Ex. H at 4-6; Sewell Decl., Ex. 19 at 1).  While state water rights are involved here, management of the System is governed by contracts and federal law.  *See* Eitel Decl., Exs. A-E.  In fact, the Districts

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

have altered their contractual relationships readily enough within the last year to implement the proposal for releases from Crane Prairie. Eitel Decl., Ex. G.

The law is well-developed that BOR may reduce irrigation deliveries despite contracts and state water rights that call for higher flows if necessary to comply with federal law, including the ESA. *See Houston*, 146 F.3d at 1126; *O'Neill*, 50 F.3d at 682-84; *Patterson*, 204 F.2d at 1213; *see also Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1250 n.20 (N.D. Cal. 2001) (court found that state water law does not preempt or supplant the ESA and that state water rights were subject to protections necessary for listed species); *Okanogan*, 347 F.3d at 1084-86 (holding that NMFS could impose instream flow requirements for National Forest streams to protect listed fish despite state water rights). An injunction requiring compliance with the ESA may lead to some reordering of operations among the various districts, but it does not force noncompliance with state law, and state water rights do not preempt or supplant requirements under the ESA.

The balance of hardships and public interest always tip strongly in favor of protected species. *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1091. Plaintiffs seek temporary measures that will protect the small populations of spotted frogs found in the Upper Deschutes and Little Deschutes sub-basins while the ESA consultation and HCP processes are completed. These pockets of remaining frogs are barely surviving, and often dying, in extremely adverse habitat conditions. By turning a blind eye to continued take of these frogs during the HCP process, the Defendants excuse their violations of the ESA and put these frogs at great risk of extirpation.

///

///

///

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA 98104*
*(206) 343-7340*

CONCLUSION

Based upon the foregoing, Plaintiffs respectfully request that the Court grant their motion for preliminary injunction and order Defendants to implement one of the two proposals recommended by Plaintiffs.

Respectfully submitted this 14th day of March, 2016.

*/s/ Janette K. Brimmer*
JANETTE K. BRIMMER (WSB #41271)
*[Appearing Pro Hac Vice]*
ANNA M. SEWELL (WSB # 48736)
*[Appearing Pro Hac Vice]*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
jbrimmer@earthjustice.org
asewell@earthjustice.org
Phone:  (206) 343-7340 | Fax:  (206) 343-1526

*Lead Counsel for Plaintiff WaterWatch of Oregon*

KARL G. ANUTA (OSB #861423)
Law Office of Karl G. Anuta, P.C.
735 S.W. First Avenue, 2nd Floor
Portland, Oregon  97204
kga@integra.net
Phone:  (503) 827-0320 | Fax:  (503) 228-6551

*Local Counsel for Plaintiff WaterWatch of Oregon*

*/s/ Lauren M. Rule*
Lauren M. Rule (OSB # 015174)
Elizabeth Hunter Zultoski (OSB # 105482)
Advocates for the West
3115 NE Sandy Blvd., Suite 223
Portland, OR  97232
lrule@advocateswest.org
ezultoski@advocates.org
Phone:  (503) 914-6388

*Counsel for Plaintiff Center for Biological Diversity*

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

CERTIFICATE OF SERVICE

I certify that on March 14, 2016 , I electronically filed the foregoing with the Clerk of the

Court using the appellate CM/ECF system, which system will serve all parties who are registered

participants.


*/s/ Janette K. Brimmer*
Janette K. Brimmer

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*